UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN MCKENNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 21-cv-0941-DLC |
| SANTANDER INVESTMENT SECURITIES, | ) |
| INC., SANTANDER HOLDINGS, USA, | ) |
| INC., and OMAR KARIUKI, in his individual | ) |
| and professional capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DEFENDANTS' REPLY 56.1 UNDISPUTED STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Santander Investment Securities, Inc. ("SIS"), Santander

Holdings, USA, Inc. ("SHUSA") (SIS and SHUSA together, "Santander"), and Omar Kariuki

(Kariuki, SIS, and SHUSA together, "Defendants") by and through their attorneys, Nelson Mullins

Riley & Scarborough LLP, respectfully submit the following Reply Statement of Undisputed

Material facts, for which they assert there is no genuine issue to be tried in support of their Motion

for Summary Judgment. This Reply 56.1 Statement consolidates Defendants' 56.1 Statement,

includes Plaintiff's response to each paragraph (reflected by "Response") and Defendant's reply

to paragraphs contained in Plaintiff's Opposition 56.1 Statement (reflected by "Reply").[1]

---

[1] These facts are largely undisputed and to the extent they are disputed they are set forth in the light most favorable to Plaintiff. The facts are based, in part, on the documents produced in discovery and depositions taken in this matter and shall be cited to herein as follows: deposition of Plaintiff, Erin McKenna ("McKenna Dep. Tr., at ___"); deposition of Omar Kariuki ("Kariuki Dep. Tr., at ___"); deposition of William Garvey ("Garvey Dep. Tr., at ___"); deposition of Juan Minuesa ("Minuesa Dep. Tr., at ___"); deposition of Christina Yahn ("Yahn Dep. Tr., at ___"), deposition of Laura Kao ("Kao Dep. Tr. at __"); deposition of Thomas Steckroth ("Steckroth Dep. Tr. at ___"); and supporting Affidavits of Beatriz Retamar ("Retamar Aff. ¶ ___"); David Headden ("Headden Aff. ¶ ___"); Omar Kariuki ("Kariuki Aff. ¶ ___"); Supplemental Affidavit of Omar Kariuki ("Supp. Kariuki Aff.¶___"); Barry Sherman ("Sherman Aff. ¶__); Frank Cignarella ("Cignarella Aff. __"); Brian Molinari ("Molinari Aff. ¶__); and Affidavit of Mitchell Boyarsky ("Boyarsky Aff. ¶_). Copies of the deposition transcript pages and other documents cited herein are attached as exhibits to the Supplemental Affidavit of Mitchell Boyarsky ("Supp. Boyarsky Aff. ¶ ___"). Additional

A. **About Defendants.**

    I.    **Santander Entities.**

1.    SHUSA is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A., ("Banco Santander") a global banking group. (Kariuki Aff. ¶ 6.) SHUSA is the intermediate holding company for U.S. businesses and the parent organization of several financial companies, including SIS.2 (*Id.*)

    **RESPONSE:** Admit.

2.    The business purpose of SIS is to meet client demand for Fixed Income products, mainly U.S. Investment Grade, Asset Back Securities ("ABS"), and European Government and Latin American ("Latam") issued bonds. (Boyarsky Aff., ¶ 4, Ex. 1 at DEFENDANTS028013; *id.* ¶ 5 Ex. 2 at DEFENDANTS027985.) SIS provides a range of investment advisory services, including execution, research, clearing and investment strategies to ultimate parent and client, Banco Santander, S.A., and additional clients in the United States. (Kariuki Aff. ¶ 7.) SIS traders are authorized to trade on behalf of Banco Santander under a Service Level Agreement signed between SIS and Banco Santander. (Boyarsky Aff., ¶ 4, Ex. 1 at DEFENDANTS028014; *id.* ¶ 5, Ex. 2 at DEFENDANTS027985.)

    **RESPONSE:** Admit.

3.    Due to Santander's expertise in Latin America ("LatAm") and its local presence, SIS also facilitates Latin American business activities. (Boyarsky Aff., ¶ 4, Ex. 1 at

---

exhibits are attached to the Second Supplemental Affidavit of Mitchell Boyarsky ("2nd Supp. Boyarsky Aff. ¶ _"). To the extent Defendants rely upon the allegations in Plaintiff's administrative charge of discrimination filed with the Equal Employment Opportunity Commission on February 4, 2021 ("Charge"), the Amended Complaint filed on May 24, 2021 (ECF No. 20), Plaintiff's discovery responses and deposition testimony, Defendants assume the facts set forth therein are true for the purposes of this motion only and expressly reserves the right to contest their validity in subsequent proceedings, including trial, if necessary.

2 SHUSA and each of its wholly-or majority-owned subsidiaries will be collectively referred to as Santander U.S. Entities.

DEFENDANTS028014; *id.* ¶ 5, Ex. 2 at DEFENDANTS027985.) This is achieved through coordination with the local affiliates in the region, flow of information from and to the region, and providing market intelligence among the New York office, the head office in Madrid, and the various affiliates located in Latin America. (*Id.*) SIS may execute trades with its affiliates or through operations acting as agent or as principal with counterparties through the inter-dealer broker screens transacting with institutional clients (*i.e.*, money managers, asset managers, investment advisors, pension funds, hedge funds, and private banks) with whom it deals with on a solicited and unsolicited basis. (*Id.*) SIS trades against the Banco Santander books in Madrid and therefore, client trades generate two tickets: one from the Banco Santander books in Madrid to SIS, and another from SIS to the client, effectively transferring risk and positions to Banco Santander. (*Id.*)

**RESPONSE:** Admit.

4.     Santander maintains an Equal Employment Opportunity policy, which was in effect during Plaintiff, Erin McKenna's, employment. (Boyarky Aff., ¶ 6, Ex. 3.) McKenna is aware of this policy as she signed a letter acknowledging receipt of Santander's employee handbook on May 1, 2018.  (Boyarsky Aff., ¶ 7, Ex. 4; *id.* ¶ 8, Ex. 5.)

**RESPONSE:** Deny that the document cited establishes that "Santander maintains and Equal Employment Opportunity policy" of which McKenna was aware.  The policy states that SIS "reserves the right to modify, suspend or revoke any and all policies, procedures and programs, in whole or in part, and to institute new policies, procedures and programs, at any times, with or without notice."  Def. Ex. 3, DEFENDANTS002894.

**REPLY:** Plaintiff has introduced no evidence that the policy in place at McKenna's hiring was substantially different from the policy cited in the record.

5.      Kariuki, head of U.S. Institutional Sales at SIS, received EEO training on multiple occasions during his employment.  (Kariuki Dep. Tr., at 48:19-49:11.)

**RESPONSE:** Deny that the record shows that Kariuki completed these trainings. On the contrary, records submitted show that he scored a "0" on multiple assessments.  Ex. 1, DEFENDANTS000139.

**REPLY:** The "Completion Status" for each training in Pl. Ex. 1, DEFENDANTS000139 is "Successful," unequivocally demonstrating that Kariuki completed the trainings.

6.      Kariuki is an African American male who as a single parent and raised his daughter on his own including caring for her while simultaneously attending the Tuck Business School at Dartmouth College, where he obtained his M.B.A. and was a merit scholar. (Kariuki Aff. ¶ 3; Boyarsky Aff., ¶ 9, Ex. 6.)

**RESPONSE:** Admit.

7.      Kariuki has significant experience in selling fixed income financial products and managing sales employees including as a Vice President at Morgan Stanley Investment Bank, Director at UBS Investment Bank and Vice President at Citigroup.  (Kariuki Aff. at ¶ 4.)

**RESPONSE:** Admit.

8.      Kariuki has faced adversity in the financial services industry as an African American, which is well-known to be an under-represented population in the financial services industry.  (Kariuki Aff. ¶ 5.) Kariuki therefore in his management of others considers the personal experience he endured based on his race in treating colleagues and subordinates with equality, dignity and respect.  (*Id*.)

**RESPONSE:** Admit that this accurately reflects the contents of the affidavit.  However, object to the evidence as inadmissible, as it is "evidence of [Kariuki's] character" offered "to prove

that on a particular occasion [he] acted in accordance with that character," i.e. that he did not discriminate against McKenna.  As such, the testimony is inadmissible under Fed. R. Evid 404(a)(1).

**REPLY:** Plaintiff has placed Kariuki's character as relates to discrimination in issue by her allegations that Santander, under Kariuki's management, was a "boys' club" with a culture of discrimination against women. *See* Pls. Mem. of Law in Opp'n to Def. Mot. for Summ. J. ("Opp.") Evidence of Kariuki's character with regard to discrimination in the financial services industry is thus admissible under Fed. R. Evid. 404(a)(1).

9.     William Garvey, Managing Director, Head of Investment Grade Trading, received EEO training on multiple occasions during his employment. (Garvey Dep. Tr., at 118:11-24.)

**RESPONSE:** Admit only that Garvey received training on "the discrimination laws."  Def. Ex. 64, Garvey Dep. at 118:11-13.

10.     Garvey attended Massachusetts Institute of Technology earning a B.S. in Management Science and has significant institutional trading experience prior to joining Santander including as an Executive Director of Credit Trading at Scotia Capital USA, Executive Director of Credit Trading at Nomura Securities, and Senior Vice President of Credit Trading at HSBC. (Boyarsky Aff., ¶ 10, Ex. 7.)

**RESPONSE:** Admit.

11.     Christina Yahn, Senior Human Resources Business Partner ("HRBP") for Santander Corporate and Investment Banking ("CIB"). (Yahn Dep. Tr., at 24:1-20.)   Yahn knows about unlawful discrimination and Santander provides annual EEO training for managers and employees and coaching if they have questions. (Yahn Dep. Tr., at 25:7-27:6.)

**RESPONSE:** Admit only that Yahn provided "annual training for managers and employees." Def. Ex. 70, Yahn Dep. at 26:24-25.

**REPLY:** Yahn's undisputed testimony establishes that Yahn was aware of the concept of unlawful discrimination. (Supp. Boyarsky Aff., ¶ 13, Yahn Dep. at 25:14-26:16 ("Q. And were you aware that employers were required to provide reasonable accommodations to employees with disabilities?  A.  Yes.  Q.  And were you also aware that employees were entitled to job protected leave for pregnancy?  A.  Yes.  Q.  And were you also aware that it was unlawful – that it is unlawful to retaliate against an employee for being pregnant, seeking an accommodation or seeking job protected parental leave?  A.  Yes")).  Yahn's undisputed testimony also establishes that it was Yahn's role to "coach [managers on EEO policies] if they have questions or are unsure of anything." (Supp. Boyarsky Aff., ¶ 13, Yahn Dep. at 27:3-4.)

12.     Beatriz Retamar Gomez, HRBP for SIS and Santander Bank, N.A. in New York regularly received EEO training throughout her employment.[3] (Retamar Aff. ¶¶ 4-5.)

**RESPONSE:** Admit.

**II.    Omar Kariuki.**

13.     In 2016, Kariuki joined SIS as an Executive Director in the Fixed Income Institutional Sales Department. (Kariuki Dep. Tr., at 28:2-25.) Less than a year after he joined SIS, SIS promoted Kariuki to be the Head of Emerging Markets Sales. (*Id.* at 28:17-25.)

**RESPONSE:** Admit.

---

[3] Several of Defendants' witnesses have had position or title changes since the key events in this litigation commenced. For purposes of this Statement of Facts, Defendants identify the titles that the witnesses held at the time of the key events in this lawsuit.

14.     Kariuki is currently the head of U.S. Institutional Fixed Income Sales ("Fixed Income Sales") at SIS where he leads a team of ten people. (Kariuki Dep. Tr., at 27:21-23; Boyarsky Aff. ¶ 11, Ex. 8.)

**RESPONSE:** Admit.

**B.  FINRA Rules, Regulatory Requirements, and SIS's Fixed Income Front Office Procedure.**

15.     SIS is an institutional broker-dealer registered with the Securities and Exchange Commission ("SEC") and is a member of the Financial Industry Regulatory Authority ("FINRA"). (Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028013; *id*. ¶ 5, Ex. 2 at DEFENDANTS027985.)

**RESPONSE:** Admit.

16.     FINRA requires individuals engaged in the securities business to be registered with FINRA and to maintain active required licenses. (*Id*.) Sales and trading personnel require the Series 7 (General Securities Representative Exam) and the Series 63 (Uniform Securities Agent State Law Examination). (*Id*.) Until a Sales & Trading Fixed Income employee has all the necessary FINRA registrations, as confirmed by SIS's Compliance department, such employee may not act in a capacity that requires registration. (*Id*.)

**RESPONSE:** Admit, except deny that Defendants strictly complied with these rules.  In late 2020, Santander hired Chris Frina [*sic*], even though he did not have either a Series 7 or Series 63 license, Def. Ex. 66, Kariuki Dep. at 57:23-24, and he could not effect any trades until he earned the Series 7. Id. at 59:7-9.  This took him four to six weeks to accomplish.  *Id.* at 61:13-17.

**REPLY:** Plaintiff misstates Kariuki's testimony, which clearly establishes that Chris Farina did not effect any trades until he earned the Series 7, in compliance with FINRA regulations. (Supp. Boyarsky Aff., ¶ 9, Kariuki Dep. Tr., 59:7-9.) Farina had extensive experience in emerging markets, for which he was hired, had a license to work in Europe and previously worked in Europe

for a European asset manager and worked for a South African asset manager that required him to have a European license. (*Id.*, 56:8-25.)

17.     Under FINRA Rule 3110, member firms are required to establish and maintain a system to supervise the activities of its associated persons (*i.e.*, individuals employed by broker/dealer firms involved in sales or the supervision of sales) that is reasonably designed to achieve compliance with the applicable securities laws and regulations and FINRA rules. (Boyarsky Aff. ¶ 12, Ex. 9.) Rule 3110(b)(4) further states that the "supervisory procedures required by this paragraph (b) shall include procedures for the review of incoming and outgoing written (including electronic) correspondence and internal communications relating to the member's investment banking or securities business." (*Id.*)  Member firms are also required to review: (i) "incoming and outgoing written (including electronic) correspondence to properly identify and handle in accordance with firm procedures, customer complaints, instructions, funds and securities, and communications that are of a subject matter that require review under FINRA rules and federal securities laws"; and (ii) "internal communications to properly identify those communications that are of a subject matter that require review under FINRA rules and federal securities laws." (*Id.*)

**RESPONSE:** Admit that this accurately describes the FINRA rules cited.  Admit that the FINRA regulation sets forth general guidelines within which members such as Santander had significant discretion.  Admit, accordingly, that FINRA did not bar any of Santander's employees from executing trades from home.  Ex. 10, Kariuki Dep. at 201:21-22 ("Other than the bank's policy, no, no regulatory rules.")  For instance, Garvey testified that he executed trades remotely before the pandemic.  Ex. 5, Garvey Dep. 111:13-15.

**REPLY:** Plaintiff's Response selectively quotes Kariuki's testimony.  (Licul Aff., ¶ 11, Kariuki Dep. at 201:21-14) ("Other than the bank's policy, no, no regulatory rules.  *Not that I am aware of.  There may be.  I just don't know.*") (emphasis added).  Kariuki—a layperson manager, not an attorney—did not testify as an expert witness and is not an authority on FINRA regulations.  His inability to cite regulations in his deposition does not support a disputed fact.  In fact, "[t]he FINRA Regulations and securities laws, which apply to SIS, require supervision of traders and institutional sales employees to place trades in a secure environment." (Cignarella Aff. ¶ 5.) Banking regulators including FINRA modified trading rules and regulations to allow for remote trading after the onset of COVID-19 that did not exist before.  (Id. at ¶ 16.)

Plaintiff's Response misstates Garvey's testimony.  Garvey did not testify that he had executed trades from home.  Rather, he testified that when he needed to execute "a trade with Asia overnight [while he was at home], [Garvey has] asked traders in London to execute trades on our behalf." (Licul Aff., Ex. 5, Garvey Dep. 111:13-15.)  Garvey did not himself effect the trade.  Rather, he provided all the information necessary for a trader who was in the office to execute the trade because he knew that "we are explicitly not permitted to do trades from home." (*Id*. at 111:17-18.)

The SIS policy is consistent with FINRA and other regulatory obligations prior to the COVID-19 Pandemic to prohibit sales employees and traders to place trades while working remotely. (Cignarella Aff., ¶ 5.)  Cignarella, a Director in the IT Department who worked for over 30 years in the Banco Santander New York Branch and SIS IT Department, and the former CIO of Santander from 2000 – 2013, is unaware of any salesperson or trader working remotely and placing trades. (Cignarella Aff. ¶¶ 2-4, 6.)

9

Plaintiff ignores other relevant FINRA rules including FINRA Rule 3110(b)(1) that requires members to "establish, maintain, and enforce written procedures to supervise the types of business in which it engages and the activities of its associated persons." (Boyarsky Aff., Ex. 9.) The supervisory procedures must include, inter alia, "procedures for the review by a registered principal, evidenced in writing, of all transactions relating to the investment banking or securities business of the member," "procedures for the review of incoming and outgoing written (including electronic) correspondence and internal communications relating to the member's investment banking or securities business," and "procedures to capture, acknowledge, and respond to all written (including electronic) customer complaints." (*Id*. at Rule 3110(b)(2 – 5).) Once a FINRA regulated bank establishes methods for supervision of personnel, the bank must enforce its procedures; it does not have discretion to waive them on an ad hoc basis. (Id. at Rule 3110(b)(1)).

18.    In compliance with FINRA Rule 3110 and other FINRA rules, SIS maintains a Fixed Income Sales & Trading Front Office Manual ("Front Office Manual"), which governs the activities of the front office staff engaged in the Fixed Income sales and trading business of SIS. (Boyarsky Aff. ¶ 4, Ex. 1; *id*.¶ 5, Ex. 2.)

**RESPONSE**: Admit that Santander maintained such rules.  Deny any implication that FINRA required Santander to implement any specific internal rules.  *See supra*, response to ¶ 17.

**REPLY:** FINRA rules required Santander to maintain a secure work environment for institutional sales employees. (*See supra*, reply to ¶ 17).  Moreover, prior to the COVID-19 Pandemic, SIS did not have appropriate and compliant technology to allow traders and salespeople who placed trades to work remotely.  (Cignarella Aff. ¶ 5.)

19.    SIS's Front Office Manual is located on SIS's Intranet and can be easily accessed by employees. (Headden Aff. ¶ 5.)

**RESPONSE:** Admit.  Object to the testimony as irrelevant, as the fact that the Front Office Manual can be easily accessed by employees is not "of consequence in determining the action." Fed. R. Evid. 401(b).

**REPLY:** The accessibility of the Front Office Manual to employees is relevant to Defendants' defense that they "acted in good faith, in an appropriate, businesslike and commercially reasonable manner, and without malice or intent to injure Plaintiff," as it provides evidence that Defendants acted in accordance with published guidelines available to and able to be known by all Santander employees.  (Defendants' Ans. To Am. Compl., p. 20.) Specifically, the Front Office Manual states:

Front Office staff [i.e., those engaged in the sales and trading activities of the Fixed Income Departments], must be fully aware of and comply at all times with SIS policies and procedures that impact their business activities and personal actions.  References to those policies and procedures are included within the context of this manual.

. . .

The[se] . . . policies and procedures are available on the Santander Policy IQ page.  Questions should be addressed to your immediate supervisor.  Exceptions to any policy or procedure are prohibited without the pre-approval by senior management.  Such cases must be extremely rare.

(Boyarsky Aff., Ex. 1, at  DEFENDANTS028014) (emphasis added.)  The open access to the Manual demonstrates SIS's publication and broad dissemination of a legitimate, non-discriminatory policy regarding the absence of remote working that Plaintiff claims she was discriminatorily denied.  (*Id*.)  During her deposition, McKenna testified that she was aware that regulated entities must have procedures in place to supervise institutional sales and trading.  (Def. Ex. 67, at 23:2-5.)

11

20.     To ensure that each transaction is conducted in compliance with FINRA's rules and regulations, as well as federal securities laws, only approved methods and systems outlined in the Front Office Manual may be used for executing transactions by traders and salespersons in SIS. (Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028019-DEFENDANTS028020; ¶ 5, Ex. 2 at DEFENDANTS027989-027009.) The approved methods and systems that may be used for executing transactions by traders and salespersons include: (i) corporate email; (ii) telephone (only via a recorded channel on the trading floor); (iii) Bloomberg Messaging System; (iv) Bloomberg HG and Latam E-trading pages; (v) Bloomberg Bon Trader (for US treasures); (vi) Bloomberg EGB and Gilts pages (Banco Santander Madrid); (vii) Market Axess (Latam and Madrid desks); (viii) TradeWeb; (ix) Inter-Dealer Matching Broker System; (x) SAN E Book (for Primary Issuances); and (xi) MTS Bond Vision.  (*Id*.) Any other proposed new method or system to be used to execute transactions must first be approved by the Head of U.S. Markets and the SIS Chief Compliance Officer. (*Id*.)   Further, when a new application is proposed, additional approval processes are required, as governed by corporate policy (*e.g*., IT, Information Security, Risk Committee., Risk Committee Cost Management, etc.)  (*Id*.)

**RESPONSE:** Deny that any of the cited regulations mention, involve or incorporate federal securities laws in any way.  Further deny any implication that these specific rules were necessary for Santander to comply with FINRA rules and regulations.  *See supra*, response to ¶ 17.  Otherwise, admit that these systems "may be used for executing transactions," and that they have been available for executing such transactions from home at all times relevant to this action. *See infra*, response to ¶ 21.  As such, Santander employees were able to make a "seamless" transition to working from home. Ex. 2, Steckroth Dep. at 89:22.  Santander employees were able to quickly "plug in" and remotely connect to their work computers.  *Id*. at 90:2-5; Ex. 3, Minuesa

Dep. at 94:15-19 ("We just sent people all the hardware home, and they didn't have to do anything. We sent everything there, and there was support from the IT department.")  Once they were set up, employees would then sign an attestation that they were following Santander's work from home regulations.  Ex. 4, DEFENDANTS026390-26391.

**REPLY:**  FINRA rules required Santander to maintain a secure work environment for institutional sales employees.  (*See supra*, reply to ¶ 17.)  Plaintiff's Response quotes only half of Juan Minuesa's testimony regarding the process of converting Santander to a work-from-home workforce in response to an unprecedented global pandemic.  While individual employees who work in the front office to make sales and place trades may not incurred much technology modifications, cost or preparation to transition to work from home, at the enterprise level Santander "need[ed] to provide hardware, laptops, monitors, turrets to communicate and give access to the – to the local network to be able to monitor, supervise.  *It is complex.*"  (Licul Aff., Ex 3, Minuesa Dep. at 94:9-13) (emphasis added);  (*See infra*, reply to ¶ 27.)  The testimony of single salesperson that he was able to "seamlessly transition to working from home does not create a disputed fact as to the burden on Santander to update their systems and provide the hardware necessary to allow Mr. Steckroth and others to "plug in" and work from home. (Licul Aff., Ex. 2, Steckroth Dep. at 89:22, 90:2-5.)  Santander's Work from Home attestation neither authorizes employees to work from home ("Note that this does NOT imply that you are allowed to work from home at this point") nor creates a disputed fact as to the burden on Santander of allowing employees to work from home or whether FINRA regulations would allow salespersons to effect trades from home.

When the COVID-19 Pandemic disrupted SIS's business operations, in order for SIS to convert to a remote working platform for traders and institutional salespeople, SIS undertook an

extensive study of technology and regulatory obligations for an investment bank. (Cignarella Aff. ¶ 12.) For this effort, SIS deployed an oversight committee called the Gold Committee supported by several subcommittees. (*Id*.) Cignarella served on several subcommittees. (*Id*.) Multiple representatives participated on each subcommittee, which met regularly. (*Id*.) It took several weeks for these committees to engage in a full review, conduct testing of the remote setup and make recommendations for the implementation of a technologically-stable and legally-compliant remote work platform for traders and sales people. (*Id*.) Ultimately, it took SIS several months to establish a remote work environment for traders and institutional sales employees.

During the period of time that it took SIS to set up a remote work platform, SIS repurposed and built out its business continuity location in Hawthorn, New York for traders and institutional salespeople from its New York office to work. (Cignarella Aff. ¶ 13.)

One of the major challenges for remote trading existed due to the absence of technological infrastructure, including that the computer equipment used by traders and salespeople did not contain the capability to record communications that took place for trading. (Cignarella Aff. ¶ 14.) Prior to SIS's conversion to a platform that enabled remote working, salespeople and traders used a computer workstation containing a turret, which is a specialized phone that enables traders to perform a number of tasks that they ordinarily would not be able to perform on a regular telephone, including but not limited to, visualizing and prioritizing calls from clients and making instantaneous calls by pushing the a single button to access dedicated telephone lines. (*Id*.) The turret also records the communications on the NICE System, which stores the recording. (*Id*.) Per SIS policy, trades cannot be placed on a personal cellphone, and must be performed on a turret or recorded phone because calls placed on a personal cellphone are neither recorded nor secure and against corporate policy. (*Id*.) As part of the change to remote working, SIS deployed laptops

which were previously prohibited and installed soft turrets in the laptop computers used by traders and institutional salespeople to place trades. (*Id*. at ¶¶ 5, 7-8, 14.) Through the use of a headset with Voice Over Internet Protocol—a technology that allows phone calls to be placed over an Internet connection instead of a regular phone line—the "soft" turrets allow for the recording of conversations between salespeople and their clients on a corporate voice recording system. (*Id*. at ¶ 14.)

Another technological impediment that affected a conversion to remote working is a secure firewall to protect SIS' electronic communications from interception by third parties. (Cignarella Aff. ¶ 10, 14.) As part of the change to remote working, SIS enhanced its firewalls to allow for remote access for the traders and sales to in order to protect communications made from remote locations. (*Id*.)

An additional communications limitation to conduct remote working was the absence of a VPN capability for the traders and sales people to allow communications directly into SIS's trading systems and other secure and proprietary systems. (Cignarella Aff. ¶ 15.) Santander needed to enhance its VPN capability to allow traders and institutional salespeople to access Santander's trading and other secure, proprietary systems. (*Id*.)

21.    Under the Front Office Manual, off-premises trading at SIS is expressly prohibited unless it falls into one of the enumerated exceptions. (Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028029-028030; *id*. ¶ 5, Ex. 2 at DEFENDANTS028000-028001.) The Front Office Manual defines off-premises trading as "the execution of trades through telephone lines (e.g., trading over cellular or personal telephone lines or via on or off-site e-mail) whereby the execution is not recorded on the SIS voice systems or the execution of trades is off-site of SIS." (*Id*.) The enumerated exceptions include: (1) times of financial emergency; (2) Acts of God; (3)

contingency or unexpected development in the global financial markets; or (4) after hours which could adversely affect Santander's position whereby a trader (or a salesperson at their client's request) needs to execute a trade off-premises and has been authorized to do so in writing prior to closing the transaction by the Head of Fixed Income. (*Id*.)

**RESPONSE:** Admit that Santander purported to maintain the policy described.  Deny that this list of exceptions accurately reflects the document cited.   The document also includes "holidays in NY (when Latam markets are open)" as an exception.   Def. Ex. 1, DEFENDANTS028029-028030.  Defendant is unabashedly omitting unfavorable evidence.  The Front Office Manual clearly demonstrates that it was possible for employees to work off premises at all times relevant to this action.  *See supra*, response to ¶ 20.

**REPLY:** Plaintiff's misinterpretation of the Front Office Manual to mis-portrays the Manual to allow off-premises trading, using the example that a trade placed during a holiday in the US when Latam markets are open is irrelevant, given that Plaintiff has introduced no evidence that Plaintiff sought to make off-premises trades in any scenario analogous to the exigent circumstances described in the Front Office Manual.  (Def. Ex. 1, DEFENDANTS028029-028030, p. 20 [DEFENDANTS028029].) The placement of a trade by an Santander affiliate employee who is in another open Santander office (i.e., in a foreign country) at the time the trade is placed during a single day or brief holiday (in the U.S.) because the U.S. office is closed is extremely different and not an accommodation to allow remote sales employees to conduct trades while "working" remotely.   In this Manual's example of the open Latam market, the trade is placed by an employee who is in the Santander affiliate office.

22.     To ensure full compliance with FINRA's rules and regulations, as well as federal securities laws, SIS requires that every trade conducted off-premises must follow the appropriate

procedures as set forth in the Front Office Manual. (Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028029-028030; *id*. ¶ 5, Ex. 2 at DEFENDANTS028000-028001.) First, the trader or salesperson must explain in writing the reason why he/she has to execute the off-premises trade. (*Id*.)  Second, the off-premises transaction must be executed through/with an affiliate that is covering the relevant timetable and must be performed only to reduce the risk in the portfolio. (*Id*.) Third, the transaction should be affirmed with the affiliate or counterparty (if necessary) via email if the Front Office personnel who executed the transaction has been assigned an authorized personal device (*i.e.*, iPhone/iPad/Android).  (*Id*.)  Fourth, on the next business day, the trader must promptly update the Front Office system including all the relevant terms of the transaction such as the date, time, and location of the execution of trade. (*Id*.)  Furthermore, notice of the transaction must immediately be sent to Operations and the Operational Risk Department to ensure that it is processed appropriately. (*Id*.) Finally, documents relevant to the transaction such as the email/report describing the necessity of the transaction, authorized trade ticket number, external affirmation of the trade, and the communications sent to Operations and Operational Risk, should all be kept for the purpose of maintaining a comprehensive audit trail. (*Id*.)

**RESPONSE**: Deny that any of the cited regulations mention, involve or incorporate federal securities laws in any way.  Further deny any implication that these specific rules were necessary for Santander to comply with FINRA rules and regulations.  *See supra*, response to ¶ 17.  Otherwise, admit that policies existed that would permit working from home at all times relevant to this action.  *See supra*, response to ¶¶ 20, 21.  For instance, the quotation above provides for the issuance of personal devices to facilitate working off premises.

**REPLY**: FINRA rules required Santander to maintain a secure work environment for institutional sales employees.  (*See supra*, reply to ¶ 17.)  Plaintiff's Response mischaracterizes

Santander's Front Office Policy.  The requirements set forth in ¶ 22 do not allow Santander employees to place trades from home.  Rather, they give the requirements for effecting off-premises trades, provided that the salesperson has met the narrow requirements for off-premises trading in the first place.  (*See supra*, reply to ¶ 17, 21.)

23.     To enforce SIS's policy prohibiting off-premises trading, SIS prohibits the use of cellphones on the trading floor.  (Boyarsky Aff., ¶ 4, Ex. 1 DEFENDANTS028030; *id.* ¶ 5, Ex. 2 at DEFENDANTS028001.) This prohibition applies to every person who works on the trading floor, individuals that operate within markets, and even individuals who do not trade or sell.  (*Id.*)

**RESPONSE:** Admit.

24.     All correspondences with customers must be conducted through a supervised channel such as a recorded telephone line, Bloomberg messaging system, or corporate email. (Boyarsky Aff., ¶ 4, Ex. 1 DEFENDANTS028030; *id.* ¶ 5, Ex. 2 at DEFENDANTS028001.); Headden Aff., ¶ 10.) SIS requires all communications with clients and all trades and sales to be recorded for risk management purposes. (Headden Aff. ¶ 10.) In the event of a mistake, SIS is able to review the recorded communications to determine the cause of the mistake and the appropriate action in response. (*Id.*) Human resources, senior management and the risk committee are "to take the actions they deem necessary" in response to violations of the off-premises trading policy. (Boyarsky Aff., ¶ 4, Ex. 1 DEFENDANTS028030; *id.* ¶ 5, Ex. 2 at DEFENDANTS028001.)

**RESPONSE:** Admit that these policies existed at all times relevant to this action, and these policies provided a clear framework under which McKenna could have worked from home in 2019, including "holidays in NY (when Latam markets are open)."  Def. Ex. 2, DEFENDANTS028001; *see supra*, responses to ¶¶ 20–22

18

**REPLY:** Plaintiff has introduced no evidence that Plaintiff sought to make off-premises trades in any scenario analogous to the exigent circumstances described in the Front Office Manual. (Def. Ex. 1, DEFENDANTS028029-028030; *see supra*, reply to ¶¶ 20-21.)

C. **COVID-19 and Santander's Transition to Remote Work.**

25.     Before the COVID-19 pandemic, it was common practice in the financial services industry to require broker/dealers to work from the office and prohibit execution of trades off-premises. (Headden Aff. ¶ 6.) Consistent with this practice, SIS did not permit traders and salespersons to execute trades remotely. (*Id*. at ¶ 7.)

**RESPONSE:** Deny. Santander's policies provided for off-premises trading at all times relevant to this action, and would permit off premises trading, for instance, on "holidays in NY (when Latam markets are open)." Def. Ex. 2, DEFENDANTS028001; *see supra*, responses to ¶¶ 20-22.

**REPLY:** The existence of a narrow set of exigent circumstances in which trades may be executed outside the office does not create a genuine dispute as to Santander's policy that "[o]ff-premises trades are generally not permitted." (Def. Ex. 2, DEFENDANTS028001; *see supra*, reply to ¶¶ 20-21.) Banco Santander New York Branch IT Department Director, Cignarella, who has been employed with Santander for over 30 years and was previously the CIO for 7 years, is unaware of an arrangement that Plaintiff claims to be permitted. (Cignarella Aff. ¶¶ 2-4, 6-7.) Traders and salespeople—including McKenna—were not provided a company laptop for trading and could not use Bloomberg Anywhere on her personal computer to place trades. (Id. at ¶¶ 7-9.)

26.     Before the COVID-19 pandemic, SIS did not have the requisite technology and supervisory infrastructure in place to accommodate remote work arrangements and no trader or salesperson was permitted to execute trades remotely. (Headden Aff. ¶ 7.) For example, in 2019,

salespeople were not assigned work laptops or work phones with a recorded line. (*Id.* at ¶ 9.)  Even if SIS assigned work laptops at the time, such laptops were primarily used for administrative tasks such as accessing their work emails, work folders, training materials and inconsequential task. (*Id.*)  The laptops were not equipped with the necessary software and security measures that would allow a salesperson to execute trade transactions.  (*Id.*)

**RESPONSE:** Deny.  Santander's policies make clear that it did have the technological and administrative capacity to permit off-premises trading when it suited Santander's business needs, for instance during "holidays in NY (when Latam markets are open)" as an exception.  Def. Ex. 1, DEFENDANTS028029-028030; *see supra*, responses to ¶¶ 20-22.  On occasion, traders simply called in trades to other people in the office.  Ex. 5, Garvey Dep. at 111:12-15 (explaining that he has asked traders in London to execute trades on his behalf.)  The assertion in paragraph 26 is also belied by the ease and speed with which Santander's employees reported transitioning when the COVID-19 pandemic hit the United States.  Ex. 2, Steckroth Dep. at 89:22 (describing transition as "seamless"); *id*. at 90:2-5 (employees used remote connection technologies when pandemic hit); Ex. 3, Minuesa Dep. at 94:15-19 ("We just sent people all the hardware home, and they didn't have to do anything.  We sent everything there, and there was support from the IT department.")  To assuage any residual concerns about confidentiality, Santander obtained simple written attestations from employees that they would promise to follow certain protocols.

**REPLY:** The existence of a narrow set of exigent circumstances in which trades placed by an employee while in a Santander office on behalf of a sales person outside the office when that out-of-office employee's Santander office is closed due to a holiday does not create a genuine dispute as to Santander's policy that "[o]ff-premises trades are generally not permitted."  (Def. Ex. 2, DEFENDANTS02800l; *see supra*, reply to ¶ 21.)  Nor does Garvey occasionally looping in a

colleague to conduct an after-hours trade establish that such a practice would have been viable for a salesperson operating throughout the entire day every business day. (Licul Aff., Ex. 5, Garvey Dep. at 111:12-15.) Testimony that individual employees found the transition to work from home seamless does not create a genuine issue as to whether the transition was burdensome on Santander. (*See supra*, reply to ¶ 20.) Record evidence demonstrates that the transition to work from home was both time-consuming and costly for Santander, and Plaintiff has introduced no evidence to demonstrate otherwise. (*See infra*, reply to ¶ 27.)

27.     In response to the COVID-19 pandemic, SIS began planning and implementing the necessary technology and infrastructure to accommodate the need for people to work remotely. (Headden Aff. ¶ 12.) Transitioning to a remote working environment required SIS to do a complete technology and compliance overhaul, as well as develop the necessary training, supervisory procedures, and work attestations for the employees. (*Id.* at ¶¶ 12-13.)

**RESPONSE:** Deny that the technology to allow people to work remotely did not already exist and deny that Santander did not "plan and implement" the necessary technology until the COVID-19 pandemic. *See supra*, response to ¶ 26. Deny that the transition to remote work required a "complete technology and compliance overhaul." Santander's policies and the testimony of its employees demonstrate clearly that the technology already existed by the time the pandemic hit. *See supra*, response to ¶¶ 20-22, 26.

The "work attestation" itself speaks to the simplicity of the procedures adopted and the ease and speed with which they were implemented. The document was distributed on March 11, 2020, before New York State had entered any kind of lock-down. Ex. 4, DEFENDANTS026390. It is a single page long. *Id.* at DEFENDANTS026391. It prescribes the use of extremely simple

procedures: using private internet connections, using Santander devices and platforms, keeping computers locked, and keeping Santander documents away from unauthorized people. *Id.*

**REPLY:** The transition to work from home at the beginning of the COVID-19 Pandemic required an investment of several months of work and significant expenditures by Santander. (Cignarella Aff. ¶¶ 12-15, 17-18; *supra* reply to ¶ 20.)  Plaintiff's perspective regarding the steps for a front office employee, such as a sales person, to convert to a remote environment is completely irrelevant and ignorant of the undisputed facts about the actual technological conversion and regulatory compliance.

28.    For the salespeople and traders to work from home during the pandemic, SIS had to assign them with laptops that had "soft" turrets installed on them which allowed the employees to access their work computer at the office remotely. (Headden Aff. ¶ 13.)  Through the use of a headset with Voice Over Internet Protocol—a technology that allows phone calls to be placed over an Internet connection instead of a regular phone line—the "soft" turrets allow for the recording of conversations between salespeople and their clients. (*Id.*) SIS only considered using the "soft" turret technology in response to the pandemic which required salespeople and traders to work remotely. (*Id.* at ¶¶ 13-14.)

**RESPONSE:** Deny that the technology described (which is not otherwise documented anywhere) was required before Santander employees could work remotely.  The record establishes that Santander's policies contemplated off premises trading even before the pandemic when it suited Santander business needs, and that the transition to mass remote working was simple, quick and smooth.  *See supra*, response to ¶¶ 20-22, 26-27.

**REPLY:** The existence of a narrow set of exigent circumstances in which trades may be executed outside the office does not create a genuine dispute as to Santander's policy that "[o]ff-

premises trades are generally not permitted." (Def. Ex. 2, DEFENDANTS02800l; *see supra*, reply to ¶ 21.)  Record evidence demonstrates that the transition to work from home was both time-consuming and costly for Santander, and Plaintiff has introduced no evidence to demonstrate otherwise. (*See supra*, reply to ¶¶ 20, 27.)

29.      SIS tested the efficacy of the "soft" turret technology only weeks before the salespersons and traders were allowed to work remotely. (Headden Aff. ¶ 14.)  Given that salespersons and traders were prohibited from working remotely and were expected to be in the office to perform their function, SIS never considered using the "soft" turret technology and had never its efficacy before the pandemic. (*Id.*)

**RESPONSE:** Deny that this technology was necessary to allow Santander employees to work remotely.  Accordingly, object to the evidence as irrelevant, because it is no "of consequence in determining the action."  Fed. R. Evid. 401(b).

**REPLY:** The soft turret technology was necessary to allow salespersons to work from home because it allowed the recording of conversations between salespersons and their clients, which they could not do with personal telephones. (*See supra*, reply to ¶¶ 20, 27, 28.)  Evidence of the deployment of soft turret technology, VPN connectivity for computers, increased firewall protection is relevant to Santander's contention that the technological framework did not exist to allow remote work prior to the pandemic.

30.      On March 11, 2020, Terrie Aoki, the CIB Chief Compliance Officer, sent an email to everyone on the Fixed Income sales and trading teams, including McKenna, asking them to complete an "Attestation Concerning Work Performed Off Santander Premises," in the event that Santander was required to implement the work from home aspect of the BCP. (Boyarsky Aff. ¶ 13, Ex. 10; *id.* ¶ 14., Ex. 11.)

**RESPONSE:** Admit.

D. **Performance Metrics for Fixed Income Salespersons.**

31.     The Fixed Income Sales Desk is responsible for buying and selling products offered by SIS, Banco Santander, or other Santander local entities, which are approved to be sold by SIS. (Boyarsky Aff., ¶ 4, Ex. 1 at DEFENDANTS028013; *id.* at ¶ 5, Ex. 2 at DEFENDANTS027985.) The Fixed Income Trading Desk provides the pricing. (*Id.*)

**RESPONSE:** Admit.

32.     There are two ways through which the salespeople on the Fixed Income desk generate business for clients—primary sales and secondary sales. (Kariuki Dep. Tr., at 83:25-85:7.)

**RESPONSE:** Admit.

33.     Primary sales are new offerings issued by a client, where the client is attempting to raise money on behalf of itself, and the new offerings are underwritten by a syndicate of banks. (Kariuki Aff. ¶ 11; Kariuki Dep. Tr., at 84:22-89:8.) When the client is preparing to go to market with a new offering, it will work with a lead underwriter who decides how many investment banks are needed to market and distribute the securities within a specified timeframe. (Kariuki Aff. ¶ 11; Kariuki Dep. Tr., at 84:22-89:8.)

**RESPONSE:** Admit.

34.     The underwriter then selects the banks it believes to be capable of smooth distribution and form a syndicate called a distributing syndicate that will work together to sell the securities to the market. (Kariuki Aff. ¶ 12; Kariuki Dep. Tr., at 84:22-89:8.) The banks in the distribution syndicate will then contact their clients to gauge interest on the new offering.  (Kariuki Aff. ¶ 12; Kariuki Dep. Tr., at 84:22-89:8.) These estimated figures are provided to the underwriter,

who will allocate a percentage of the securities to the distributing syndicate at or around the date of issuance. (Kariuki Aff. ¶ 12; Kariuki Dep. Tr., at 84:22-89:8.)

**RESPONSE:** Admit.  In other words, Santander would act as an issuer of the debt in question.  Declaration of Erin McKenna in Opposition to Defendants' Motion for Summary Judgment ("McKenna Decl.") at ¶ 6.  This is what Defendants mean when they say below that a secondary trade, as opposed to a primary trade, "involves bonds issued by *other* companies or municipalities."  *See infra*, response to ¶ 38.  A primary trade, by contrast, would involve an issuance *by Santander*.  An example of a primary loan of this kind can be found at Def. Ex. 48, which shows Santander as an "issuer."  DEFENDANTS028524-028544.

**REPLY:** Plaintiff misunderstands the nature of a primary trade.  A primary trade involves the sale of new debt or, in other words, debt that is purchased directly from the issuer.  (*See supra*, ¶ 33.)  Plaintiff's self-serving misunderstanding of a primary trade as stated in her Declaration in Opposition to Defendants' Motion for Summary Judgment does not create a genuine dispute as to the character of a primary trade.

35.    Consequently, a client that wants to purchase the new offering must engage all of the banks in the distributing syndicate to ensure that they get their allocation. (Kariuki Dep. Tr., at 86:11-89:6.)

**RESPONSE:** Deny that Kariuki so testified.  Kariuki testified that, for a primary sale, "all of the banks in the syndicate reflect the same orders."  Def. Ex. 66, Kariuki Dep. at 87:14-19.  This does not mean that a client "engage[s] all of the banks in the distributing syndicate."  Santander might act as sole arranger and dealer of a given loan deal.  *See, e.g.*, Def. Ex. 48, DEFENDANTS028524-028544.

**REPLY:** Plaintiff mischaracterizes and selectively quotes Kariuki's testimony.  Kariuki testified that once a distributing syndicate is formed, a purchaser must engage all banks in the distributing syndicate to effect a primary trade.  (Kariuki Dep. at 87:11-19) ("Q: So a client . . . could not go to a different bank for that same deal?  A: There are other – there are other banks within the syndicate, but if they want to ensure that they are going to get their allocation it is important that all of the banks in the syndicate reflect the same orders.").  In order for all banks in the distributing syndicate to "reflect the same orders," the client necessarily must engage all banks in the distributing syndicate.  (*Id.*)  The possibility that one deal may involve a single arranger and dealer does not create a genuine issue as to whether a client seeking to effect a primary trade must engage every bank in a distributing syndicate.

36.     As a result, primary sales offerings are a passive generator of business, requiring less involvement by the SIS salesperson. (Kariuki Dep. Tr., at 86:11-89:6; Garvey Dep. Tr., at 52:5-14.)

**RESPONSE:** Deny.  Successfully selling the debt originated by Santander, i.e. primary sales, required salespeople to educate their clients on the debt offerings, learn their clients' investment strategies, and pitch them on primary products that fit those strategies.  McKenna Decl. at ¶ 7.  For instance, when Santander interviewed the person who would ultimately replace McKenna, Krishna Murali talked about discussing "a bit of what we originate here," meaning loans originated by Santander, i.e. primary deals.  Def. Ex. 43, DEFENDANTS028513; *supra*, response to ¶ 35.  Murali added that it "[w]ould be good to plug her into those when she comes on board," meaning she would need to be trained on the primary products originated by Santander, because this was an important part of Santander's business.  *Id.*; McKenna Decl. at ¶ 6.

Furthermore, the records shows that Kariuki thought primary deals were extremely important, at least when men handled them. As Santander admits below, *see infra*, response to ¶ 157, Kariuki justified terminating McKenna for her low sales credits in comparison to Steckroth based on the fact that Steckroth, as Kariuki explained it, was about to close a big deal. This deal was so important that Kariuki insisted that Yahn move ahead with terminating McKenna even though the deal was not yet closed. Ex. 6, DEFENDANTS021784-021785.

As further proof that this was, in fact, a primary deal, below, at ¶ 157, defendants attach a spreadsheet purporting to show Steckroth's sales on November 25, 2020. This is a lie; the spreadsheet they attach is from August 31, 2020. An analysis of the actual numbers shows that the deal was booked as 679,000 in *primary* sales credits. Ex. 77, compare DEFENDANTS022146 (On November 24, 2020, primary sales from Steckroth of 2,343; secondary sales of 364.8) with DEFENDANTS022152 (On November 25, 2020, primary sales for Steckroth of 3,022.1; secondary sales of 365.6). This aligns with Steckroth's testimony stating that the deal was worth "north of 650,000." Def. Ex. 69, Steckroth Dep. at 103:16-17.

In this briefing, Kariuki even further admits that in making employment decisions, he "solicited . . . feedback from employees on the Syndicate and Debt Capital Markets teams who were responsible for *primary business*." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Mot."), Dkt. No. 65, at 13 (emphasis added).

**REPLY:** Plaintiff introduced no evidence to demonstrate that primary sales involved significant work compared to a salesperson's skill and relationship building with clients for secondary sales. Plaintiff's affidavit does not legitimately parse between skills and effort involve in primary versus secondary sales; she generally describes sales activity without a comparison to

27

secondary sales activity.  Instead, ¶ 7 of her Declaration contains an opinion about the work done to make sales in general.

Rather, in executing a primary sale, the salesperson "simply is reactive to take the order in comparison to actively selling and interacting with the client account to complete the deal." (Supp. Kariuki Aff. ¶ 14.)  Def. Ex. 43, DEFENDANTS028513 merely establishes that in a conversation with Foley, Murali once mentioned securities originated by Santander.  Mentioning primary trades once in a conversation with a potential hire, who lacked experience in primary sales transactions at her former employer, does not provide evidence of its importance to Santander.  (*Id*.)  Moreover, from Murali's statement it is clear that Foley's lack of experience in primary sales activity did not affect her candidacy; rather Murali simply thought that she might be able to add some value to that space were she exposed to it at Santander.  (*Id.*)  This is consistent with Santander's IG sales team management's (Juan Minuesa, Kariuki and Bill Garvey before him) view that secondary trades are a more important indicator of a salesperson's value than primary trades.  Barry Sherman, one of McKenna's sales colleagues on the IG Sales Team also understood the emphasis that IG Sales management placed on secondary trade activity.  (Sherman Aff. ¶ 8.)

The sale referenced in Pl. Ex. 6, DEFENDANTS021784-021785 was a "special situation trade" involving $417,200,000 of bonds that Steckroth helped place on behalf of Macquarie Investment Management Advisors ("Macquarie"), one of his accounts.  (Supp. Kariuki Aff. ¶¶ 3, 7.)  While the sales credits for this sale were reflected in Steckroth's primary sales credits, "the time and effort it takes to source an investor willing to invest and consummate a private placement is more akin to executing a secondary trade."  (*Id*. at ¶ 8.)  To effect this sale, Steckroth "Sherman spent several hours on telephone calls with lawyers and custodians to understand and help manage the loan confirmation process, and to make sure the lawyers for their clients were satisfied with

the documentation involved to secure the loan. " (*Id.* at ¶ 12.)  Steckroth also "conducted calls with analysist of their clients who purchased the securities to provide requested information about the loan, handled calls with banks' attorneys and asset managers' attorneys regarding the term sheet." *Id*.  Steckroth's work on this trade was fundamentally different than the work that goes into a primary deal. (*Id.* at ¶ 3-11, 13-14,)  The sale was only recognized as a primary deal because it involved the sale of the client's "stock shares or bonds to investors." (*Id.* at 8.)  In all other respects it was "the same if not more involved than a secondary trade." (*Id.* at 4.) Barry Sherman also conducted significant sales effort to help place a trade for his client account Manulife to purchase the private placement deal in BASA for the Chilean mine investment. (Id. at ¶¶ 11-13.) The deal took several months to close and involved similar work with lawyers, tax advisors and analysts to complete the trade.  (Id.; Sherman Aff., ¶¶ 11-12, 14.)

Defendants inadvertently attached the August 31, 2020 spreadsheet referenced as Ex. 47 to the Boyarsky Aff.  The correct November 25, 2021, spreadsheet that should have been attached as Ex. 47 to the Boyarsky Aff. and is attached to the 2nd Supp. Boyarsky Aff., as Ex. 88, DEFENDANTS022152.

37.     A primary sale will occur regardless of who is the salesperson handling the account. (Garvey Dep. Tr., at 52:5-14.) The salesperson's function in a primary transaction is akin to that of an order clerk. (*Id.*; Kariuki Dep. Tr., at 85:8-89:7.) The salesperson only needs to check with all their clients to make sure that their orders are recorded in the syndicate book. (Kariuki Dep. Tr., at 85:8-89:7; Garvey Dep. Tr., at 52:5-14.)

**RESPONSE:** Deny all of the foregoing statements and the characterization of primary sales.  Primary sale work in fact requires work around educating clients about the bank's offerings

and matching buyers' needs to those offerings.  *See supra*, response to ¶ 36.  Santander considered primary trades extremely important when men executed them.  *Id*.

**REPLY:** The undisputed record evidence shows that primary deals require little effort on the part of salespersons and are fundamentally different from Steckroth's private placement, which involved work comparable to a secondary trade.  (*See supra*, reply to ¶ 36.)  Plaintiff invented allegations to argue that gender played a role to emphasize the importance of certain primary trades.  It is undisputed that one of the IG Sales Team's largest clients, Vanguard, was given to Plaintiff at her request after she was pregnant and that a great majority of trades placed by Vanguard's IG Sales Team was primary sales. (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr. 154:7-19.)  The assignment of a key account to Plaintiff does not lessen the important the IG Group placed on secondary trading activity. Moreover, the special situation trade involved with the BASA deal that Steckroth and Sherman handled was only categorized in credits as primary because it involved the sale of the client's "stock shares or bonds to investors." (*See* Reply ¶ 36.)

38.     Secondary sales occur when a client investor is looking to purchase or sell securities. (Kariuki Aff. ¶ 14.) In the Fixed Income space, the purchase or sale typically involves bonds issued by other companies or municipalities. (*Id.*) Any money generated in the sale of a secondary issue goes to the holder of the security. (*Id.*)

**RESPONSE:** Admit.

39.     Banks like Santander generate income by effecting secondary trades and maximizing the bank's Profit/Loss ratio ("P&L). (Kariuki Dep. Tr., at 66:9-67:17, 83:2-17, 84:4-21.) There are two ways to generate income from a secondary trade. (*Id.*) The first way involves executing a riskless trade where the bank does not have to commit any capital. (*Id.*) Santander prefers riskless trades because it allow Santander to generate revenue without committing any

capital (*i.e.*, without taking any risks). (*Id.*) Second, Santander can buy a security, hold it on its balance sheet for a period of time, hope that the security appreciates in value, and sell it at a profit. (*Id.*) These types of trades are riskier for Santander as there is a possibility that the security may depreciate in value, causing Santander to suffer a loss. (*Id.*)

**RESPONSE:** Admit that this describes the secondary trade process.  Deny that primary trades are not also important to Santander.  *See supra*, response to ¶ 36.

**REPLY:** The undisputed record evidence shows that primary deals require little effort on the part of salespersons and that Santander considered secondary trades a better indicator of salesperson performance than primary trades.  (*See supra*, reply to ¶ 36.)  Santander hired Foley, who did not perform primary sales activity at her former employer, in the restructuring that affected Barker and McKenna. (*See supra* reply ¶ 36.)

40.     In general, there are two approaches to generating business in the secondary market—one is by utilizing an electronic platform such as Market Axess or Bloomberg, and the other is through client relationships or prospects, also known as voice trades. (Garvey Dep. Tr., at 54:20-56:17.)

**RESPONSE:** Admit.

41.     Electronic platforms such as Market Axess and Bloomberg allows the holder of the securities to post-secondary offerings and send quote requests to multiple dealers at the same time. (*Id.* at 55:17-23.) When an offering is posted, banks have a very short time window to submit their best price, and the deal is made with the bidder at the best price. (Kariuki Dep. Tr., at 126:15-127:3.) This is an easy way to source deals, which involves less emphasis on client relationships and more focus on pricing, which favors larger and large-volume broker-dealers. (*Id.* at 125:23-129:10.)

**RESPONSE:** Deny that Kariuki's testimony says anything about banks having "a very short time window to submit their best price." Def. Ex. 66, Dep. of Kariuki at 126:22-127:3. Otherwise, admit.

**REPY:** The urgency to quickly submit the bank's best price comes from the fact that, as Kariuki testified, "more than one broker dealer sees the [electronic] trade at the same time, and the client trades on the best price given on the electronic platform." (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 126:23-127:3.) Santander cannot effect a trade if it does not submit its best price before the bidder accepts another broker-dealer's offer.

42.   Because other competitor broker-dealers are able to see the details of the transaction and Santander's position on an electronic platform, electronic trading undermines Santander's ability to make a profit on the trade. (Kariuki Dep. Tr., at 126:15-129:10.) Having insight into Santander's position in the market gives competitor broker-dealers the opportunity to manipulate the price of the bond to Santander's disadvantage. (*Id.*)

**RESPONSE:** Admit.

43.   Secondary sales that are not sourced from an electronic platform are called voice trades and require leveraging client relationships and prospects. (Kariuki Dep. Tr., at 253:17-256:9.) While an electronic trade will come no matter who the salesperson is, in a voice trade, a client will contact SIS directly to ask for its best price. (*Id.* at 255:10-256:9.) Such inquiries give SIS an opportunity to generate a higher profit because it assumes that the client has not contacted other banks, and therefore, allows the trader to price the security at a level in which they are comfortable buying and potentially selling or holding it. (*Id.*)

**RESPONSE:** Admit.  Admit that pricing in the case of voice trades would count on the trader (i.e., Garvey) rather than the seller (i.e., McKenna) choosing a competitive price, meaning

that secondary voice trading performance was often outside of the control of the individual seller. *See, e.g.*, McKenna Decl. at ¶ 9; Ex. 7, DEFENDANTS001824 (conversation in which a client of Santander tells McKenna that Santander's traders are using inappropriate pricing).

**REPLY:** Salespersons are not passive participants in the pricing of secondary trades.  As Pl. Ex. 7, DEFENDANTS001824 evidences, the salesperson's role is, in part, to negotiate between Santander traders and clients to find a price agreeable to both parties.  In DEFENDANTS001824, McKenna relates a Santander trader's bid for a security.  (*Id*.)  When the potential seller rejects the bid, McKenna asks for his desired price so that she could "[s]ee if I can get my trader to move at all."  (*Id*.)

44.     Salespeople earn sales credits for both primary and secondary sales. (Kariuki Dep. Tr., at 63:24-64:8.) A sales credit is the value assigned to a particular transaction to measure the efficacy of a salesperson. (*Id.* at 63:21-64:3.) Although salespeople earn sales credits for every transaction, the sales credit assigned to a particular transaction is calculated using a specific formula and depends on the quality of the trade. (*Id.* at 64:4-68:5.)

**RESPONSE:** Admit the definition of sales credit. Deny that the record contains any evidence of this formula, or any evidence of how the two categories of sales credit were weighted. For instance, Def. Ex. 30 (ECF pages 3 and 4) shows a tabulation of sales credits. Both primary and secondary credits are tallied into a single number, with no apparent attempt to weight either of them or apply any valuation formula.

**REPLY:** Santander's formula for determining sales credits is a highly confidential trade secret.  Kariuki's undisputed testimony establishes, however, that Santander did employ such a formula to determine the value of each transaction and that Santander used sales credits to evaluate salesperson performance.   (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 63:21-68:5.)

Undisputed testimony of Kariuki and Garvey establishes, however, that Santander employed such a formula to determine the value of each transaction; used the categorization of a trade as electronic or voice, riskless, bid or offer, and AXE or anti-AXE in determining the amount of sales credit; and used sales credits to evaluate salesperson performance.  (*Id*. at Kariuki Dep. Tr., at 63:21-68:5; Supp. Boyarsky Aff., Ex. 54, Dep. Tr., at 54:13-19; *see supra*, reply to ¶ 44.) The formula itself to which Plaintiff refers does not change unrefuted testimony by IG Sales management (Minuesa, Kariuki and Garvey) as well as testimony by Steckroth and the affidavit of Sherman that secondary sales credits was considered very important by management to assess overall sales activity.  (*See supra*, reply ¶ 36.)

45.     A riskless trade is a trade where the bank does not have to commit any capital. (Garvey Dep. Tr., at 56:18-20.) A bid and offer refer to the purchase or sale of a security, respectively. (*Id.* at 57:4-6; Kariuki Dep. Tr., at 315:7-16.) An AXE is a trade that the trader is keen to execute either because it wants to buy or sell a risk.  (*Id a*t 56:21-23.)  An Anti-AXE refers to a trade that is the opposite of what a trader wants to do. (Kariuki Dep. Tr., at 343:6-10.)

**RESPONSE:** Admit.

46.     For secondary sales specifically, the quality of the trade, and consequently, the sales credit assigned to a particular transaction depends on the following factors: (i) whether it was an electronic or voice trade; and (ii) whether the trade was riskless, bid and offer, AXE or anti-AXE. (Kariuki Dep. Tr., at 252:16-253:13; Garvey Dep. Tr., at 54:13-19.)

**RESPONSE:** Deny that the record contains evidence about how Santander actually weighted the two categories of trade. *See supra*, response to ¶ 44.

**REPLY:** Santander's formula for determining sales credits is a highly confidential trade secret.   Undisputed testimony of Kariuki and Garvey establishes, however, that Santander

employed such a formula to determine the value of each transaction; used the categorization of a trade as electronic or voice, riskless, bid or offer, and AXE or anti-AXE in determining the amount of sales credit; and used sales credits to evaluate salesperson performance.  (*See supra* reply to ¶ 44.)

47.     Voice trades are preferred over electronic trades. (Kariuki Dep. Tr., at 316:11-20; Garvey Dep. Tr., at 54:13-55:9.) The quality of a voice trade, in order of preference, are then ranked as follows: (i) riskless trades; (ii) AXE trades; (iii) bid and offer trades; and (iv) anti-AXE trades. (Kariuki Dep. Tr., at 315:5-317:2; Garvey Dep. Tr., at 54:13-55:9.)

**RESPONSE:** Deny. *See supra*, response to ¶ 46.

**REPLY:** Plaintiff has introduced no admissible evidence disputing Kariuki and Garvey's testimony regarding the factors Santander considered in calculating sales credits and the relative value Santander placed on each.  (*See supra*, reply to ¶¶ 44, 46.)

### E.   <u>Incentive Compensation for the Institutional Fixed Income Sales Team.</u>

48.     Under SHUSA's Annual Incentive Plan ("AIP") which applies to all of its wholly- or majority-owned subsidiaries, including SIS, an individual employee's actual bonus amount is based on two criteria—individual performance and firm performance. (Boyarsky Aff. ¶ 15, Ex. 12 at DEFENDANTS000641-DEFENDANTS000649; *id*. ¶ 16, Ex. 13 at DEFENDANTS000650-DEFENDANTS000657; *id*. ¶ 17, Ex. 14 at DEFENDANTS000658-DEFENDANTS000665.)  The annual incentive target amount for every eligible employee is established at the time of hire/promotion and is generally based on the market for each role. (*Id*.) The initial aggregate incentive pool under the Plan is the sum of the annual incentive target of eligible participants. (*Id*.) The incentive pool for the bonus year is then further modified based on the business performance of Santander U.S. Entities. (*Id*.) Once the final incentive pool is approved by the Chief Executive

Officer ("CEO") of Santander U.S. Entities, senior leaders will be given an incentive pool for the eligible employees that report to him/her to allocate once approved. (*Id.*)  Each senior leader will approve recommendations for his/her eligible employees and submit them to Human Resources ("HR") for the next level of approval.  (*Id.*) Following thorough review and approval by SHUSA's Chief Human Resources Officer and CEO, the incentives will be considered approved. (*Id.*)

**RESPONSE:** Deny that these documents support the proposition that "an individual employee's actual bonus amount is based on two criteria—individual performance and firm performance." In particular, an individual's bonus is not based on "firm performance." Instead, the documents say that "quantitative and qualitative performance measures are considered when determining both pool funding as well as discretionary individual awards." Def. Ex. 13, DEFENDANTS000651. They further explain that "funding is tied to performance" without specifying what performance is meant. *Id*. In summarizing the system, the documents explain:

> The initial aggregate incentive pool under the Plan is the sum of the annual incentive target of eligible Participants. The incentive pool is then further modified through consideration of Santander US and line of business performance, and other factors. Once the final incentive pool is approved by the SHUSA and SBNA CEOs, senior leaders will be given an incentive pool for the Participants that report to him/her.

*Id*. at DEFENDANTS000652. The document does not explain what "other factors" are considered.

Finally, the documents do not support the idea that supervisors are required to evenly distribute across their employees any reductions in the overall pool. Instead, they say "[a] participant's award under the Plan, if any, shall be paid from the allocated incentive pool and be based 100% on achievement of assigned annual performance objectives as compared to peers." Def. Ex. 12, DEFENDANTS000644; Def. Ex. 13, DEFENDANTS000653. This means, for example, that Santander leadership could have reduced a team's overall pool by 50%, but the supervisors distributing that reduced pool could decide that one employee had far outperformed

36

her team. The supervisor would have discretion to give that employee their full target incentive, even if it meant reducing the incentive of the other team members to 25%. That is the only fair reading of these documents.

The documents referenced, in sum, do not support the bonus allocation system described.

**REPLY:** Plaintiff misconstrues the documents cited and introduces a hypothetical that is not evidence. Under Santander's Annual Incentive Plan, the incentive pool from which individual bonuses were paid was initially set by the "sum of the annual incentive target of eligible Participants" (i.e., the employees in a given group). (Def. Ex. 12, DEFENDANTS000644; Def. Ex. 13, DEFENDANTS000653.) The incentive pool would then be "modified based on Santander US and line of business performance," and "[i]n no event [would] the aggregate total of the actual award amounts for a plan year exceed the aggregate total of the final approved incentive pool." (*Id.*) This means that while an employee's *share of the pool* would be based "100% on achievement of assigned annual performance objectives as compared to peers," the *size of pool* could be reduced based on performance of Santander and individual business lines. (*Id.*)

The record clearly indicates that bonuses are based on "relative individual performance" and an employee's performance "as compared to peers." (*Id.*) Plaintiff concocts a scenario in which a team's bonus pool is reduced by 50% but one employee is still able to receive her target bonus because the remaining team members' bonuses are reduced to 25% of target. Were the Court to consider this hypothetical, which Defendants submit is inadmissible and not evidence, this scenario is informative, though not for the reason Plaintiff believes. In Plaintiff's hypothetical, this employee's performance would have to have been significantly greater than that of her peers during the bonus period. In this scenario, Santander's performance would still have affected the

employee's bonus, which, due to her nearly unbelievable performance, would have far exceeded its target if the bonus pool had not been reduced by 50%.

Plaintiff has introduced no evidence creating a genuine issue as to whether Santander's performance and the performance of a particular line of business affected the bonuses of employees within that line of business.

49.     To illustrate, in the case of an employee with a reference bonus target amount of $200,000, if the funding pool is set at 75 percent, then the target bonus for the employee is reduced to $150,000. (*See* Boyarsky Aff. ¶ 15, Ex. 12 at DEFENDANTS000641-DEFENDANTS000649; *id*. ¶ 16, Ex. 13 at DEFENDANTS000650-DEFENDANTS000657; *id*. ¶ 17 Ex. 14 at DEFENDANTS000658-DEFENDANTS000665.)   The   employee's   individual   performance ultimately determines the bonus earned against the target. (*Id.*) The available pool is also a factor affecting the bonus paid to an individual participant. (*Id*.) An employee who successfully meets expectations is eligible for 100 percent of the target (in this example, $150,000).  (*Id.*) If the pool is lower than the target, the person could receive less than $150,000. (*Id*.) An employee who does not meet expectations will likely receive a bonus amount that is below target.  (*Id.*)

**RESPONSE:** Deny that these documents support the idea that reductions in bonus are predetermined by reductions in the bonus pool. *See supra*, response to ¶ 48. In particular, the plans provide that "[a] participant's award under the Plan, if any, shall be paid from the allocated incentive pool and be based 100% on achievement of assigned annual performance objectives as compared to peers." Def. Ex. 12, DEFENDANTS000644; Def. Ex. 13, DEFENDANTS000653. This means that supervisors had total discretion, even after a pool was allocated, to set bonuses.

**REPLY:** As described above, see supra, reply to ¶ 48, Santander's requirement that bonuses be based on an employee's "relative individual performance" means that a reduction in

the total bonus pool could reduce an individual employee's paid bonus compared to the bonus the employee was eligible to receive had the bonus pool not been reduced. (Def. Ex. 12, DEFENDANTS000644; Def. Ex. 13, DEFENDANTS000653.) Plaintiff has introduced no evidence that supervisors had discretion to award bonuses in excess of the amount of the incentive pool or to award bonuses not related to an employee's performance relative to other employees and thus has created no genuine issue as to the facts in ¶ 49.

50.     Decisions regarding the bonus awards are typically made in the fourth quarter of the performance year, and payouts are paid by March 15 of the following year. (Boyarsky Aff. ¶ 15, Ex. 12 at DEFENDANTS000641-DEFENDANTS000649; *id.* ¶ 16, Ex. 13 at DEFENDANTS000650-DEFENDANTS000657; *id.* ¶ 17, Ex. 14 at DEFENDANTS000658-DEFENDANTS000665.)

**RESPONSE:** Admit that the documents state this timeline but deny that there is any admissible record evidence that such timelines were followed or enforced.

**REPLY:** Santander's Annual Incentive Plan unequivocally states that "[i]ncentive awards not subject to deferral will be paid no later than March 15th after the end of the Plan Year." (Boyarsky Aff., Ex. 13 at DEFENDANTS000658-DEFENDANTS000665.) Plaintiff has introduced no evidence that Santander did not follow its policy, and Plaintiff's bare assertion does not create a genuine issue as to this fact.

51.     Due to the volatility of market conditions, it is impossible to determine the incentive pool before the close of the fiscal year. (*See* Boyarsky Aff. ¶ 15, Ex. 12 at DEFENDANTS000641-DEFENDANTS000649; *id.* ¶ 16, Ex. 13 at DEFENDANTS000650-DEFENDANTS000657; *id.* ¶ 17, Ex. 14 at DEFENDANTS000658-DEFENDANTS000665; Kariuki Dep. Tr., at 119:14-120:3.) Because an individual employee's bonus amount is inextricably tied to the business performance

of Santander U.S. Entities, in general, Santander does not guarantee bonuses. (Kariuki Dep. Tr., at 118:17-120:3.)

**RESPONSE:** Deny that individual bonuses are "inextricably tied to the business performance of Santander U.S. Entities." *See supra*, responses to ¶¶ 48–49.

**REPLY:** The record clearly establishes—and Plaintiff has introduced no evidence to dispute—that annual incentive pools could be reduced due to Santander's performance, that managers could not award bonuses in excess of the amount of the incentive pool, and that managers were required to consider an employee's performance relative to other members of their team in setting bonuses.  (*See supra*, replies to ¶¶ 48–49.)

F. **Hiring and Recruiting of McKenna.**

52.    McKenna began her employment with SIS in May 2018, as a salesperson at SIS's Fixed Income sales desk. (McKenna Dep. Tr., at 10:19-20, 11:10-12; Boyarsky Aff. ¶ 18, Ex. 15 at DEFENDANTS000395.) At the time McKenna started at SIS, the Fixed Income Sales team was made up of three primary sales teams: Credit Sales, Macro Sales, and Investment Grade ("IG") Sales. (Boyarsky Aff. ¶ 19, Ex. 16.) The Credit and Macro Sales teams specialized in Emerging Market ("EM") products, while the IG Sales Team specialized in selling IG products. (Kariuki Aff. ¶ 10.) Emerging markets consists of non-G10 countries that have outstanding debt and companies within those countries. (Kariuki Dep. Tr., at 32:2-4.)  McKenna was a part of the IG Sales Team and dealt primarily in IG products. (Boyarsky Aff. ¶ 19, Ex. 16.)

**RESPONSE:** Admit. Deny any implication that McKenna was ever expected or required to sell only IG products. Members of the IG team routinely sold EM products to support their clients. Ex. 8, DEFENDANTS025603 (discussing Barker's EM sales credits); Ex. 9, McKenna Dep. at 103:8-12; Def. Ex. 66, Dep. of Kariuki at 153:15-22 (discussing assignment of EM duties

to McKenna and Barker); Ex. 3, Dep. of Minuesa 43:6-12 (discussing how he deliberately created an overlap between IG and EM teams); Ex. 10, Kariuki Dep. at 33:23-25; Ex. 5, Garvey Dep. at 61:13-15 (EM sales people could do both EM and IG trade).

**REPLY:** It is undisputed that a separate EM sales team existed to handle EM sales.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., 181:20-21.) The IG Sales Team's primary focus was IG sales with some limited overlap. (Boyarsky Aff., Ex. 16.)

53.    In 2018, SIS rehired Garvey and offered him an opportunity to run the Fixed Income sales and trading teams and build out the teams as he saw fit. (Garvey Dep. Tr., at 35:4-11.) Consistent with his mandate of building out the sales and trading teams, Garvey hired a total of four salespeople, including McKenna. (*Id.* at 40:13-23.) Garvey knew McKenna from his prior employment at Scotia Bank, where she applied for an open sales position. (*Id.* at 86:18-87:12.) Although McKenna did not get the job at Scotia Bank, Garvey thought she was a good candidate, and thus, recruited her to SIS in early 2018. (*Id.* at 86:18-87:2; Minuesa Dep. Tr., 50:16-21.)

**RESPONSE:** Admit.

54.    Garvey is a Caucasian male. (Kariuki Aff. ¶ 23.)

**RESPONSE:** Object to the testimony as irrelevant as Garvey's race is not "of consequence in determining the action." Fed. R. Evid. 401(b).

55.    Dr. Siobhan Donnelly is a clinical psychologist specializing in depression, anxiety, trauma, OCD, other anxiety-related disorders, and substance abuse disorders. (Donnelly Dep. Tr., at 14:6-10, 16:7-12.) She has been treating McKenna for support around anxiety and work-related stressors since October 2014 (almost four years before working at Santander). (Donnelly Dep. Tr., at 14:9-11, 19:19-20:18.) Dr. Donnelly testified that McKenna reported feelings of "ambivalence" about her job before Santander because it was a male-dominant workplace environment, there was

a boy's club, and she was expected to hide her emotions. (*Id*. at 42:14-21, 43:4-44:10.) McKenna was excited and hopeful about her new job with Santander. (*Id*.)

**RESPONSE:** Deny any implication that working at Santander did not cause McKenna emotional distress damage. McKenna reported concerns that Santander was "treating her differently." Def. Ex. 63, Donnelly Dep. at 47:19-24. She reported that Santander was "not happy with her working from home." Ex. 11, Donnelly Dep. at 117:4-7. She reported that Santander was "not happy" about her second pregnancy. Def. Ex. 63, Donnelly Dep. at 51:3-6. McKenna reported being treated differently "as a stressor," Ex. 11, Donnelly Dep. at 117:25, and, while she cannot recall specific details, Donnelly believes that she prescribed coping techniques to deal with this stressor. *Id.* at 118:21-23. In general, McKenna reported that work stressors exacerbated the symptoms of her general anxiety disorder and her post-traumatic stress disorder. *Id.* at 120:23-121:16.

**REPLY:** Deny that Donnelly testified that anything related to McKenna's employment with Santander exacerbated her post-traumatic stress disorder.  (Donnelly Dep. Tr., at 121:6-16.) ("Q. And do you believe the work stressors she experienced at Santander exacerbated [McKenna's post-traumatic stress disorder?  A.  I can't give a causal opinion on that").

56.    According to the terms of the offer letter that she signed, McKenna would be entitled to a base salary equivalent to $215,000 calculated annually. (Boyarsky Aff. ¶ 18, Ex. 15 at DEFENDANTS000395.) According to her offer letter, in addition to her annual base compensation, McKenna was also eligible to receive a discretionary bonus with a reference target of $200,000 that was payable in accordance with SIS's policy with respect to the payment of bonuses. (*Id.*) McKenna also received a one-time special payment in the amount of $75,000 that

was intended to compensate her for the deferred compensation she gave up from her prior employer because she joined Santander. (*Id.*)

**RESPONSE:** Admit.

57.     McKenna did not have a guaranteed bonus according to her offer letter.  (Garvey Dep. Tr., at 95:3:96:6; Boyarsky Aff. ¶ 18, Ex. 15 at DEFENDANTS000395; Boyarsky Aff. ¶ 20, Ex. 17.) Santander did not commit in any writing to pay McKenna a guaranteed bonus of $200,000. (*Id.*; Boyarsky Aff. ¶ 18, Ex. 15 at DEFENDANTS000395.) McKenna acknowledged that her 2019 bonus was discretionary. (McKenna Dep. Tr., at 170:14:17.)

**RESPONSE:** Deny any implication that the bonus was not guaranteed. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** McKenna's offer letter, which she accepted with her signature on March 21, 2018, unambiguously provides that she was not guaranteed a bonus, much less a specific amount of bonus.  (Def. Ex. 15 at DEFENDANTS000395.)  The offer letter explicitly states that she would be eligible for "a *discretionary* bonus with a *reference* of $200,000."  (*Id.*) (emphasis added).  The offer letter further conditions the bonus, making it "payable in accordance with SIS policy with respect to the payment of bonuses," which, as discussed above, allowed for target bonuses to be reduced based on individual and firm performance.  (*Id.*; *see supra* at ¶ 48-51.)  The offer letter provides that it "contains the entire understanding of the parties regarding the subject matter hereof and no terms, including compensation terms, may be modified except by a document signed by the parties and referring explicitly hereon."  (*Id.*)  Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted.

58.     Before signing the offer letter to join Santander, McKenna had multiple discussions about the terms of her offer letter, including the amount of her bonus, with Garvey and Human

Resources. (Garvey Dep. Tr., at 89:6-90:25, 94:10-98:10; Boyarsky Aff. ¶ 20, Ex. 17.) During these discussions, Garvey expressly informed McKenna that Santander does not guarantee bonuses, and thus, she, like everyone else who decides to join Santander, does not have a guaranteed bonus. (Garvey Dep. Tr., at 95:3-96:6.)

**RESPONSE:** Deny. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted.  (*See supra*, at ¶ 57.)

59.     Garvey also explained that the target amount referenced in the offer letter was just a target, and while McKenna could negotiate for a higher or lower target bonus, the final allocation was discretionary, and would depend on the business results of the Santander U.S. Entities and individual performance. (Garvey Dep. Tr., at 95:3-96:6.) Indeed, one of the main discussions Garvey had with every candidate for employment was to make sure that they understood how the target bonus works, and the lack of a guaranteed bonus at Santander. (*Id.*)

**RESPONSE:** Deny. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted.  (*See supra*, at ¶ 57.)

60.     Garvey explained to all candidates he spoke with, McKenna included, that they should not join Santander if they were uncomfortable about not getting a guaranteed bonus. (Garvey Dep. Tr., at 95:3-96:6.) Specifically, Garvey testified:

Q.     And did you discuss the salary and target bonus with Ms. McKenna?
A.     I did.  I explicitly discussed it. . . .
         . . .

A.      . . . **[O]ne of the main things I spoke to every candidate was to make sure that I expressly described the target bonus and lack of guaranteed bonus at Santander.** I had a long and lengthy conversation with each of the candidates about it. I explained to them that **Santander does not offer guaranteed bonuses, that I was going without a guaranteed bonus, and no one joining would get a guaranteed bonus, and that was how they did business, and if they were not comfortable with not getting a guaranteed bonus that they should not come to Santander, but under no circumstance would they give a guaranteed bonus to anyone.**

**I explained to them the target bonus was just a target. It was discretionary at the end of the year, and they could negotiate for a higher target bonus or lower target bonus, but when push comes to shove, the bonus they got was up to the business, Mr. Minuesa and myself.**

(*Id.*) (emphasis added.)

**RESPONSE:** Deny. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted. (*See supra*, at ¶ 57.)

61.      In addition to her conversation with Garvey, Human Resources also explained how the target bonus worked at the time it sent the offer letter to McKenna. (Boyarsky Aff. ¶ 20, Ex. 17.) In an email dated February 13, 2018, Retamar from Human Resources specifically explained to McKenna that, "**the reference that we will consider for the payment of the annual variable is $200,000. This amount acts as a reference that can be lower or higher in the final allocation, depending on the results of the company and your individual performance**." (*Id.*) (emphasis added.)

**RESPONSE:** Deny any implication that the bonus was not guaranteed. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted. (*See supra*, at ¶ 57.) Plaintiff worked for

Santander in 2018 for eight months or two thirds (2/3) of the year for which her total bonus was 15% less than her target and consistent with her offer letter (Boyarsky Aff., Ex. 15) and bonus plan, including which provides for pro-rated bonuses for employees starting before September 29, 2018 (Boyarsky Aff., Ex. 12, p. 5, DEFENDANTS000645.)  The email from Retamar states "This amount will be prorated in 2018 depending on your final start date."  (Boyarsky Aff., Ex. 17.)

62.     During her deposition, McKenna testified that she was working with the assistance of legal counsel regarding the terms of her offer letter. (McKenna Dep. Tr., at 157:15-24.) Although her lawyer proposed certain changes to the terms of her offer letter, Santander did not change the terms of her offer letter based upon the proposed changes by her lawyer. (*Id.* at 158:17-23.)

**RESPONSE:** Deny that "her lawyer proposed certain changes to the terms of her offer letter" and that in response "Santander did not change the terms of her offer letter based upon the proposed changes by her lawyer." McKenna testified that she could not "remember if I just had a discussion with Bill or if I actually sent over the changes that my lawyer put in the offer letter." Def. Ex. 67, McKenna Dep. at 158:17-19.

**REPLY:** In McKenna's text message with Garvey as a job candidate when she was negotiating her compensation, she states "I'm in a car with a coworker. But can I send you my lawyers changes and then call you when I am at the airport. I just that the bonus would be guaranteed for my first year 200k. In the contract it read discretionary. Did I misunderstand? That is my only big concern … otherwise he just changes some wording" (2nd Supp. Boyarsky Aff., Ex. 74, PL001751.)  Plaintiff admitted that Santander did not change her offer letter based upon suggestions by her lawyer. (Supp. Boyarsky Aff., Ex. 67, McKenna Dep. at 158:20-23 (Q: "did

Santander change your offer letter based upon suggested changes by your lawyer? A: No.") Plaintiff's offer letter never changed regarding the discretionary bonus provision.

63.    Based on her discussions with Garvey, Human Resources, and counsel, McKenna was well aware that the $200,000 indicated in her offer letter was merely a target amount, and not guarantee. (McKenna Dep. Tr., at 157:15-24, 158:17-3; Garvey Dep. Tr., at 95:3:96:6; Boyarsky Aff. ¶ 20, Ex. 17.)  With this knowledge and understanding of the target bonus works at Santander, on March 21, 2018, McKenna signed the offer letter confirming her acceptance of the terms therein.  (Boyarsky Aff. ¶ 18, Ex. 15 at Defendants000395-398.)

**RESPONSE:** Deny. Garvey represented to McKenna that she would certainly receive her target bonus. Ex. 9, McKenna Dep. at 13:21-24.

**REPLY:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted.  (*See supra*, at ¶ 57.)

64.    From 2018 through March 2019, Garvey was the head of both the Fixed Income trading and sales teams. (Garvey Dep. Tr., at 30:9-31:24; Minuesa Dep. Tr., at 40:16-19.) At the time, Kariuki was the head of the Emerging Markets sales team. (Kariuki Dep. Tr., at 28:17-30:17.) Both Kariuki and Garvey report to Juan Minuesa, the Head of Markets in the U.S. (Minuesa Dep. Tr., at 15:5-11, 15:20-17:16.)  From May 2018 through March 2019, McKenna reported to Garvey. (Boyarsky Aff. ¶ 21, Ex. 18 at ¶ 27; McKenna Dep. Tr., at 54:23-55:3.) Because the business was not performing as expected, in or around March 2019, Minuesa decided to reevaluate his business strategy by merging both the Emerging Markets and Fixed Income Sales teams under a single supervisor—Kariuki. (Minuesa Dep. Tr., at 39:23-40:23.) As a result of the merger of the sales teams, Kariuki became McKenna's supervisor in March 2019. (Boyarsky Aff. ¶ 21, Ex. 18 at ¶ 38; McKenna Dep. Tr., at 54:23-55:3.) After the merger, Garvey became the Head of IG Trading and

no longer supervised the salespeople. (Garvey Dep. Tr., at 30:9-31:19.) As Kariuki was not McKenna's supervisor in 2018 or at the time her 2018 bonus was allocated, he was not involved in McKenna's 2018 bonus allocation but was involved in her 2019 bonus allocation. (Minuesa Dep. Tr. 62:3-13; Kariuki Dep. Tr. 117:24-118:3, 111:13-113:25.) Kariuki testified that after he is provided the annual bonus pool by his manager, he reviews his employees targets and assesses both individual performance and the employee's contributions to the sales Team as a whole to determine how to allocate bonus amounts. (*Id* at 111:13-113:25.)

**RESPONSE:** Admit that Kariuki was not involved in her 2018 bonus allocation. Admit that Kariuki was involved in her 2019 bonus allocation. Deny that Kariuki solely reviewed McKenna's "performance" and "contributions." He also took into account the amount of work she was unable to do because of her pregnancy. Ex. 9, McKenna Dep. at 169:6-7 (Kariuki told McKenna she was lucky to receive even a diminished bonus "because [she] had missed so much time for pregnancy."); Ex. 12, DEFENDANTS010714 (Garvey email, faulting McKenna for diminished performance over course of year she was out on maternity leave); Ex. 13, DEFENDANTS010850 (ranking McKenna last on her team shortly after her maternity leave); Ex. 14, DEFENDANTS025575-025583 (extremely negative contemporary performance review of an employee Kariuki ranked above McKenna).

**REPLY:** None of the documents cited by Plaintiff are evidence that Kariuki considered McKenna's pregnancy in assigning her 2019 bonus.  "Pl. Ex. 12, DEFENDANTS010714, and email from Garvey, is not evidence of Kariuki's state of mind.  Pl. Ex. 13, DEFENDANTS010850 is a ranking of members of the IG sales team with no commentary.  The email does not indicate what Kariuki considered in creating the ranking and thus does not provide evidence that Kariuki took McKenna's maternity leave into account when setting her 2019 bonus.   Pl. Ex. 14,

DEFENDANTS025575-025583, a performance evaluation of another employee, provides no insight into Kariuki's state of mind when setting McKenna's bonus.  Kariuki's performance evaluation of McKenna was not negative. Kariuki acknowledged that McKenna had not been working for a period of time and expressed confidence, similar to his evaluation of Steckroth's performance, who only recently joined SIS in October 2019. (*See supra* ¶ 117; Boyarsky Aff., Ex. 33; 2nd Supp. Boyarsky Aff., Ex. 83.) In Kariuki's 2019 annual review of Steckroth, Kariuki also gave Steckroth an "Expectations Totally Met" rating across all categories and provided the general comment that "Tom is a new joiner but I am confident he will do well on this platform."  (2nd Supp. Boyarsky Aff., Ex. 83.)  McKenna's self-serving deposition testimony, corroborated by no admissible extrinsic evidence, does not create a genuine issue of fact.

65.      In 2018 and 2019 McKenna received bonuses proportional to other salespeople on her IG Sales Team, and higher than other IG Sales Team members for both years. (Boyarsky Aff. ¶ 22, Ex. 19.) In 2018, based on the business performance business of Santander U.S. Entities, the IG Sales Team, supervised by William Garvey at the time, was allocated an aggregate bonus pool of eighty five percent (85%) for all employees in the group, which is lower than the initial aggregate incentive pool for that year. (Yahn Aff. ¶ 8.) Accordingly, McKenna's target bonus of $200,000 was reduced to $170,000— the exact amount she received. (McKenna Dep. Tr., at 167:15-24; Yahn Aff. ¶ 8; Boyarsky Aff. ¶ 22, Ex. 19) Similarly, in 2019, McKenna received a bonus of $165,000, *i.e.*, $5,000 less than her target bonus of $170,000, while a male colleague, with a higher performance rating for the year and same target bonus only received $150,000. (McKenna Dep. Tr. at 166-23; Boyarsky Aff. ¶ 22, Ex. 19.)

**RESPONSE:** Deny that it was Santander's fixed practice to proportionally reduce bonuses based on a diminished incentive pool, or that Garvey or Kariuki were required to do so. *See supra*,

responses to ¶¶ 48–49. In 2018, male comparators got better bonus treatment than McKenna. According to its own records, it accorded a full bonus to a man who had a lower performance review than her. Ex. 15, DEFENDANTS025574 (bonus pay-outs against target and performance review ratings for 2018 and 2019 bonuses). With regards to the 2019 bonus payouts, deny that McKenna can be compared to the men on her team based on a target of $170,000. The record otherwise firmly establishes that her target bonus was $200,000, not $170,000. *See supra*, response to ¶ 56. Even granting these targets, a man with the same rating as he received a bonus $5,000 above his stated target. Ex. 15, DEFENDANTS025574.

**REPLY:** The record clearly establishes—and Plaintiff has introduced no evidence to dispute—that annual incentive pools could be reduced due to Santander's performance, that managers could not award bonuses in excess of the amount of the incentive pool, and that managers were required to consider an employee's performance relative to other members of their team in setting bonuses.  (*See supra*, replies to ¶¶48–49.)  With respect to the 2018 and 2019 bonuses, Plaintiff cherry-picks data points to create a dispute of fact where there is none.  McKenna worked in 2018 for two thirds of the year (from April through December) and received a $170,000 bonus out of a potential $200,000 target.  (Boyarsky Aff., Exs. 17, 19.)  Her only claim in her text message to a co-worker in 2020 related to her 2018 bonus is she did not receive the alleged guaranteed amount. (2nd Supp. Boyarsky Aff., Ex. 82, PL000396-7.)  She did not state in this text message that she thought the $170,000 amount related to her gender. (*Id*.)

G. **McKenna's First Pregnancy and Accommodation Request.**

66.    In late 2018, McKenna disclosed her first pregnancy to Garvey, her supervisor at the time. (Boyarsky Aff. ¶ 21, Ex. 18 at ¶ 27; Garvey Dep. Tr., at 105:21-106:10.)

**RESPONSE:** Admit.

67.     After disclosing her pregnancy to Garvey, McKenna informed Garvey that she would be unable to commute into the office due to complications arising from her pregnancy. (Garvey Dep. Tr., at 107:6-18.) At the time, McKenna informed Garvey that her doctor was unsure how long she was going to be unable to commute to the office. (*Id.* at 107:19-25.) Given the uncertainty of the situation and how it could potentially last a day or two, or a week or two, Garvey asked McKenna to come into the office whenever she could and that they would reevaluate the situation again once she had more information on whether she could commute to the office full time. (*Id.* at 107:19-108:9.)

**RESPONSE:** Admit the first two sentences. Deny that "Garvey asked McKenna to come into the office whenever she could and that they would reevaluate the situation once she had more information on whether she could commute to the office full time." Garvey in fact told McKenna that she could work from home. McKenna Decl. at ¶ 10. It is unsurprising that he would deny having done so, as he clearly violated Santander's policies. "[A] jury may disregard his testimony because he is an interested witness." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home.  (*See supra*, reply to PP 25-16.)  Moreover, by her own admission, McKenna testified during her deposition that she did not speak with Human Resources or senior management for a policy exception as required under Santander's policies. (Supp. Boyarsky Aff., Ex. 67, McKenna Dep. Tr., 21:11-25:5; supra reply to ¶ 19.)  Garvey did not have authority to grant a remote work arrangement to McKenna, which first would have required multiple levels of approval at Santander.  (Cignarella Aff. ¶ 10.)

Garvey is not an interested witness, unlike Plaintiff. McKenna elected purposely to not sue him individually but instead to sue Kariuki individually.

68. During his conversations with McKenna about her inability to commute to work, Garvey expressly instructed McKenna not to execute any transactions at home. (Garvey Dep. Tr., at 107:19-108:9; *see* Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028029-028030; *id*. ¶ 5, Def. Ex. 2 at DEFENDANTS028000-028001.) Garvey explained that it has been Santander's longstanding policy that people on the Fixed Income sales and trading desks were prohibited from executing transactions outside of company premises. (Garvey Dep. Tr., 108:15-109:5; Boyarsky Aff. ¶ 4, Ex. 1 at DEFENDANTS028029-028030; *id*. ¶ 5, Ex. 2 at DEFENDANTS028000-028001.) McKenna acknowledged that no one else on her team worked remotely during this time and that she did not have a Bloomberg terminal at home. (McKenna Dep. Tr. 23:18-24, 27:3-19.) To the extent McKenna needed an exception from the policy, Garvey told her that she should reach out to the Human Resources and Compliance Departments. (Garvey Dep. Tr., at 108:15-109:5.) Unless Human Resources and Compliance gave her an exception to work from home, however, Garvey told McKenna that it was impossible for her to work from home. (*Id*.) McKenna expressed her frustration at Garvey's instructions and Santander's policy prohibiting her from working from home. (*Id*.)

**RESPONSE:** Deny that "Garvey expressly instructed McKenna not to execute any transactions at home" or that he instructed her to report to HR. Garvey in fact told McKenna that she could work from home. McKenna Decl. at ¶ 10. It is unsurprising that he would deny having done so, as he clearly violated Santander's policies. "[A] jury may disregard his testimony because he is an interested witness." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000);

*see In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

Deny that McKenna did not have access to a Bloomberg terminal at home. Working remotely, she "accessed [her] Bloomberg in order to make trades." Ex. 9, McKenna Dep. at 27:15-16.

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home. (*See supra*, reply to ¶ 25-26.) Garvey is not an interested witness, unlike Plaintiff. McKenna elected purposely to not sue him individually but instead to sue Kariuki individually.

69.     Because it was unclear whether or not McKenna's inability to commute to work would be long-term or short-term, Garvey waited for McKenna to provide him with further instructions from her doctor before notifying Human Resources of her condition and request to work from home. (Garvey Dep. Tr., at 109:6-110:19.)

**RESPONSE:** Admit that Garvey delayed informing Human Resources about McKenna's situation. Deny it was unclear whether the inability to commute would be "long term." The inability to commute could not have lasted beyond McKenna's pregnancy, which was already nearly at term by this time, given she gave birth in early May.

**REPLY:** Plaintiff offers no specific evidence to refute Garvey's sworn testimony and, therefore, her Response is improper. (Local Civ. R. 56.1(d).)

70.     A primary and essential function of McKenna's job as a salesperson on the IG Sales Team is to execute trades. (McKenna Dep. Tr. 26:9-11.) In early 2019, McKenna executed trades remotely with the assistance of other salespeople by adding them to Bloomberg IB without a Bloomberg terminal at home. (McKenna Dep. Tr. at 26:5-27:19.)

**RESPONSE:** Admit that this is a "primary and essential function of McKenna's job." Deny that McKenna needed the "assistance of other salespeople." She was simply looping them in, as Garvey had requested. Ex. 9, McKenna Dep. at 24:4-5 (testifying that Garvey asked her to keep another salesperson in the loop when she worked from home). Deny that McKenna did not have access to a Bloomberg terminal at home. In fact, she was able to securely access her Bloomberg. *Id.* at 27:15-16.

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home. (*See supra*, reply to ¶ 25-26.)

71.     As of March, McKenna had not provided Garvey with an update on how long she expected her inability to commute to the office would last. (Garvey Dep. Tr., at 109:6-110:19.) Instead, she came into work sporadically for some time. (*Id.*) Thus, on March 7, 2019, Garvey followed up via text message asking her if and when she could come to work. (Boyarsky Aff. ¶ 23, Ex. 20.) McKenna informed Garvey that she was still advised not to commute to the office. (*Id.*)

**RESPONSE:** Deny Garvey testified "McKenna had not provided Garvey with an update." He testified instead that they were waiting to hear from McKenna's doctor. Ex. 5, Garvey Dep. at 110:16-19. Otherwise admit, but deny any implication that McKenna was unable to work from home or that Garvey believed she was not working from home. *See supra*, responses to ¶¶ 67–70.

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home. (*See supra*, reply to ¶ 25-26.)

72.     After approximately one or two weeks of her not reporting to the office, Garvey explained to McKenna that she could no longer continue coming in to work only two days a week, like a part-time employee. (Garvey Dep. Tr., at 109:6-110:19, 113:9-114:16.) Given that McKenna's inability to commute to work appeared to be more than temporary and she had already missed a significant amount of work, Garvey told her that she should reach out to Human Resources to discuss working either full-time or part-time due to the situation. (*Id.* at 114:2-16.)

**RESPONSE:** Deny that McKenna was a part-time employee. McKenna was working full-time from home, and Garvey understood this. *See supra*, responses to ¶¶ 67–70. Deny, accordingly, that McKenna "had already missed a significant amount of work." Further deny the testimony supports that Garvey told McKenna to reach out to Human Resources.

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home. (*See supra*, reply to ¶ 25-26.) Plaintiff did not have a remote work arrangement which would have required multiple approves that did not take place. (*See supra*, reply to ¶ 67.)

73.     Although Garvey was McKenna's supervisor at work, it was not within his purview, neither was he authorized, to reduce her working hours without conferring with Human Resources. (Garvey Dep. Tr., at 114:17-115:2.)

**RESPONSE:** Admit that he so testified. Deny there is record evidence about Santander's policies under these circumstances. "[A] jury may disregard [Garvey's] testimony because he is an interested witness." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

**REPLY:** Plaintiff offers no specific evidence to refute Garvey's sworn testimony and, therefore, her Response is improper. (Local Civ. R. 56.1(d).)  Garvey is not an interested witness, unlike Plaintiff.  McKenna elected purposely to not sue him individually but instead to sue Kariuki individually.

74.     After speaking to McKenna, Garvey spoke to Minuesa and Human Resources about McKenna's situation. (Garvey Dep. Tr., at 113:9-19.) On March 8, 2019, Garvey sent an email (the "March 8 Email") to Retamar in Human Resources, informing her of McKenna's pregnancy and inability to commute into the office. (*Id.*; Boyarsky Aff. ¶ 24, Ex. 21.)  In the March 8 Email, Garvey also informed Retamar that he has instructed McKenna not to execute any transactions while she is out of the office. (*Id.*) In response, Retamar told Garvey that they would reach out to McKenna to discuss and work out a solution. (Garvey Dep. Tr., at 113:9-19.) McKenna testified that Kariuki told McKenna she would be fired if she worked remotely at some point after these communications (which is disputed) but testified that she does not remember anything else about this conversation, including whether Kariuki told her why she would be fired had she worked from home. (McKenna Dep. Tr., at 48:20-49:10.)

**RESPONSE:** Admit that Garvey spoke to Minuesa and Human Resources about McKenna's situation and that he informed Retamar at this time. Deny that Garvey originally instructed McKenna not to trade from the office. *See supra*, responses to ¶¶ 67–70. Admit Retamar's response. Admit that McKenna so testified.

**REPLY:** McKenna's self-serving testimony does not create an issue of fact as to Santander's clear policies against institutional salespersons working from home.  (*See supra*, reply to ¶ 25-26.)

75.     On March 12, 2019, Human Resources emailed McKenna and asked her to contact Catherine Baer, a Senior Specialist in Benefits to discuss her medical condition, and to send over a copy of her doctor's instructions. (Boyarsky Aff. ¶ 25, Ex. 22 at PL000070.)  On March 13, 2019, McKenna spoke to Baer and they agreed to continue their discussion about McKenna's pregnancy after McKenna had a chance to discuss with the Compliance team.  (*Id.* at PL000069.)

**RESPONSE:** Admit.

76.     About a week after Baer failed to hear anything from McKenna about her pregnancy and accommodation request, on March 19, 2019, Baer sent an email to follow up with McKenna about the doctor's note that Human Resources requested for the week prior. (Boyarsky Aff. ¶ 25, Ex. 22 at PL000069.) In the March 19 email, Baer also asked McKenna if there were other accommodations that her doctor was requesting given that her position prohibited her from working remotely. (*Id.*) Baer also asked McKenna if a ride share may be an option for an accommodation. (Boyarsky Aff. ¶ 26, Ex. 23 at PL000068.)

**RESPONSE:** Deny that Baer "failed to hear anything from McKenna." By this time, McKenna had spoken to Santander's compliance team, Ex. 16, PL000069, and had spoken again with Santander's HR team, *Id.* at PL000068–000069. Catherine Baer apparently understood the outcome of McKenna's conversation with compliance. *Id.* at PL000069 ("It is my understanding your position is not one that has the ability to work remote.") McKenna had also lined up a doctor's appointment at her earliest convenience. *Id.* at PL000068. Otherwise, admit the contents of the emails is as described.

In fact, Santander did not decide until March 20, 2019, that McKenna should fill out its pregnancy accommodation forms. Ex. 17, DEFENDANTS000695.

**REPLY:** The mere fact of sending pregnancy accommodation forms on March 20 as a follow up to discussions that Human Resources representatives conducted with McKenna a week earlier does not negate the existence of Garvey's communications with Human Resources as evidenced in a March 8 email and Human Resources communications with McKenna on March 12 to explore accommodations. (*See supra*, ¶¶ 74, 75.)

77.     Approximately two weeks after Human Resources first requested a doctor's note from McKenna regarding her medical condition, on March 21, 2019, McKenna sent Baer an email with her doctor's note attached, and informed Baer that her doctor was still in the process of completing the Pregnancy Accommodation Forms, but that she anticipated having them by the following week. (Boyarsky Aff. ¶ 26, Ex. 23 at PL000068.) In the March 21 email, McKenna informed Baer that her husband could drive her to work twice a week and requested that Santander provide her with a car service twice a week, including the next day. (*Id.*) Given that McKenna had yet to complete her Pregnancy Accommodation Form, Baer informed McKenna that she would not be able review her request for the car service until she received the completed forms from her doctor. (*Id.* at PL000067-68.)

**RESPONSE:** Deny that McKenna failed to get a doctor's note quickly. In fact, Santander did not even decide until March 20, 2019, that McKenna should fill out its pregnancy accommodation forms. Ex. 17, DEFENDANTS000695. Admit that McKenna said her husband could drive her twice a week. Admit that Santander declined to review any requests at this time.

78.     McKenna testified that she never submitted a reimbursement request for a car service. (McKenna's Dep. Tr., at 34:11-36:23.) Given that McKenna never submitted a request for reimbursement, Santander never denied McKenna's request to be reimbursed for a car service. (*Id.*)

**RESPONSE:** Admit that McKenna did not submit a reimbursement request at this time. Deny that McKenna is at fault for not submitting a request for reimbursement, as Santander never made a decision about a car service. Ex. 18, DEFENDANTS001453.

**REPLY:** Santander did not make a decision regarding McKenna's request for car service, because McKenna withdrew her request.  (*See infra*, response to ¶ 231.)

79.     McKenna admitted in her deposition that there was nothing in the supporting documentation provided by her doctor instructing her to remain at home for the rest of her pregnancy. (McKenna Dep. Tr., at 37:15-38:5.) McKenna's doctor's note dated March 21, 2019 states that she "has been cleared to go back to work 4 days a week as long as she is provided with transportation. (Boyarsky Aff. ¶ 27, Ex. 24.) The Pregnancy Accommodation Form dated March 21, 2019 completed by McKenna's doctor, detailed the specific accommodations that she was requesting for her pregnancy. (Boyarsky Aff. ¶ 28, Ex. 25.) The Accommodation Form states that McKenna "should not be lifting anything at all, climbing, pushing/pulling" and that she "need to be provided with transportation and has been cleared to return to work 4 days a week." (*Id.*)

**RESPONSE:** Deny this characterization of the note. As stated, the note only cleared McKenna to return to work four days a week. While the note did not instruct McKenna to "remain at home for the rest of her pregnancy," it also did not clear her to return to work full-time. Admit the contents of the pregnancy accommodation form.

**REPLY:** McKenna did not provide any evidence that she requested an accommodation to work from home one day per week during the remainder of her pregnancy. The Accommodation Form and March 21, 2019 doctor's note do not include such a request.

80.     Given that remote work was not viable option for McKenna's position, Santander made significant efforts to find alternative means of accommodating her. (Boyarsky Aff. ¶ 29, Ex.

26 at DEFENDANTS000700.) On April 2, 2019, Retamar emailed McKenna and asked her if there were any Santander bank branches near where she lived to which she could comfortably commute.  (*Id.*)

    **RESPONSE:** Deny that remote work was not a viable option for McKenna's position. See supra, response to ¶¶ 20–22, 26. Deny Santander made significant efforts on McKenna's behalf. The email cited shows Retamar insultingly asking if McKenna knew of Santander bank branches near her home, when this was public information to which Retamar already had full access. Def. Ex. 26, DEFENDANTS000700. The only efficient thing about Santander's internal process was the speed with which it "closed" McKenna's case. *Id*. at DEFENDANTS000699.

    **REPLY:** The record does not demonstrate that Santander had an obligation to keep open McKenna's accommodation request after she had withdrawn it.  (*See supra*, reply to ¶ 78.)

    81.    On April 3, 2019, McKenna responded to Retamar's April 2 email informing her that she has "positive news" after visiting her doctor yesterday. (Boyarsky Aff. ¶ 29, Ex. 26 at DEFENDANTS000699-DEFENDANTS000700.) McKenna told Retamar that she was "all good now to commute" as she was "out of the critical time for the baby." (*Id.*) She further states that her baby was "over 4lbs" and that her doctors were pleased.  (*Id.*) McKenna testified that she "begged" her doctor to be able to return to work. (McKenna Dep. Tr. 43:6-11.)

    **RESPONSE:** Admit the contents of these documents and McKenna's testimony.

    82.    Based on McKenna's email, Retamar emailed everyone who was involved in McKenna's accommodation request that there was "no[] need to do anything else." (Boyarsky Aff. ¶ 29, Ex. 26 at DEFENDANTS000699.)

    **RESPONSE:** Admit.

83.     After McKenna's April 2 email informing Retamar that she no longer needed an accommodation, on April 24, 2019, McKenna provided another doctor's note regarding her pregnancy. (Boyarsky Aff. ¶ 30, Ex. 27.) In the April 24 note, the doctor instructed McKenna to "cut back on commuting 2-3 times weekly for 2 weeks and then not at all" due to complications arising from her pregnancy. (*Id.*) McKenna conceded in her deposition that, like the March 21 doctor's note, there was nothing in the doctor's instructions in the April 24 note requiring her to work from home full-time. (McKenna Dep. Tr., at 44:17-45:17.)

**RESPONSE:** Admit that McKenna provided the second doctor's note. Admit the contents of that note. Admit the note did not state that she should work from home full-time. However, clarify that it did not clear her to return to work full-time either.

**REPLY:** Plaintiff's Response does not create a genuine issue as to whether her doctor's note required her to work from home full-time. *See also supra* reply to ¶ 79 for the import of the Accommodation Form and March 21, 2019 doctor's note.

84.     McKenna provided no answer to explain why she sued Kariuki but not Garvey, who was her supervisor at the time half of her claims (wage discrimination and failure to accommodate for pregnancy) arose. Specifically, McKenna testified that Garvey was her supervisor at the time that her bonus 2018 amount was decided and at the time that she states that her purported accommodation to work from home was "retracted" (which Defendants' dispute). (McKenna Dep. Tr. 240:6-243:3.)  Despite this fact, and the fact that McKenna never mentioned or complained of Kariuki to Dr. Donnelly, McKenna chose to file claims against Kariuki and not Garvey.  (Donnelly Dep. Tr. 48:24-49:11.)

**RESPONSE:** Object to the evidence offered as inadmissible. Defendants have offered no explanation of how McKenna's choice of whom to sue is relevant to any defense in this action.

Any evidence offered on this point is "of [no] consequence in determining the action," Fed. R. Evid. 401(b), and, thus, irrelevant and inadmissible.

### H.  McKenna FMLA Leave and Assignment of Accounts.

85.      After Kariuki assumed responsibility for both the Emerging Markets and IG Sales Team in or around March 2019, he did broad-stroke reallocations of client accounts approximately three times. (Kariuki Dep. Tr., at 132:3-12.) In general, reallocation of accounts is a regular practice and occurs due to departing salespeople resulting in a gap in sales coverage. (*Id.* at 132:3-6; Garvey Dep. Tr. 66:12-67:25, Steckroth Dep. Tr., at 103:24-104:8)

**RESPONSE:** Admit.

86.      The first reallocation of accounts occurred in or around March 2019, when Kariuki first took over management of the Emerging Markets and IG Sales Team.  (Kariuki Dep. Tr., at 132:9-19.) The first reassignment occurred because two salespeople from the IG Sales Team recently left Santander and Kariuki had to reallocate their accounts to the remaining salespeople. (*Id.* at 132:9-19, 133:25-134:4.) One of the salespeople who left, left voluntarily for another opportunity and the other male salesperson, Christopher Dearborn, was terminated because of his underperformance and attitude.  (*Id*. at 132:14-133:24, Garvey Dep. Tr. 68:9-69:8, Minuesa Dep. Tr. 105:2-18.) Garvey also testified that while he was managing the IG Sales Team, the two employees he spoke to about underperforming were McKenna and Dearborn. (Garvey Dep. Tr., at 63:15-64:8.)

**RESPONSE:** Admit these facts. Admit that Garvey so testified. Deny that McKenna underperformed. *See, e.g., infra* ¶ 325.

**REPLY:** The record evidence demonstrates that McKenna consistently performed lower than her colleagues in terms of both primary and secondary sales credits. (*See infra*, reply to ¶¶ 110-123.)

87.     Although Kariuki was responsible for making the final decision on account coverage among the salespeople on his team, he engaged in a collaborative process and sought input from the all the salespeople (including McKenna) on his team, as well as Garvey and the traders on his team, before making his decision. (Kariuki Dep. Tr., at 120:17-121:19, 133:25-145:22.)

**RESPONSE:** Admit the foregoing as a description of the first reallocation of accounts after Kariuki took joint control over the IG and EM sales teams.

88.     During his discussion with Garvey, Kariuki told Garvey that one of his primary concerns with respect to the reallocation of accounts was to make sure that the process was equitable, and that everyone on his team had an opportunity to add value. (Kariuki Dep. Tr., at 122:20-123:24.) Kariuki also asked Garvey if there were any specific relationships between the client and the salesperson that should be preserved. (*Id.*) In response, Garvey told Kariuki that, other than Barry Sherman and his longstanding relationship with his Boston accounts, there were no other significant relationships that justified preserving. (*Id.*)

**RESPONSE:** Deny the characterization of Kariuki's testimony. While Kariuki said he wanted to make sure everybody would "be able to add value," he never expressed any concern that the process be "equitable." Admit Kariuki's testimony regarding Barry Sherman's accounts.

**REPLY:** Kariuki's concern with an equitable distribution of accounts in indisputably demonstrated by his testimony that a purpose of the reallocation was to "make sure that everyone had a shot to be able to cover an account and effect trades." (Kariuki Dep. Tr., at 125:13-15.)

89.     Garvey's observation regarding the salespeople's preexisting relationships with their current accounts was based on the volume of secondary trades that the salespeople did with their clients. (Kariuki Dep. Tr., at 123:16-130:3.) As a trader, one of the main things that Garvey and his team watches closely is the volume of trades that are done over an electronic platform. (*Id.* at 125:23-130:3.) If an account does the majority of their trades over an electronic platform, he interprets that to mean the relationship between the client and the salesperson is not good. (*Id.*) If a client has a good relationship with a particular salesperson, they are more likely to seek out that salesperson when they want to do a trade. (*Id.*) An electronic trade requires practically no effort from the salesperson because, regardless of who the salesperson is, the client will trade based on the best price provided on the electronic platform.  (*Id.* at 125:23-130:3; Garvey Dep. Tr., at 54:20-55:9.)

**RESPONSE**: Admit. Regarding the levels of effort involved for different kinds of sales, however, both Kariuki and Garvey are interested in the characterization, and "a jury may disregard [their] testimony because [they are] interested witness[es]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment). Garvey is not an interested witness, unlike Plaintiff.  McKenna elected purposely to not sue him individually but instead to sue Kariuki individually.

**REPLY**: The undisputed record evidence shows that primary deals require little effort on the part of salespersons and that Santander considered secondary trades a better indicator of salesperson performance than primary trades.  (*See supra*, reply to ¶ 36.)

90.     After his discussion with Garvey, Kariuki and all of the remaining salespeople on his team—*i.e.*, Christopher Tolkin, Barry Sherman, and Erin McKenna—all gathered in a

conference room to discuss account coverage, preexisting client relationships, and made the initial determination on account coverage together. (Kariuki Dep. Tr., at 134:5-21, 136:5-146:6.) As to be expected, every salesperson wanted to succeed and therefore wanted more and larger accounts to cover. (*Id.* at 137:6-8.) During this meeting, McKenna, also shared her input and requested that Kariuki assign some larger and better accounts to her. (*Id.* at 142:13-143:7.) After this initial meeting with the salespeople, Kariuki shared these preliminary discussions with Garvey for his input before making a final decision. (*Id.* at 134:13-21.)

**RESPONSE:** Admit.

91.   Not long after the first allocation of accounts, a second reallocation of accounts occurred because another salesperson resigned and Jeffrey Barker—a salesperson who was previously on the Emerging Markets sales team—transitioned over to the IG Sales Team. (Kariuki Dep. Tr., at 148:11-15.) In considering account coverage for the second reallocation, Kariuki's focus was on increasing the volume of secondary activity by the salespeople. (*Id.* at 146:23-147:6, 148:11-15.) Furthermore, the salesperson who resigned—Brian Healion—was an effective salesperson, and Kariuki wanted to ensure that the accounts Healion covered and had a good relationship with would be redistributed to people who could carry on that relationship. (*Id.* at 148:21-152:9.)

**RESPONSE:** Deny the characterization of Kariuki's testimony. In the cited range, he never once mentions that "Healion was an effective salesperson" or that he redistributed accounts to people "who could carry on that relationship." He testified only to giving part of one account to one other person. Indeed, the record evidence shows that Kariuki simply plowed all of Healion's accounts into Chris Tolkin without giving the matter much thought. Ex. 19, DEFENDANTS009040.

Moreover, object to Kariuki's testimony about Brian Healion as irrelevant. Defendants have offered no evidence about how Healion's accounts were distributed. The stray fact is not "of consequence in determining the action," Fed. R. Evid. 401(b), and therefore inadmissible.

**REPLY:** Plaintiff's Ex. 19, DEFENDANTS009040 is a single sentence email from Tolkin to the Santander Middle Office distribution list asking for Healion's accounts to be moved over to him. It provides no evidence that Kariuki "simply plowed all of Healion's accounts into Chris Tolkin" and gives no insight into Kariuki's rationale. In fact, Kariuki did not reassign Healion's accounts to Tolkin. (Supp. Kariuki Aff. ¶ 18.) Rather, Tolkin "asked to cover [Healion's accounts] temporarily because he was Healion's backup to help with accounts during Healion's employment, and the team needed to cover the accounts during the interim period after Healion's departure." (*Id.*) This was simply a stopgap measure until Healion's accounts were "further redistributed to the remaining sales team, including to McKenna when she returned from her leave." (*Id.*)

92.    The second reallocation of accounts occurred when Kariuki decided to modify the account lists of some salespeople to ensure an equitable distribution of accounts and prevent the over-saturation of accounts in any single salesperson. (*Id.* at 149:21-150:9.)

**RESPONSE:** Deny that Kariuki testified in any way about "an equitable distribution of accounts." Admit that he testified about his concern with concentration in a single salesperson.

**REPLY:** Plaintiff's admission and denial are at odds. Preventing the concentration of accounts in a single salesperson is a method for promoting equitable division of accounts.

93.    During this time, Kariuki modified McKenna's and Barker's accounts lists. (Kariuki Dep. Tr., at 152:13-156:14.) Before the second reallocation of accounts, McKenna covered more Midwest accounts but specifically requested to cover the Los Angeles accounts in the reallocation because she had a preexisting relationship with some of the clients. (*Id.* at 152:13-

25.) At some point, McKenna also requested that Kariuki assign Vanguard—one of the largest asset managers in the world with approximately 6 trillion of assets under management ("AUM")—to her.  (Kariuki Dep. Tr., at 142:13-144:17; McKenna Dep. Tr., at 104:5-10.)  Vanguard is one of SIS's premier clients and is very active in the Fixed Income space.  (Kariuki Dep. Tr., at 143:21-144:3; McKenna Dep. Tr., at 80:7-16, 104:5-10.) McKenna testified that she knew Vanguard was a large institutional client and that it was one of the top asset managers in the word. (McKenna Dep. Tr., at 80:7-16, 104:5-10.)  McKenna told Kariuki that she had a relationship with Vanguard at a prior firm, and that she wanted an opportunity to cover larger accounts. (Kariuki Dep. Tr., at 142:13-144:17.)

**RESPONSE:** Deny McKenna had a preference for the LA accounts over the Midwest accounts. Outside of Kariuki's self-serving testimony, the record demonstrates that McKenna strenuously protested the loss of these accounts, Ex. 20, DEFENDANTS008045, with the support of Garvey, who believed that it was discriminatory for Santander to take these accounts away. Ex. 21, DEFENDANTS008213; Ex. 22, PL001815 ("This shit pisses me off so badly . . . They cannot fuck with your account list for having a baby.") McKenna had already invested significant effort in developing her Midwest accounts. Ex. 23, DEFENDANTS004408 (Garvey congratulating McKenna for "doing most of the heavy lifting on trips to . . . the Midwest."); McKenna Decl. at ¶ 20. Admit that McKenna requested Vanguard, but not as a preference over the Midwest accounts, given that the change would ultimately leave her with fewer accounts to cover, Ex. 24, DEFENDANTS000183-000184, and would essentially force her to start from scratch for a large proportion of her accounts, Def. Ex. 67, McKenna Dep. at 123:3-10.

Deny also the timeline around reassigning McKenna's accounts to Barker. The record shows that this happened during her maternity leave. Ex. 20, DEFENDANTS008045.

**REPLY:**  Plaintiff misrepresents how Northwest Mutual, the one account mentioned in Pl. Ex. 20, DEFENDANTS008045 was reallocated.  Both Barker and McKenna had a relationship with Northwest Mutual and wanted sole responsibility for the account.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 153:7-20.)  Kariuki thus allocated Investment Grade sales for Northwest Mutual to McKenna and Emerging Markets sales to Barker, allowing each salesperson to develop the portion of the business for which they were most suited.  (*Id*. at 153:15-22.)  Moreover, Pl. Ex. 20, DEFENDANTS008045, sent prior to McKenna's maternity leave, shows that the reallocation of accounts began prior to McKenna's maternity leave.

94.     Kariuki considered all of McKenna's requests and accommodated her by giving her the Los Angeles accounts, as well as Vanguard, that she requested. (Kariuki Dep. Tr., at 152:13-156:14.) To ensure that he was allocating accounts equitably, however, in exchange for giving McKenna the LA accounts that she expressed a preference for covering, Kariuki moved some of her Midwest accounts to Barker. (*Id.* at 152:13-156:14.) Despite Kariuki's accommodating all her requests, including the receipt of one of the largest asset managers in the world, McKenna was unhappy that she had to give up some Midwest accounts to Barker and insisted on covering some of those accounts. (*Id.* at 153:6-156:14.) Specifically, McKenna was particularly upset about Northwest Mutual's assignment to Barker. (*Id.*)  In response to McKenna's dissent, Kariuki once again accommodated McKenna by allowing her to continue covering Northwestern Mutual. (*Id.*) Instead of just giving McKenna another account, however, Kariuki reallocated Northwestern Mutual in a way that was in the best interests of the entire team, and also fair to McKenna and Barker. (*Id.*) Kariuki split the account and gave coverage for Investment Grade sales to McKenna and coverage for Emerging Markets sales to Barker. (*Id.*)

**RESPONSE:** Deny that Kariuki stripped McKenna's Midwest accounts as part of some "accommodation" requested by McKenna. McKenna did not request the changes, and vigorously protested them. *See supra*, response to ¶ 93. Deny that Kariuki would have been "giving McKenna another account." The sum total of his actions (as described) was to take away part of the Northwestern Mutual account (an account she herself had opened) from McKenna. Ex. 9, McKenna Dep. at 103:8-12; Def. Ex. 66, Kariuki Dep. at 153:15-22.

**REPLY:** The only Midwest account that Plaintiff cites was allocated to both McKenna and Barker due to pre-existing relationships between both salespersons and the client regarding discrete products.  (*See supra*, reply to ¶ 93.)

95.     Although Kariuki moved some of the Midwest accounts that McKenna previously covered to Barker, McKenna's account list actually improved as a result of the reallocation. (Kariuki Dep. Tr., at 153:2-154:21.) The reallocation gave McKenna ample opportunity to succeed given that she received strategic accounts that were more important to Santander, as well as accounts that Santander already had an established relationship with, and thus, were comfortable trading with Santander. (*Id.* at 153:2-154:21, 260:16-24, 326:13-18; Garvey Dep. Tr., at 78:9-20.)

**RESPONSE:** Deny that "McKenna's account list actually improved." McKenna was forced to build her new accounts from scratch. Def. Ex. 67, McKenna Dep. at 123:3-10. And, she lost the benefit of the effort she had put into visiting her Midwest accounts during 2018. Ex. 23, DEFENDANTS004408 (Garvey congratulating McKenna for "doing most of the heavy lifting on trips to . . . the Midwest.") In fact, by the end of this process, McKenna would have fewer accounts in 2020 than in 2019. Ex. 24, DEFENDANTS000183-000184.

**REPLY:** Plaintiff has introduced no evidence to contradict Kariuki's testimony regarding the size, quality, or strategic importance of the accounts assigned to her in the reallocation. The

reallocation accounts was a regular occurrence at SIS for the IG Group and it impacted other sales people.  Sherman's accounts, Legal and General Investments, National Investment Securities Inc and Northern Trust were reassigned to McKenna.  (Sherman Aff. ¶ 11.) The account Lord Abbott also was removed from him. (*Id*.)  He did not advocate these losses, considered them a regular occurrence and worked with new, reallocated accounts to generate sales.  (*Id*.)

96.     McKenna never testified that her opportunity to make sales credits with her new accounts after she returned from maternity leave was less than the one she had before taking maternity leave. (McKenna Dep. Tr., at 126:16-127:15.) All that McKenna testified to was that she had "existing relationships with some of the accounts [she] had to give up" and so she had to "rebuild the new accounts that were given to [her]." (*Id.*)

**RESPONSE:** Deny this characterization of McKenna's testimony. When asked to compare her before and after account lists, McKenna stated "I had existing relationships with some of the accounts I had to give up. So I had to rebuild the new accounts that were given to me." Def. Ex. 67, McKenna Dep. at 127:13-15. When it suits their case, Santander readily argues that salespeople are prejudiced by having to start from scratch. *See infra*, response to ¶ 108. A juror could easily conclude that Santander had reduced McKenna's "opportunity" to make sales by forcing her to start from scratch.

**REPLY:** McKenna did not have to "start from scratch" in building the accounts that were assigned to her as part of this reallocation.  To the contrary, she received the Investment Grade sales for Northwest Mutual, a client with whom she had a relationship; Western Assets, a client with whom she also had a good relationship; and Vanguard, a strategically important client with a close institutional relationship with Santander.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at

153:15-22; 154:23-25; 154:15-19; *see also supra*, reply to ¶ 93.)  Plaintiff's self-serving testimony does not create a genuine issue of fact.

97.     On May 6, 2019, McKenna gave birth to her first child. (McKenna Dep. Tr., at 47:19-20.) McKenna began her FMLA leave on May 6, 2019 and returned to work August 12, 2019. (*Id.* at 99:21-25.)

**RESPONSE:** Admit.

98.     McKenna received her regular base pay under a Santander private benefit plan during her maternity leave instead of unpaid FMLA leave. McKenna Dep. Tr., at 99:21-100:10.)

**RESPONSE:** Admit McKenna received pay during her maternity leave. Deny that this was not FMLA leave. As Santander's policies acknowledge, FMLA leave and paid disability leave are not exclusive. Ex. 25, DEFENDANTS028106-028107.

**REPLY:** Plaintiff's response misstates ¶ 98 in that her time off treated as FMLA leave was paid pursuant to a company policy instead of statutory FMLA leave, which is unpaid.

99.     During the time that she was out on maternity leave, Sherman covered her accounts for her.  (McKenna Dep. Tr., at 113:23-114:7; Boyarsky Aff. ¶ 31, Ex. 28.)  Sherman was consistently the IG Sales Team's second highest producing salesperson in primary and secondary sales credits.  (Boyarsky Aff. ¶ 32, Ex. 29; *id.* ¶ 33, Ex. 30.)

**RESPONSE:** Admit Sherman covered McKenna's accounts. Deny that these two sales-number snapshots support the proposition that "Sherman was consistently the IG Sales Team's second highest producing salesperson." For instance, on February 8, 2019, McKenna was the IG Sales Team's third highest producing salesperson and Sherman was the fourth. Ex. 26, DEFENDANT005163-005164.

**REPLY:** Plaintiff's evidence that five weeks into 2019, and on a single date, McKenna had $530.00 more in secondary sales credits than Sherman does not create a genuine issue as to whether Sherman was a better performer when his year-end 2019 secondary sales credits were more than double McKenna's.  (Boyarsky Aff. ¶ 32, Ex. 29.)

100.    McKenna was not the first employee to take leave while employed at Santander. Laura Kao, a Vice President on the Fixed Income Syndicate team and was recently promoted to Executive Director, and Melissa Zaccagnino, an institutional sales employee like McKenna but on the Fixed Income Emerging Markets Team, both took FMLA leaves and returned to work. (Kao Dep. Tr. at 19:19-21, 40:21-41:7.)  Kao is still employed and received a promotion following her maternity leave.  (Kao Dep. Tr., at 13:10-17:10.)   Zaccagnino resigned voluntarily to pursue another job well after her maternity leave. (Kariuki Dep. Tr. at 248:8-11.) Additionally, a male employee Kariuki supervised took paternity leave. (Kariuki Dep. Tr. at 248:14-17.)

**RESPONSE:** Admit that Kao took a maternity leave. Deny any of the cited testimony of Laura Kao speaks to Zaccagnino's maternity leave or return to work.

Admit that Kao received a promotion. Deny that the testimony cited supports the assertion that Zaccagnino resigned.

Deny that any of this establishes an absence of discrimination. Kao believes that Santander has failed to take care of its pregnant employees and complained about this fact on numerous occasions. Ex. 27, Kao Dep. at 18:12-20:9, 23:2-9. Kariuki gave Zaccagnino a low ranking on her team out of a subjective belief she was "disruptive," a conclusion he came to during her pregnancy, Ex. 13, DEFENDANTS010850; Ex. 10, Kariuki Dep. at 242:18-248:7, and then, around the time she was giving birth, began discussing moving her to a different team. Ex. 28, Yahn Dep. at 127:3-8; Ex. 29, DEFENDANTS012112 (Yahn email about Zaccagnino).

**REPLY:**  Plaintiff's mischaracterize Kao's testimony.  Kao specifically testified that she had never raised a complaint to Santander's Human Resources department.  (Licul Aff., Ex. 27, Kao Dep. at 18:12-16) ("Q.  Have you ever raised a complaint to any HR employee of Santander? A: Complaints?  No.").

Plaintiff's Response intentionally skipped the reason Kariuki considered Zaccagnino disruptive.  Kariuki's assessment was based on additional factors.  First, Zaccagnino misled a member of Santander's research team into joining a meeting with a former client of Zaccagnino's who had moved to a company whose account was managed by another Santander salesperson. (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. Tr., at 244:3-24.)  Zaccagnino further failed to notify anyone on her team that her former client had moved to a new company.  (*Id*.)  In Kariuki's estimation, her actions "could have really fractured the team and [were] something that was not okay and kind of flies in the face of everything that our team represents."  (*Id*. at 244:20-24.) Second, Kariuki testified that Zaccagnino negatively affected the bank by allocating resources to people at her accounts based on her personal opinion of them, rather than based on whether they could make profitable deals with Santander.  (*Id*. at 247:23-248.)

Moreover, the ranking that Kariuki did of Zaccagnino and the rest of the team was not used for any purpose but instead was a request from Minuesa of all of his direct reports about the value of their team.  (Boyarsky Aff., Ex. 60.)

101.    In general, if a salesperson is out for a day or two, the sales credits for trades conducted by the salesperson's clients during the salesperson's absence would still be attributed to him/her. (Kariuki Dep. Tr., at 157:10-24.) If, however, the salesperson is out for an extended period of time, the salesperson covering the accounts and doing the trades would receive the sales credits. (*Id.*) Because McKenna was out for an extended period of time, Sherman, and any other

salesperson who covered her accounts in her absence received the sales credits for trades executed in that period of time. (*Id.*) Allowing the salesperson temporarily covering the accounts to receive sales credits ensures that the salesperson temporarily covering the accounts do not neglect those accounts. (Kariuki Aff. ¶ 15.)

**RESPONSE:** Admit that other salespeople received credit on McKenna's account in her absence. Deny that there was any good reason for this system. For instance, it is common at other similar employers to continue giving credit to the account "owner," even when someone else is covering the account in the owner's absence, and McKenna once covered accounts for Tolkin for five weeks while he recovered from a surgery. He received all of the sales credit. McKenna Decl. at ¶ 17.

**REPLY:** Plaintiff has produced no evidence that she was treated inconsistently with any other salesperson as to the allocation of sales credits while on leave.

102.    If the salesperson temporarily covering another salesperson's accounts neglect the clients because they do not receive sales credits for any of the trades executed during the absence, that could be detrimental to the returning salesperson who would have to re-engage and rebuild those relationships. (Kariuki Aff. ¶ 15.)

**RESPONSE:** Admit that other salespeople received credit on McKenna's account in her absence. Deny that there was any good reason for this system. McKenna Decl. at ¶ 17.

**REPLY:** Santander's allocation of sales credits to backup salespersons during the primary salesperson's short-term or long-term absence was typical for the industry and reasonably designed to encourage collaboration and to account for the impact to a salesperson providing backup to a co-worker taking an extended leave.  (*See supra*, reply to ¶ 102.)  McKenna's self-serving belief about reasoning does not create a question of fact.

103.     Assigning a higher producer to cover a sales employee's accounts during such person's absence is more likely to generate future business from satisfied clients. (Kariuki Aff. ¶ 16.)

**RESPONSE:** Admit that other salespeople received credit on McKenna's account in her absence. Deny that there was any good reason for this system. McKenna Decl. at ¶ 17.

**REPLY:** Santander's allocation of sales credits to backup salespersons during the primary salesperson's short-term or long-term absence was typical for the industry and reasonably designed to encourage collaboration and to account for the impact to a salesperson providing backup to a co-worker taking an extended leave.  (*See supra*, reply to ¶ 102.)

## I.  McKenna's Sales Performance Relative to Her Colleagues in the IG Sales Team.

104.     Salespeople on the Fixed Income Sales Team received reports on their sales activity on a regular basis. (Garvey Dep. Tr., at 83:13-22.) The sales reports are provided in the form of an excel spreadsheet and provides the salesperson's name and total sales credits earned to date. (Boyarsky Aff. ¶ 32, Ex. 29; *id.* ¶ 33, Ex. 30.) The sales reports also provide a detailed breakdown of: (i) the amount of sales credits earned in primary versus secondary sales; (ii) the amount of sales credits earned in electronic versus voice trades; and (iii) the amount of sales credits attributed to AXE, anti-axe, riskless, and bid or offer trades. (*Id.*)  Other than sales credits specifically identified as "Primary," all other sales credits earned refer to secondary sales. (*Id.*)

**RESPONSE:** Admit these spreadsheets exist and are sent as described. Deny, however, that all of the spreadsheets are broken down in the way described. Some, for instance, present only secondary sales information, for instance the spreadsheets at Def. Ex. 29, DEFENDANTS0011846-011847 and Def. Ex. 30, DEFENDANTS026920-026921.

**REPLY:** The documents Plaintiff cites are cover emails attaching the spreadsheets.  The cover emails include only secondary sales, but the attached spreadsheets themselves include both primary and secondary credits.  (*See*, 2nd Supp. Boyarsky Aff., Ex. 72.)

105.    Given that primary sales are akin to data entry and requires minimal effort by the salesperson, secondary sales are a far better reflection of a salesperson's true ability to add value and generate business. (Garvey Dep. Tr., at 52:5-53:3; Kariuki Dep. Tr., at 86:11-17; Minuesa Dep. Tr., at 52:22-53:4.) Thus, a salesperson's ability to effect secondary sales is an important performance metric to which management, including Kariuki, Minuesa, and Garvey pay very close attention. (Garvey Dep. Tr., at 52:5-53:3; Kariuki Dep. Tr., at 85:8-86:17; Minuesa Dep. Tr., at 52:22-53:4.)

**RESPONSE:** Deny that primary sales are more important the secondary sales. *See infra*, ¶ 36.

**REPLY:** The undisputed record evidence shows that primary deals require little effort on the part of salespersons and that Santander considered secondary trades a better indicator of salesperson performance than primary trades.  (*See supra*, reply to ¶ 36.)  Plaintiff's own theory of sales credits is not a fact.

106.    Garvey and Kariuki often emphasized the importance of making secondary trades to the salespeople, and therefore, the salespeople were well aware their secondary sales numbers were an important performance metric. (Garvey Dep. Tr., at 53:24-54:8.)

**RESPONSE:** Deny that the record cited contains any evidence regarding Kariuki. Deny that anyone communicated any clear goals to McKenna regarding her secondary sales. *See infra*, response to ¶¶ 120-22.

**REPLY:** Kariuki testified that both he and Garvey had communicated numerous times to the sales team the importance of secondary trades.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 261:3-9) ("which was communicated by both myself and by Bill Garvey a number of times, sometimes in way I didn't agree with, it was stressed upon – it was stressed to all of the salespeople how important it is to do secondary – to effect secondary trades."); (*see infra*, reply to ¶ 120.)  (*See also* Sherman Aff. ¶ 8.)  In this regard, SIS hired Foley who had no recent work experience in primary sales. (*See* reply ¶¶36, 39.)

107.    Thomas Steckroth, who started onto the IG Sales Team in or about October 2019, was hired in part due to his prior sales experience selling asset backed security (ABS") products and secondary sales activity. (Kariuki Dep. Tr. 262:24-263:15; Garvey Dep. Tr. at 154:18-158.), Boyarsky Aff. ¶ 34, Ex. 31.) According to his resume and testimony, Steckroth worked with ABS investments as a Director in FICC Sales at National Australia Bank and Vice President of FICC Sales at Barclays Capital.  (Boyarsky Aff. ¶ 34, Ex. 31.)

**RESPONSE:** Deny that there is record evidence that these were Santander's motivations at the time Steckroth was hired, apart from Kariuki and Garvey's ex-post justifications at their depositions. The record demonstrates instead that Santander hired him out of fear that McKenna's pregnancy would impact Santander's bottom line. Ex. 30, DEFENDANTS001510 (around the time of Steckroth's hiring, expressing concerns over McKenna's absence for maternity leave). Kariuki interviewed and hired him quickly during McKenna's first leave, Ex. 2, Steckroth Dep. at 62:17-63:20; 76:25-77:7, and had the HR department post for open jobs on his team, Ex. 31, DEFENDANTS026348. Soon after hiring him, Kariuki already considered him a better employee for McKenna, without any clear business reason to believe that, Ex. 13, DEFENDANTS010850, even though Steckroth had been working for too little time for Kariuki to accurately compare him

to McKenna at this point. Ex. 10, Kariuki Dep. at 348:14-18 ("Q: So as of October 2019, you really didn't have much in the way of numbers with respect to Mr. Steckroth, right? A: Correct.") Kariuki also interviewed the person who would ultimately replace McKenna at around this time. Ex. 32, DEFENDANTS009704.

**REPLY:** Plaintiff's evidence does not contradict Kariuki or Garvey's sworn testimony that their interest in Steckroth was due to his experience with asset backed securities.  It is well within the purview of a manager to ensure that his team is appropriately staffed.  The only evidence that Pl. Ex. 30, DEFENDANTS001510 provides is that Kariuki planned to staff his department taking into account both McKenna's maternity leave and the absence, expected or planned, of any other member of his team, in part due to concerns raised by a distributing syndicate that Santander is "extremely thin if any of the members are out of the office."  (Pl. Ex. 30, DEFENDANTS001510.)

108.    Steckroth had to start afresh with multiple new accounts at Santander when he commenced employment in October 2019. (Kariuki Aff. ¶ 18.)

**RESPONSE:** Admit. Defendants' admission is evidence of its disparate treatment of McKenna and Kariuki's discriminatory intent. McKenna, too, had to start from scratch in 2019. As Kariuki acknowledged in 2019, after Santander had stripped her of some of her best accounts, "Erin recently returned from maternity leave to be given a new list of account [sic] for which she is responsible." Def. Ex. 33, DEFENDANTS000358; 363 (emphasis added). While it defends Steckroth's performance based on his having a fresh account list, it disparages McKenna's performance for the same period, even though she, too, had to start with a "new list of account[s]."

**REPLY:**  McKenna did not have to "start from scratch" in building the accounts that were assigned to her as part of this reallocation.  (*See supra*, reply to ¶ 96.)

109.    Between 2019 and 2020, McKenna has consistently ranked one of the lowest in both total and secondary sales credits. (Boyarsky Aff. ¶ 32, Ex. 29; *id.* ¶ 33, Ex. 30.)

**RESPONSE:** Deny, as set forth in the following responses.

110.    In 2019, McKenna's total sales credits for both primary and secondary sales amounted to 1,746,100, making her the second lowest performer by a large margin. (Boyarsky Aff. ¶ 32, Ex. 29.)

**RESPONSE:** Deny that Def. Ex. 29 supports the proposition that McKenna was "the second lowest performer by a large margin." Nothing in Def. Ex. 29 indicates the sale number described, of 1,746,100. The exhibit provided shows her as third place out of five.

**REPLY:** Def. Ex. 29, DEFENDANTS011846-11847 shows secondary sales credits specific to the New York IG sales group's voice trades (excluding secondary sales credits through electronic trading platforms, such as Market Axess and any possible EM trades) for 2019. McKenna's secondary sales credits of $265,960,000 indicates she ranks in third place out of five. (*Id.*) Her secondary sales credits were less than half of the credits of the next highest team member, Barry Sherman, and one quarter of the highest team member, Chris Tolkin. (*Id.*) McKenna only outperformed Thomas Steckroth, who was hired in October 2019, and Jeff Barker. (*Id.*) DEFENDANTS011848, a chart attached to DEFENDANTS011846-011847 shows primary and secondary sales credits for 2019.[4] Out of the five team members active at the end of the year, McKenna ranked second to last, with total sales of $1,746,100. (*Id.*) She only outperformed

---

[4] Defendants inadvertently did not attach the December 30, 2019 spreadsheet to the December 30, 2019 email referenced as Ex. 29 to the Boyarsky Aff. The December 30, 2019, spreadsheet and the corresponding December 30, 2019 email is attached to the 2nd Supp. Boyarsky Aff. as Ex. 89, DEFENDANTS011846-11848. The December 30, 2019 spreadsheet ("Sales Credit US IG NY," attached as Ex. 89) is a comprehensive sales credit report reflecting all secondary sales credits used to generate DEFENDANTS011846-11847.

Thomas Steckroth, who started in October 2019. (*Id*.) Her total sales credits were roughly half the credits of the next highest performer, Jeff Barker. (*Id*.)

111.    The IG Sales Team's sales credit performance for 2019 is summarized as follows:

| Employee | Total Sales Credits | Primary Sales Credits | Secondary Sales Credits |
|---|---|---|---|
| Christopher Tolkin | 4,135,900 | 1,875,200 | 2,260,700 |
| Barry Sherman | 4,033,700 | 3,152,300 | 881,400 |
| Jeffrey Barker | 3,513,800 | 891,400 | 2,622,400 |
| Erin McKenna | 1,746,100 | 1,360,400 | 385,700 |
| Thomas Steckroth | 398,100 | 193,700 | 204,400 |

(*Id*.)

**RESPONSE:** Deny that Def. Ex. 29, the exhibit cited, contains any of these numbers. Indeed, based on the evidence proffered, and after a diligent search through the record submitted for any evidence that could support Santander's chart, it is impossible to determine how Santander has come to its conclusions.

**REPLY:** The record adequately supports the figures cited in the above paragraph. (*See supra*, reply to ¶ 110.)

112.    A significant majority—approximately 78 percent (or 1,360,400)—of McKenna's 2019 total sales credits were derived from primary sales. (Boyarsky Aff. ¶ 32, Ex. 29.)

**RESPONSE:** Deny. *See supra*, response to ¶ 111.

**REPLY:** The record adequately supports the figures cited in the above paragraph. (*See supra*, reply to ¶¶ 110-111.)

113.    In 2019, only 385,700 of McKenna's total sales credits came from secondary sales.[5]
(*Id.*)

**RESPONSE:** Deny. *See supra*, response to ¶ 111.

**REPLY:** The record adequately supports the figures cited in the above paragraph.  (*See supra*, reply to ¶¶ 110-111.)  Note the addition of spreadsheet at DEFENDANTS011848 attached as Ex. 89 to 2nd Supp. Boyarsky Aff. is the document inadvertently not identified in footnote 5 *infra*.

114.    Although Thomas Steckroth ranked directly below McKenna with 398,100 in total sales credits in 2019, his total sales credits were for a three-month period and during a period of time when he received, had to develop, relationships with new accounts having only started his employment at Santander in October 2019. (Steckroth Dep. Tr., at 96:2-21.) Further, despite his late start, in 2019 Steckroth earned a total of 204,400 in secondary sales credits, which was approximately 51 percent of his total sales credits.  (Boyarsky Aff. ¶ 32, Ex. 29.)

**RESPONSE:** Deny. *See supra*, response to ¶ 111.

**REPLY:** The record adequately supports the figures cited in the above paragraph.  (*See supra*, reply to ¶¶ 110-111.)

115.    On October 30, 2019, Garvey sent an email to Minuesa with the October 2019 sales report for the IG Sales Team attached and stated: "Tom seems to be off to a good start, while Erin and Jeff have really done very little for our business this year." (Boyarsky Aff. ¶ 35, Ex. 32.)

**RESPONSE:** Admit.

---

[5] All sales credits other than the sales credits identifies as "Primary" constitute secondary sales credits.  (Boyarsky Aff. ¶ ___., Ex. [2019 Sales Excel].)  Consequently, a salesperson's total secondary sales credits are calculated by subtracting the total primary sales credits from the total sales credits earned.  (*Id.*)

116.    McKenna's lackluster sales performance continued into 2020. (Boyarsky Aff. ¶ 33, Ex. 30 at DEFENDANTS026920.) In 2020, McKenna's earned a total of 3,650,000 in both primary and secondary sales credits. (Boyarsky Aff. ¶ 33, Ex. 30.) Similar to her performance in 2019, a large majority of McKenna's total sales credits came from primary as opposed to secondary sales. (*Id.*) Only approximately 9 percent (or 341,200) of the total sales credits McKenna earned in 2020 came from secondary sales. (*Id.*)

**RESPONSE:** Deny. Again, it is impossible to determine how Santander draws its conclusions. The numbers in the exhibit cited do not support any of the above statements.

**REPLY:**  McKenna's 2020 performance through November 27, 2020 can be found in 2nd Supp. Boyarsky Aff., Ex. 86, DEFENDANTS027188, which supports the figure cited above.

117.    The IG Sales Team's sales credit performance through August 31, 2020 is summarized as follows:

| Employee | Total Sales Credits | Primary Sales Credits | Secondary Sales Credits |
|---|---|---|---|
| Christopher Tolkin | 3,535,400 | 2,514,400 | 1,021,000 |
| Barry Sherman | 3,412,300 | 2,983,600 | 428,700 |
| Jeffrey Barker | 1,855,000 | 1,570,700 | 284,300 |
| Erin McKenna | 2,298,400 | 2,063,900 | 234,500 |
| Thomas Steckroth | 1,899,400 | 1,584,800 | 314,600 |

(Boyarsky Aff. ¶ 33, Ex. 30.)

**RESPONSE:** While the spreadsheet actually contains these numbers, unlike Defendants' other proffered exhibits, deny that these numbers accurately reflect McKenna's performance. The record contains evidence that Santander stopped counting McKenna's secondary EM trades at some point in 2020. *Compare* Ex. 8, DEFENDANTS025603 (Barker's review, telling him he

should pursue EM trades) with Def. Ex. 34, DEFENDANTS000366 (McKenna's review, pointing out that Kariuki had not acknowledged her EM trades); Ex. 33, DEFENDANTS017953-017954 (McKenna complaining to Kariuki that a report from Garvey had not counted voice trades in EM). Moreover, Santander had reduced McKenna's secondary sales credits in June 2020, without any explanation given to her. *Compare* Ex. 34, DEFENDANTS018269-018270 (showing McKenna with secondary sales credits of 177.48 and Steckroth with secondary sales credits of 140.07 on June 22, 2020), DEFENDANTS018272-018273 (showing McKenna with secondary sales credits of 192.48 and Steckroth with secondary sales credits of 147.02 on June 23, 2020), and DEFENDANTS018295-018296 (showing McKenna with secondary sales credits of 194.40 and Steckroth with secondary sales credits of 153.38 on June 29, 2020), with DEFENDANTS018318-18319 (showing McKenna with secondary sales credits of 143.34 and Steckroth with secondary sales credits of 153.38 on June 30, 2020), DEFENDANTS018463-018464 (showing McKenna with secondary sales credits of 143.35 and Steckroth with secondary sales credits of 156.29 on July 6, 2020), and DEFENDANTS018466-018467 (showing McKenna with secondary sales credits of 143.35 and Steckroth with secondary sales credits of 156.29 on July 7, 2020). This was irregular, as Santander would not usually revise sales numbers downwards. Ex. 10, Kariuki Dep. at 334:2-7 (saying Santander would not usually revise numbers downwards absent "some sort of mistake."); id. at 335:9-337:6 ("At the end of the day, somebody lost money, and somebody is going to be accountable."); Ex. 5, Garvey Dep. at 104:23-105:2 (explaining that such mistakes occurred "very infrequently."); Ex. 10, Kariuki Dep. at 334:18-19 ("A couple of times a year.") When it happened on these rare occasions, the salesperson or trader impacted would be informed. *Id*. at 336:4-6; 17-18.

**REPLY:** The documents Plaintiff cites do not provide "evidence that Santander stopped counting McKenna's secondary EM trades at some point in 2020."[6]   Def. Ex. 34, DEFENDANTS000366, McKenna's 2020 mid-year review, does not establish that Kariuki did not consider EM trades in McKenna's performance review.   McKenna merely provided feedback that she had "also done some nice secondary trades in the EM space as well."   (*Id.*)   Pl. Ex. 33, DEFENDANTS017953 is an email from McKenna to Kariuki noting "*additional* EM voice trades" that she wanted included in a report.   Her use of "additional" implies that other EM voice trades were counted.   (*Id.*)

The undisputed evidence shows that sales credits were at times revised downwards.   (Licul, Aff., Ex. 10, Kariuki Dep. at 334:2-7, 334:18-19, 335:9-337:6; 2nd Supp. Boyarsky Aff., Ex, 77, Garvey Dep. at 104:23-105:2.)   Any downward revision to McKenna's secondary credits in June 2020 was thus not done outside of Santander's standard practices.   If McKenna thought that the revision downward was unfair or in error, she had ample opportunity to respond to it, as she had so responded in the past.   (2nd Supp. Boyarsky Aff., Ex. 85, DEFENDANTS008222.)   During her deposition, McKenna also testified that she paid close attention to her sales credits and made sure that she received credits for trades that she did.   (Supp. Boyarsky Aff., Ex. 67, McKenna Dep. Tr., at 88:4-89:12) (Q. And did you regularly monitor your trades to make sure you got credit like you do here? A. That was a bigger trade.   So I'm sure that stood out to me a little more.   Q. But during your employment as a salesperson, did you monitor these reports to see if you got credit for your secondary trading? A. I would look and make sure I was getting credit.) Moreover, the $51,060 difference between McKenna's June 29, 2020 and June 30, 2020 secondary sales, (*see* Licul Aff.,

---

[6] Defendants inadvertently attached the wrong email to the August 31, 2020, spreadsheet referenced as Ex. 30 to the Boyarsky Aff.   The correct email that should be have been attached to the August 31, 2020 spreadsheet together with the actual spreadsheet are attached to the Boyarsky 2nd Supp. Aff., Ex. 72, DEFENDANTS021345-021347.

Ex. 34 DEFENDANTS018295-018296 and DEFENDANTS018318-18319), is still less than the difference between McKenna's August 30, 2020 secondary sales and the secondary sales of Jeff Barker, the next highest performer.  (*See supra*, ¶ 117.)

118.    While McKenna's 2020 total sales credits through August put her slightly ahead of Steckroth, she ranked last in the number of secondary sales credits earned. (Boyarsky Aff. ¶ 33, Ex. 30.)

**RESPONSE:** Admit McKenna was ahead of Steckroth.  Otherwise, deny.  *See supra*, response to ¶ 117.

**REPLY:** 2nd Supp. Boyarsky Aff., Ex. 72, DEFENDANTS021347 clearly shows McKenna with $234,500 in secondary sales credits on August 31, 2020, behind Barker ($284,300), Sherman ($428,700), Tolkin ($1,021,000), and Steckroth ($314,600).

119.    Notwithstanding his late start at Santander, Steckroth showed significant progress and his year over year performance demonstrated a strong capability in making secondary sales—a primary performance metric. (Boyarsky Aff. ¶ 32, Ex. 29; *id.* ¶ 33, Ex. 30.)

| Employee | 2019 Secondary Sales Credits | 2020 Secondary Sales Credits | YoY |
|---|---|---|---|
| Christopher Tolkin | 2,260,700 | 2,958,300 | 31% |
| Barry Sherman | 881,400 | 680,300 | -23% |
| Jeffrey Barker | 2,622,400 | 1,081,100 | -59% |
| Erin McKenna | 385,700 | 341,200 | -12% |
| Thomas Steckroth | 204,400 | 379,100 | 85% |

(Boyarsky Aff. ¶ 32, Ex. 29; *id.* ¶ 33, Ex. 30.)

**RESPONSE:** Again, deny the Exhibit cited, 30, shows the numbers cited above. Given, also, that the chart serving as the basis of comparison (Def. Ex. 29) did not even purport to

show sales as of August 2019. Apart from these glaring deficiencies, deny the chart shows any progress on the part of Steckroth as a matter of logic. As Santander is quick to point out elsewhere, Steckroth worked only part of the year in 2019, and had only worked for a few weeks by the end of August 2019. It is no surprise that the year-over-year number would show an inflated 85%.

**REPLY:** McKenna's 2020 performance can be found in 2nd Supp. Boyarsky Aff., Ex. 86, DEFENDANTS027188, which supports the figures cited above.

120.     McKenna knew that her secondary sales numbers were lacking compared to the rest of the team given that she has been asked to increase her secondary trading efforts several times by both Garvey and Kariuki. (Boyarsky Aff. ¶ 36, Ex, 33; *id.* ¶ 37, Ex. 34; *id.* ¶ 38, Ex. 35.)

**RESPONSE:** Deny that any of these exhibits show anyone asking McKenna to "increase her secondary trading efforts several times." Def. Ex. 33, McKenna's 2019 year-end review, shows her as "Expectations Totally Met" in every single category. The only feedback Kariuki provided in this review is the boilerplate, copy-pasted comment "Erin recently returned from maternity leave to be given a new list of account [sic] for which she is responsible. I am confident that she will do well." Def. Ex. 34, her 2020 mid-year review, does not criticize McKenna's secondary sales performance. Deny that Def. Ex. 35 shows anyone criticizing McKenna as "compared to the rest of her team," as Garvey, in that email, criticizes her and two other team-members equally.

**REPLY:** Kariuki testified that both he and Garvey had communicated numerous times to the sales team the importance of secondary trades.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 261:3-9) ("which was communicated by both myself and by Bill Garvey a number of times, sometimes in way I didn't agree with, it was stressed upon – it was stressed to all of the salespeople how important it is to do secondary – to effect secondary trades.") McKenna also admitted in a

text message dated January 23, 2020, that her sales activity was low.  (2nd Supp. Boyarsky Aff., Ex. 75.)

121.    In his 2019 midyear review for McKenna, Kariuki noted that he wanted McKenna to focus on getting "closer to her accounts to help increase secondary trading volume" upon her return from maternity leave. (Boyarsky Aff. ¶ 36, Ex. 33.) Similarly, in his 2020 midyear review for McKenna, Kariuki noted that only 8.6 percent of McKenna's total sales credits to date were comprised of secondary sales, and commented that he would like to see McKenna make more of an effort to "print more business with key accounts (ie Prudential, Capital Research, Invesco, TCW, Conning)." (Boyarsky Aff. ¶ 37, Ex. 34.)

**RESPONSE:** Deny that Def. Ex. 33 anywhere contains the words that McKenna should get "closer to her accounts to help increase secondary trading volume." The quote is manufactured. Admit Kariuki noted the percentage of McKenna's secondary sales. However, he omitted McKenna's EM sales. Def. Ex. 34, DEFENDANTS000366 ("I have also done some nice secondary trades in the EM space as well.") Therefore, deny that the number is accurate.

**REPLY:** Defendants inadvertently attached McKenna's 2019 Annual Assessment as Ex. 33. The correct citation for McKenna's 2019 mid-year review is 2nd Supp. Boyarsky Aff.,  Ex. 76, DEFENDANTS000003.  In McKenna's mid-year review, Kariuki advises of his expectation that McKenna "det closer to her accounts to help increase secondary IG trading volume."  The figure cited in McKenna's 2020 mid-year review was specifically to "secondary IG trading," so McKenna's comment regarding EM trades does not affect at all its utility as an evaluation metric. Boyarsky Aff., Ex. 34, DEFENDANTS000366.

122.    In an email dated June 11, 2020, Garvey also sent out an email to the team identifying McKenna as one of the salespeople who was "making no contribution to Santander's

business, given their utter lack of productivity" based on her secondary sales performance to date. (Boyarsky Aff. ¶ 38, Ex. 35.)

**RESPONSE:** Admit that Garvey sent the email described. Garvey named McKenna alongside two other men, including Tom Steckroth.

123.    McKenna had ample opportunity to succeed, given that she had the second highest number of accounts that Santander has identified as the top twenty-five producing accounts, including Vanguard, the third largest asset manager in the world with approximately 6 trillion in assets under management. (Kariuki Dep. Tr., at 143:21-144:3, 153:15-154:19, 260:12-261:9, 326:13-18, 377:4-378:6.) Notably, McKenna dodged answering questions about the value of her client account lists before and after her maternity leave testifying that "Everything's relative, right?",  while simultaneously bragging about being able "generate more in the first half of 2020 than [her] two male colleagues that covered [Vanguard] in 2019." (McKenna Dep. Tr., 123:17-20, 127:3.) Likewise, Dr. Donnelly testified that McKenna told her she was a high performer and "never experienced any negative consequences, or…acknowledgements contrary to that" throughout her employment at Santander. (Donnelly Dep. Tr., at 102:8-12.)

**RESPONSE:** Deny McKenna "had ample opportunity to succeed." McKenna was forced to build her new accounts from scratch. Def. Ex. 67, McKenna Dep. at 123:3-10. And, she lost the benefit of the effort she had put into visiting her Midwest accounts during 2018. Ex. 23, DEFENDANTS004408 (Garvey congratulating McKenna for "doing most of the heavy lifting on trips to . . . the Midwest.") In fact, by the end of this process, McKenna would have fewer accounts in 2020 than in 2019. Ex. 24, DEFENDANTS000183-000184.

Deny the characterization of the testimony. Nowhere does any of it establish that "she had the second highest number of accounts that Santander has identified as the top twenty-five

producing accounts." When asked point-blank if he could recall a single other account given to McKenna, Kariuki testified that he could not think of any. Def. Ex. 66, Kariuki Dep. at 155:22-23. Additionally, deny that McKenna's testimony is self-contradictory or inconsistent. At both of the points cited in her deposition, McKenna was discussing the importance of looking at the value of individual accounts, fully acknowledging the value of the Vanguard account. Def. Ex. 67, McKenna Dep. at 127:3-6 ("Everything's relative, right? Depends on what the different firms were focused on, at the time. Different firms trade different things and different products at different times.")

**REPLY:**  McKenna did not have to "start from scratch" in building the accounts that were assigned to her as part of this reallocation.  (*See supra*, reply to ¶ 96.)  Sherman received reallocated accounts and lost accounts, including to McKenna.  (*Id.*)  He moved on and worked with the new accounts assigned to him. (*Id.*)

124.   Dr. Donnelly testified that McKenna did not raise any issues during her therapy sessions related to her employment at Santander other than her concerns "about their impressions of her" because "during her first pregnancy she felt her employers were not happy that her doctor wanted her to work remotely or stay off her feet, and during her second pregnancy, she reported feeling worried that they weren't happy that she was pregnant again", and her termination, which she never discussed complaining to Santander about. (Donnelly Dep. Tr., 43: 47:23-51:22, 75:4-15.) Dr. Donnelly does not remember McKenna ever complaining about her compensation, account assignments or any issues with her managers. (*Id*. at 48:20-49:12, 64:6-24, 75:4-15.) In contrast, Dr. Donnelly testified that McKenna specifically said in their sessions prior to her employment at Santander that she worked in a male-dominated environment, it was sometimes a boys' club, and she was expected to not complain. (*Id*. at 43:8-44:10.)

89

**RESPONSE:** Deny that McKenna did not raise issues related to her pregnancy to Donnelly. McKenna reported concerns that Santander was "treating her differently." Def. Ex. 63, Donnelly Dep. at 47:19-24. She reported that Santander was "not happy with her working from home." Ex. 11, Donnelly Dep. at 117:4-7. She reported that Santander was "not happy" about her second pregnancy. Def. Ex. 63, Donnelly Dep. at 51:3-6. In general, Donnelly did not keep a record of every single event McKenna reported to her. Ex. 11, Donnelly Dep. at 115:22-116:5.

**J.**     **The Restructuring of the Fixed Income IG Sales Team.**

125.    In or around February 2020, Minuesa and Kariuki began discussing the need to restructure and "upgrade" the Fixed Income sales team. (Minuesa Dep. Tr., at 71:22-75:9; Boyarsky Aff. ¶ 39, Ex. 36.) It is the nature of the business for senior management to evaluate the performance of the team and to look for talented people who could bring added value to the business and better client penetration. (Minuesa Dep. Tr., at 71:22-75:9.)

**RESPONSE:** Deny that the discussion began only in February 2020. As early as October 2019, shortly after McKenna returned from her maternity leave, Kariuki had already ranked McKenna and Barker as his two lowest performing employees, with McKenna in last place. Ex. 13, DEFENDANTS010850. Previously, during her maternity leave, Kariuki had interviewed the person who would ultimately replace her. Ex. 35, Foley Dep. at 11:20-12:6; *Id.* at 13:21-14:5; Ex. 32, DEFENDANTS009704. During McKenna's first absence, Kariuki had also posted a job listing for two new team members. Ex. 31, DEFENDANTS026348. By February 25, 2020, Kariuki had already identified McKenna and Barker as the two employees he would lay off. Ex. 10, Kariuki Dep. at 231:2-6; Ex. 36, DEFENDANTS014894; Ex. 3, Minuesa Dep. at 110:20-24. Indeed, as Yahn testified, were it not for the pandemic, Santander would have moved on this termination much more quickly. Ex. 28, Yahn Dep. at 46:15-47:5.

**REPLY:** A ranking of employees, such as Pl. Ex. 13, DEFENDANTS010850 provided by a manager to his immediate supervisor does not show a manager planning to terminate the employment of any of the employees. As Kariuki testified, such a ranking was a regular exercise for Minuesa. (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. Tr., at 237:14-236:15) ("he asks this of all the business heads . . . . He asked me in a group setting with all of his direct reports. It wasn't explicitly for Omar to rank salespeople."). None of the documents Plaintiff cites establish a timeline to Kariuki's decision to terminate McKenna and Barker. Foley was initially interviewed due to the need to fill the position vacated by Healion. (Supp. Kariuki Aff. ¶ 18.) In Licul Aff., Ex. 10, Kariuki Dep. at 231:2-6, Kariuki testified that he had a conversation with Minuesa about the two weakest members of his team without the timing of the conversation. Licul Aff., Ex. 36, DEFENDANTS014894 is an email from Yahn regarding the need to begin searching for two candidates as part of the restructure of the IG Sales Team. This email is focused on the search for new talent; it does not indicate who would be replaced or even if the employees to be laid off had yet been chosen. (*Id.*) Licul Aff., Ex. Ex. 3, Minuesa Dep. at 110:20-24 also merely states that Minuesa had a conversation with Yahn about terminating McKenna and Barker. Minuesa did not testify as to the timing of that conversation. (*Id.*)

126.   In early 2020, Kariuki and Minuesa informed Yahn that there would a "talent upgrade" and changes to the Fixed Income Sales Team in the near future. (Yahn Dep. Tr., at 40:17-23, 41:13-42:7.)

**RESPONSE:** Deny that Kariuki and Minuesa told Yahn there would only be a "talent upgrade." The record shows that they had already identified McKenna and Barker for termination in early 2020. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)

127.    In an email dated February 18, 2020, Kariuki sent an email to Santander recruiter Brian Maier, copying Yahn and Minuesa, informing them that he was "asked to upgrade the sales team ASAP," and asking for approved headhunters he could use to help with the search.  (Boyarsky Aff. ¶ 39, Ex. 36.)

**RESPONSE:** Admit Kariuki sent this email containing the contents described.

128.    The discussions about restructuring and upgrading the sales team continued into April 2020.  (Boyarsky Aff. ¶ 40, Ex. 37.) On April 29, 2020, Minuesa, Kariuki, and Krishna Murali, the Global Head of Sales at Santander Corporate and Investment Bank met to discuss the performance of the Fixed Income sales team and the need to restructure and upgrade the team. (*Id.*; Minuesa Dep. Tr., at 71:22-75:9.)

**RESPONSE:** Deny the cited exhibit contains "discussions about restructuring" in April 2020. It shows only Krishna Murali asking Juan Minuesa and Omar Kariuki to speak generally with him about "where we can re-allocate resources" and other general business topics. Def. Ex. 37, DEFENDANTS017270. Deny that any of Minesa's testimony supports the timeline or corroborates that the meeting mentioned in the cited email on April 29, 2020 had anything to do with personnel matters. Def. Ex. 68, Minuesa Dep. at 71:22-75:9.

129.    The purpose of restructuring the Fixed Income sales team was to fulfill two specific business objectives. (Yahn Dep. Tr., at 43:8-45:17.) First, Santander US sales management was looking to expand into new product areas including ABS (asset-backed securities), hedge funds, LatAm corporates, LatAm sovereign bonds, and insurance companies. (*Id.*; Boyarsky Aff. ¶ 41,

Ex. 38.) Second, Santander US sales management wanted to focus on stronger sales skills, particularly with respect to secondary trading. (Yahn Dep. Tr., at 43:8-45:17.)

**<u>RESPONSE</u>:** Deny that Yahn testified to these two "specific business objectives." Yahn discusses a variety of topics in the testimony range cited. For instance, Yahn also discusses "operating internal operations. So being able to navigate perhaps a less developed platform in being nimble to, you know, look for efficient ways of doing things and being able to optimize revenue and production, despite perhaps if there were any challenges that you faced. So more of, I guess, challenge management type skills." Def. Ex. 70, Yahn Dep. at 45:8-17.

Deny that Def. Ex. 38 anywhere mentions "ABS (asset-backed securities)." It does mention hedge funds, LatAm corporates and LatAm sovereign bonds.

Deny generally that these were the bona fide reasons for terminating McKenna. These were pretexts to disguise pregnancy discrimination. Most importantly, Santander did, in fact, place great value upon primary trades. Even when it came to the secondary numbers, these numbers did not actually support the decision to terminate McKenna. And, to the extent McKenna's secondary sales were lower than expected, Santander had been taking accounts away from her since her first pregnancy. Nor did any of these reasons truly justify termination, as male employees were usually given a chance to improve for being terminated. Finally, when hiring men, Kariuki was perfectly willing to ignore their lack of sales experience.

To begin, Santander has systematically and deliberately overstated the importance of secondary numbers versus primary numbers. Santander issued primary loans and needed salespeople to educate potential buyers on the loans' value. *See supra*, response to ¶ 36. For instance, when hiring Foley, Murali discussed how she might be able to help with Santander's primary product offerings. *Id.* Kariuki himself believed primary deals to be of great importance,

at least when men did them. For instance, when justifying McKenna's termination, Kariuki told Christina Yahn that her sales could not be compared to Steckroth's sales, because Steckroth had a large deal in the pipeline that did not yet show on Santander's books. This deal was a primary deal. *Id*. The contrast could not be more stark. Santander has consistently disparaged McKenna's primary sales performance. When it came to Steckroth, the same performance becomes a reason to value his employment highly. Then, there is the simple fact that, if primary sales had no importance, Santander would not bother to track them at all.

In any case, when she had a fair chance to perform, McKenna posted secondary sales numbers close to the highest on her team, for instance in early 2019. Ex. 26, DEFENDANT005163-005164. Indeed, early in 2020, when Santander decided to terminate her, her secondary sales performance was twice that of Jeff Barker's and three times as great as Tom Steckroth's. Ex. 37, DEFENDANTS014915-014916. At the time of her termination, as Kariuki admitted, McKenna's sales numbers were "comparable" to Steckroth's. Ex. 10, Kariuki Dep. at 382:8-11. For that exact reason, Brian Molinari assured McKenna that the termination was unrelated to performance. Ex. 38, PL001887. Indeed, an early draft of the memo justifying McKenna's termination did not even include secondary sales numbers, as the memo's drafter, Christina Yahn, did not think they justified the termination. Ex. 40, DEFENDANTS021729. After Yahn asked for further substantiation for Kariuki's rationale for terminating McKenna, he refused to provide it, and told Yahn she should move forward without the information. Ex. 6, DEFENDANTS021784-021785. Of course, the sale would not have justified the secondary sales justification, because it was a primary sale, as explained. Minuesa's chief of staff would later tell Kariuki and Yahn that their assessment of McKenna's performance had been inaccurate. Ex. 24, DEFENDANTS000183-000185.

Even if the secondary sales were lower than expected, Santander had taken away valuable accounts from McKenna in 2019, crippling her ability to make sales. Garvey himself told McKenna that it would be discriminatory for Santander to "even think" about taking accounts away from her and mentioned two accounts in particular. Ex. 21, DEFENDANTS008213. Amongst multiple others taken from her coverage of the Midwest region, Santander took away those exact two accounts. Ex. 9, McKenna Dep. at 120:13-20. McKenna was forced to build a new account base from scratch, prejudicing her performance, Def. Ex. 67, McKenna Dep. at 123:3-10, even though she had spent much of 2018 traveling around the Midwest to build her client base there, Ex. 23, DEFENDANTS004408. Moreover, as Santander admits elsewhere, other people received credit on McKenna's accounts during her maternity leave, making a simple comparison between her and other team members during 2019 unfair. Def. Ex. 66, Kariuki Dep. at 157:18-24 (explaining that, when a salesperson is out of the office for an extended period, the person who backs up the account will receive sales credit for trades executed on those accounts.)

Even if it judged her harshly for her performance, male employees, by contrast, were typically given many chances to improve. Barker received negative reviews for years and was allowed to switch teams to improve his performance. Ex. 14, DEFENDANTS025575-025584 (negative performance reviews); Ex. 10, Kariuki Dep. at 186:18-22 ("I felt like he was – yes, he was – he was working hard."); Dep. of Minuesa at 67:25-68:3 ("Q: Was the move of Mr. Barker from EM to IG to help him perform better? A: I think so. Yes.") Barry Sherman was promoted to hold him more accountable when Santander took a negative view of his performance. Ex. 40, DEFENDANTS026311 (In an email expressing severe criticisms of employees Chris Dearborn and Barry Sherman, stating "Barry will at least work when promoted.")

Finally, at around the same time he was criticizing her secondary sales performance and terminating her, Kariuki was hiring other young, male employees, even though he believed they were "inexperienced at sales" and had an uncertain "work ethic." Ex. 41,

**REPLY:** Plaintiff misconstrues Yahn's testimony.  At the beginning of the section cited, she clearly testifies that "the team – they had wanted the team to expand into new areas . . . and they did want to focus on stronger sales skills, particularly in secondary trading.  (2nd Supp. Boyarsky Aff., Ex. 70, Yahn Dep. Tr., at 43:14-21.)  Plaintiff attempts to create confusion by citing later testimony regarding "operating internal operations," but this is merely a subset of "stronger sales skills," not a new objective for the restructure.  (*Id*. at 44:23-45:17.) ("Q.  Okay.  And what were the specific sales skills that were discussed?  A.  So, in terms of skills, I recall the ability to drive secondar sales . . . The other area that I recall is about operating internal operations.").

The undisputed record evidence shows that primary deals require little effort on the part of salespersons and that Santander considered secondary trades a better indicator of salesperson performance than primary trades.  (*See supra*, reply to ¶ 36.)  The undisputed record evidence also shows that Steckroth's private placement involved work comparable to a secondary trade, hence its greater value to Santander than a primary trade.  (*See supra*, reply to ¶ 36.)

In an email from Kariuki dated July 23, 2019 to provide comments to Human Resources to post for two openings in the IG Group following Dearborn's and Healion's departures, he stated "… The ideal candidate will have an institutional client base (either as primary or back-up coverage responsibilities) that includes hedge funds, real money accounts, and/or insurance companies. Added value would be experience with asset-back security sales, auto etc…" (Licul Aff., Ex. 31 [DEFENDANTS026348].)

The third and fourth paras. of Plaintiff's Response are mostly argument instead of a recitation of evidence. McKenna repeatedly mischaracterizes evidence such as by stating "Indeed, early in 2020, when Santander decided to terminate her . . ." without any evidence that SIS identified her to terminate, and she relies upon for a single day in 2020 regarding secondary sales numbers that was not the full scope of data that Kariuki analyzed to make his selection decision. Plaintiff's misstatement of Steckroth's "comparable" sales number is a reference to his total primary plus secondary numbers. (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. 381:22-382:11) However, Steckroth's secondary numbers were higher than McKenna's. (Boyarsky Aff., Ex. 30 (showing McKenna with secondary sales credits of 234,500 and Steckroth with secondary sales credits of 314,600 as of August 31, 2020)).  Kariuki testified that he was required to terminate two employees and the data supported his decision that McKenna and Barker were the lowest.  (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. 382:15-24.)  Kariuki also testified that in determining that McKenna and Barker were the weakest performers on his team he considered the opinions of the Syndicate and Debt Capital Markets team as well as Garvey's trade team.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 267:10-17.)  Kariuki also solicited the feedback of Garvey himself. (*Id*. at 259:9-24.)  He focused on the 2020 time period through late August 2020. (*Id*. at 254:24-255:9.) Kariuki further testified that he considered "which two people are going to have the least impact on the overall business by not being there," which is another way of saying that he considered who could best contribute to the business moving forward.  (*Id*. at Kariuki Dep. Tr., at 254:12-17.)

That secondary sales numbers were inadvertently omitted from the first draft of the document setting forth the business rationale for McKenna's termination is not evidence that Yahn or Kariuki did not consider them important to the decision.  (Licul Aff., Ex. 39) It is the nature of

first drafts to change with the input of other drafters.   Plaintiff misrepresents Kariuki's communications with Yahn regarding the business rationale document.   (*Id*. at Ex. 6). Yahn did not ask for "further substantiation for Kariuki's rationale for terminating McKenna."   (*Id.*)   She simply asked Kariuki to "review . . . and let me know your thoughts."   (*Id.*)   Nor did Kariuki "refuse to provide" information to Yahn.   Kariuki responded to Yahn within three business days and provided substantive feedback on the document.   (*Id.*)   Plaintiff's assertion that Kariuki "told Yahn she should move forward without the information" is wholly divorced from the document cited, which contains no such language.   (*Id.*) Plaintiff's characterization of Feliu's emails is similarly tendentious.   (Licul Aff., Ex. 24) Nowhere does Feliu render a judgment on the sufficiency of McKenna's termination—or acknowledge her termination at all.   (*Id.*) Feliu merely discusses the "metrics that are analyzed to evaluate the *team's* performance." (*Id.*) (emphasis added)

Plaintiff's assertions about the quality of her accounts are unfounded.   In the 2019 reallocation, she received the Investment Grade sales for Northwest Mutual, a client with whom she had a relationship; Western Assets, a client with whom she also had a good relationship; and Vanguard, a strategically important client with a close institutional relationship with Santander. (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 153:15-22; 154:23-25; 154:15-19; *see also supra*, reply to ¶ 93.)   McKenna received accounts from Sherman, a seasoned and successful salesperson who generated primary and secondary sales far higher than hers.   (*See supra*, ¶95 and reply thereto.) McKenna was treated no differently than any other employee.   All employees including -- but not limited to, Steckroth when he was hired, Sherman when he lost accounts to McKenna, and McKenna when she received reassigned accounts – started with new accounts that

they needed to learn. (*Id.*)  Moreover, Plaintiff introduced no evidence that she was treated inconsistently with any other salespersons as to the allocation of sales credits while on leave.

The comparisons Plaintiff attempts to draw between McKenna and her male counterparts are inapt, given that McKenna was terminated as part of a restructure in which Kariuki was required to identify the weakest two members of his team for termination. (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. Tr., at 232:19-233:25) Plaintiff introduced no evidence  demonstrating that Kariuki retained discretion not to terminate the salespeople he determined to be the weakest on the Investment Grade sales team.

The uncontroverted evidence shows that Kariuki did not know McKenna was pregnant when he decided to terminate her. (*Id*. at 286:8-291:12; Boyarsky Aff., Ex. 51, at DEFENDANTS000800) Minuesa, who approved the decision in late August did not know McKenna was pregnant at that time.  (*Id.*)  On September 1, when Yahn did not know that McKenna was pregnant when Yahn spoke with Kariuki to discuss the restructuring and Kariuki told her that he selected McKenna and Barker to terminate. (*Id*.)

Defendants object to the admission of Licul Aff., Ex. 38, which is a surreptitious recording and inadmissible hearsay under Fed. R. Evid. 801(c).  It is an out-of-court statement used to prove the truth of the matter asserted.

The recording also was identified in Plaintiff's initial responses to discovery but not produced until after the end of discovery.  Also, Plaintiff failed to produce the recording during discovery despite Defendants' deficiency letter to Plaintiff dated February 11, 2022, related to the referenced recording that was not produced.  Plaintiff did not first seek Defendants' consent prior to making an application to the Court to submit a recording native, to which Defendants would have objected.

The recording also violates Florida anti-wiretapping law (Fla. Stat. Ch. 934.03) because Molinari worked from and resided in Florida. (Molinari Aff. ¶ 4.)  Molinari included his Florida business address on his work email signature.  (*Id.* at ¶ 7.)  Plaintiff did not request Molinari's consent to record the call. (*Id.*)  Molinari did not know that Plaintiff was recording the call.  (Id.) Molinari did not consent to the call. (*Id.*)

Soon after McKenna was informed of her termination, she called Brian Molinari, who conducted the termination meeting, she asked if she was terminated for performance.  (Molinari Aff. ¶ 9.) This is significant because if an employee is terminated for performance also considered cause, the employee is not eligible for severance benefits under the Santander severance plan.  (*Id.*) Molinari answered that she was terminated in a restructuring and he was not involved the termination decision but it was not treated as termination for performance for which McKenna was eligible for severance benefits.  (*Id.*)  The term performance in the context of a termination at SIS means cause or the result of her individual poor performance.  (*Id.*)

When Plaintiff specifically questioned Molinari about the details of the restructure, Molinari advised her that he could not speak to the underlying business reasons for the structure, but was aware that the business took into consideration a number of business factors, and urged her to speak with Yahn, who was the Human Resources Business Partner involved with the Fixed Income Sales Group and familiar with the rationale for McKenna's termination, to answer her questions. (*Id.* at ¶ 10.)

130.    While these discussions about the restructuring slowed down during the pandemic, based on the conversations that Yahn continued to have with Kariuki and Minuesa, Yahn was aware that they would be restructuring the Fixed Income sales team in the near future. (Yahn Dep. Tr., at 46:15-47:5.)

**RESPONSE**: Admit the pandemic slowed down the termination of McKenna. Deny that Kariuki, Minuesa and Yahn were only in general discussions around this time. The record shows the decision to terminate McKenna in particular had been made by February 2020. See supra, response to ¶ 125.

**REPLY:** Plaintiff has cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.) She also misstates that the pandemic slowed McKenna's termination, which is pure argument.

131.    At the time, the number of salespeople on the Emerging Markets sales team was nearly the same as the number of salespeople on the IG Sales Team—there were a total of six people on the Emerging Markets sales team and five people on the IG Sales Team. (Minuesa Dep. Tr., at 74:14-23.) Given that SIS is a known leader in the Emerging Markets space, it did not make much business or economic sense to have the same number of people on both teams. (*Id.*) Consequently, a decision was made to reduce the number of people on the IG Sales Team, and Minuesa instructed Kariuki to identify the two lowest performers on his team to be laid off. (*Id.*; Kariuki Dep. Tr., at 192:16-193:18.)

**RESPONSE:** Admit the number of employees. Deny Minuesa testified that "it did not make much business or economic sense to have the same number of people on both teams." Instead, he testified "it didn't make sense to have all the same people." Def. Ex. 68, Minuesa Dep. at 74:19-20. Deny the decision to terminate McKenna was made in this time span. The record shows the decision to terminate McKenna in particular had been made by February 2020. *See supra*, response to ¶ 125.

Moreover, deny that the balance between the two teams meant anything to Santander. The record demonstrates that traders on the IG team often worked in the EM space, and there was no

strict difference or delineation of sales activities. Members of the IG team routinely sold EM products to support their clients. Ex. 8, DEFENDANTS025603 (discussing Barker's EMsales credits); Ex. 9, McKenna Dep. at 103:8-12; Def. Ex. 66, Kariuki Dep. at 153:15-22 (discussing assignment of EM duties to McKenna and Barker); Ex. 3, Minuesa Dep. 43:6-15 (discussing overlap between IG and EM teams); Ex. 10, Dep. of Kariuki at 33:23-25; Ex. 5, Garvey Dep. at 61:13-15 (EM sales people could do both EM and IG trade).

**REPLY:** Minuesa's clearly testified that "it [made] sense to have more people dedicated to [EM than to IG]."  (Supp. Boyarsky Aff., Ex. 68, Minuesa Dep. Tr., at 74:14-75:9.) ("I recall that we had even almost the same number of all salespeople in – in IG comparing with merging markets, and in emerging markets we are really a top house in the market. . . . Q:  So because you are a top house in emerging markets, was it your belief that you could use more salespeople in emerging markets?  A.  Well, we have more clients.  We have more penetration with clients, so it makes sense to have more people dedicated to that.").  Additionally, Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)

132.    Foley has worked in the financial services industry for more than twenty-five years. (Boyarsky Aff. ¶ 42, Ex. 39.) Before joining Santander, Foley worked at Imperial Capital LLC ("Imperial") as a Managing Director in Credit Sales where she was responsible for maintaining coverage of more than a hundred accounts, including investment managers, middle markets accounts, private banks, wealth managers, and retail accounts. (*Id.*)

**RESPONSE:** Admit Foley's experiences.

133.    Imperial is a small broker-dealer that conducts its business by taking very little to no risk. (Kariuki Dep. Tr., at 80:13-81:25; 92:19-93:7; Garvey Dep. Tr., at 163:9-167:8.) Banks

like Santander make money by effecting secondary trades. (Kariuki Dep. Tr., at 82:2-12.) In turn, traders like Garvey make money for Santander by maximizing Santander's P&L through one of two ways: (i) by executing a riskless trade; or (ii) buying a security, holding it on the bank's balance sheet, and hope that the security appreciates in value before selling it at a higher price. (*Id.* at 82:2-83:17.) Because Imperial takes little to no risk, it rarely holds any securities. (*Id.* at 81:14-25.) Consequently, salespeople like Foley had to be really driven to gain business because they were required to source both the buyers and sellers of a bond. (*Id.*) Foley not only worked at Imperial for approximately ten years, she was also consistently a top performer on her team.  (*Id.*; Garvey Dep. Tr., at 163:9-167:8; Yahn Dep. Tr., at 92:19-93:7; Boyarsky Aff. ¶ 42, Ex. 39.)

**RESPONSE:** Admit the details about Imperial's business strategy and Foley's experience. Deny that riskless trading was as important to Santander's business as described. Def. Ex. 38, the purported restructuring memo, never mentions riskless trades. Moreover, in years of reviews, no one once told McKenna that she needed to increase her volume of riskless trades or that this was a basis for evaluating her performance. Def. Ex. 33, DEFENDANTS000358-365; Def. Ex. 34, DEFENDANTS000366.

**REPLY:** Plaintiff misconstrues Defendant SIS's position.  Kariuki's testimony demonstrates that Santander was interested in Foley not for her ability to execute riskless trades at Santander—though this of course was a benefit—but because her entire job at her former employer involved making secondary sales successfully at a bank with a very low risk tolerance, all demonstrating that she had the ability and the drive to find both buyers and sellers of securities. (Supp Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 81:14-25.)

134.    Given that one of the primary objectives of the restructuring was to increase the volume of secondary sales, Kariuki thought that Foley would be a good candidate, and thus, begin

setting up the interviews with the necessary stakeholders to consider her candidacy. (Kariuki Dep. Tr., at 80:13-83:17.)

**RESPONSE:** Deny the primary objective was the increase the volume of secondary trades. The record shows that the restructure was a pretext for discrimination against McKenna. *See supra*, response to ¶ 129. Deny that Kariuki "began setting up the interviews" at this time. Foley's candidacy had been in the works since the time of McKenna's first maternity leave. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)  Foley was initially identified as a candidate to fill the position vacated by Healion.  (*Id*.)

135.    On July 29, 2020, Foley interviewed with Garvey over the phone. (Boyarsky Aff. ¶ 43, Ex. 40.) During the call, Foley and Garvey discussed the clients she covered, her experience at Imperial, and how her experience could be additive to Santander's business. (Garvey Dep. Tr., at 165:18-167:8.) Because Imperial was virtually risk free, Foley told Garvey she knew how to be aggressive and negotiate for riskless trades. (*Id.*) Based on his conversation with Foley, Garvey supported Kariuki's decision to hire her for the open sales position. (*Id.*)

**RESPONSE:** Admit that the July 29, 2020 interview occurred. Object to the descriptions of Foley's qualifications. They are out-of-court statements offered for the truth asserted— i.e., that Foley really did have these qualifications. Thus, they are inadmissible as hearsay under Fed. R. Evid. 801(c).

**REPLY:** Plaintiff deposed Garvey and Foley and had more than ample opportunity to question them about the telephone call. (Supp Boyarsky Aff., Ex. 64, Garvey Dep. Tr., at 165:18-167:8; 2nd Supp Boyarsky Aff., Ex. 81, Foley Dep. Tr., at 40:23-42:11.)

136.    Shortly after her interview with Garvey, Foley also interviewed with Minuesa on August 5, 2020, and with Murali on September 17, 2020. (Boyarsky Aff. ¶ 44, Ex. 41; *id.* ¶ 45, Ex. 42.)

**RESPONSE:** Admit.

137.    After his interview with Foley, on September 17, 2020, Murali sent an email to Kariuki, Minuesa, and Garvey stating that he was "[v]ery supportive of bringing [Foley] in and think[s] she will be very good for the platform." (Boyarsky Aff. ¶ 46, Ex. 43.) In his email, Murali identified four specific reasons why he thought Foley would be additive to the team. (*Id.*) First, Foley is "[v]ery experienced" and her prior experience at Bear Stearns & Company, Inc. ("Bear Stearns"), J.P. Morgan, and Imperial "means a diverse experience and having to create things without expecting it to fall into your lap." (*Id.*) Second, Foley has experience working with a variety of products from ABS/Structured to Investment Grade products.  (*Id.*) Third, Foley has experience with Emerging Markets products at Imperial with the cross-over accounts. (*Id.*) Fourth, Santander was looking for someone experienced with illiquid investments and Murali thought that Foley could be additive in this space given her background and experience.  (*Id.*)

**RESPONSE:** Admit the email was sent with those contents. Deny that Murali thought that Foley "could be additive in this space given her background and experience." What he meant is that they wanted "someone for illiquids," that Foley did not necessarily squarely possess that experience, but that she "could be additive" nonetheless." Def. Ex. 43, DEFENDANTS028513.

**REPLY:** Plaintiff's conjecture about Murali's mental state is unsupported by the evidence.

138.    On August 4, 2020, while Kariuki was on vacation, Minuesa sent him an email reminding him of the open items that remain pending and the priorities that he needs to focus on upon his return. (Boyarsky Aff. ¶ 47, Ex. 44; Kariuki Dep. Tr., at 279:3-285:17.)  Among other

things, Minuesa instructed Kariuki to prioritize the restructuring of the team and his identification of the "low-production sales persons." (Boyarsky Aff. ¶ 47, Ex. 44; Kariuki Dep. Tr., at 279:3-285:17.) In the August 4 email, Minuesa also emphasized the importance of increasing the team's secondary trading effort, stating: "Historical P&L is pretty much flat . . . and we need to find the way to jump to a different level in terms of PL, active clients and volumes." (*Id.*)

**RESPONSE:** Deny. Def. Ex. 44 shows Minuesa talking about the "identification of the 'low-production sales persons.'" He simply lists as an action-item "3. Re-structuring of team (low-production sales person)." Def. Ex. 44, DEFENDANTS021080. By this time, Kariuki had already made the decision to terminate McKenna. *See supra*, response to ¶ 125. Deny Minuesa was discussing generally "the team's secondary trading effort." He was discussing "secondary Latam," a particular secondary theme. Def. Ex. 44, DEFENDANTS021080.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)

139.   After Kariuki returned from vacation in or around August 17, 2020, he promptly began identifying the two lowest performers on the IG Sales Team. (Boyarsky Aff. ¶ 47, Ex. 44; Kariuki Dep. Tr., at 279:3-285:17.)

**RESPONSE:** Deny he began identifying the two lowest performers at this time. By this time, Kariuki had already made the decision to terminate McKenna. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.)

140.   To help him identify the two weakest performers, Kariuki considered several factors including: (i) the individual's sales credits and the quality of the sales credits; (ii) feedback from Garvey and the trading desk; (iii) feedback from the Syndicate and Debt Capital Markets

teams; and (iv) the individual's skillset and their ability to contribute to the business moving forward. (Kariuki Dep. Tr., at 252:7-261:9.)

**RESPONSE:** Deny the cited testimony supports the "factors" described. Deny Kariuki considered these factors. He testified that he considered only McKenna's secondary trading numbers. Def. Ex. 66, Kariuki Dep. at 260:16-261:21 ("Her sales credit numbers were the second lowest . . . . So from that I – it became very clear that she was the second worst performer after Jeff Barker. Q: Was there any other reason you ranked her as the second worst performer after Jeff Barker? . . . A: No.") This is not to mention the evidence that Kariuki's true reason was discriminatory. *See infra*, response to ¶ 186.

**REPLY:** Kariuki also testified that in determining that McKenna and Barker were the weakest performers on his team he considered the opinions of the Syndicate and Debt Capital Markets team as well as Garvey's trade team.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 267:10-17) ("Q. Other than secondary sales credits, what else did you consider when you ranked Mr. Steckroth higher than Ms. McKenna?  A.  Got it.  I also had to solicit their opinions of the primary – of the folks in primary, so that would have been syndicate and the DCM folks. . . . [A]nd then also secondary trader.").  Kariuki further testified that he considered "which two people are going to have the least impact on the overall business by not being there," which is another way of saying that he considered who could best contribute to the business moving forward.  (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 254:12-17.)  The record shows no evidence that Kariuki's true reason for ranking McKenna second weakest was discriminatory.  (*See infra*, response to ¶ 186.)

141.    With respect to the sales credits and the quality of the sales credits, Kariuki did not just consider the total sales credits earned by each salesperson. (Kariuki Dep. Tr., at 252:7-253:13.)

Rather, to identify the two weakest performers on his team, Kariuki needed to determine which two salespeople who were "going to have the least impact on overall business by not being there." (Kariuki Dep. Tr., at 252:7-254:15-17.)  Secondary sales are where the salespeople truly add value because such sales are driven by the client's relationship to a particular salesperson.  (*Id.* at 252:16-258:21, 381:22-24; Garvey Dep. Tr., at 52:5-54:19.) Primary sales are akin to data entry where the salesperson essentially functions like an order clerk, making sure that all of the orders are included in the syndicate book. (Garvey Dep. Tr., at 52:12-14; Kariuki Dep. Tr., at 85:22-86:17.) Thus, beyond the total sales credits, Kariuki also considered the quality of the sales credits, and more specifically, what percentage of the sales credits were derived from primary as opposed to secondary sales. (Kariuki Dep. Tr., 253:3-9) Within the volume of secondary sales, Kariuki also considered the percentage of voice versus electronic trading and AXE versus non-AXE trades. (*Id.*)

> **RESPONSE:** Deny that primary sales are "akin to data entry" or that a salesperson who books a primary deal is only an "order clerk." *See supra*, response to ¶ 36. Deny that Kariuki did anything more than look at her overall secondary sales number. *See supra*, response to ¶ 140. This is not to mention the evidence that Kariuki's true reason was discriminatory. *See infra*, response to ¶ 186.

> **REPLY:** The undisputed record evidence shows that primary deals require little effort on the part of salespersons and that Santander considered secondary trades a better indicator of salesperson performance than primary trades.  (*See supra*, reply to ¶ 36.)  Plaintiff presented no evidence disputing Kariuki's sworn testimony that he considered secondary trade credits, the opinions of the primary trade team, the opinions of the secondary trade team, and the employees' overall ability to contribute to Santander in determining that McKenna and Barker were the

weakest members of his team.  (*See supra*, reply to ¶ 140.)  The record shows no evidence that Kariuki's true reason for ranking McKenna second weakest was discriminatory.  (*See infra*, response to ¶ 186.)

142.    Kariuki began his evaluation process by requesting for the sales reports that provided specific information on secondary trading volumes and the types of secondary trades executed by each salesperson from the reporting team. (Kariuki Dep. Tr., at 252:7-253:9.)

**RESPONSE:** Admit Kariuki's testimony. Deny Kariuki actually reviewed any particular set of numbers. *See infra*, response to ¶ 143. It may be inferred from the absence of any record of such a request being made that Kariuki did not really make a request at this time, and "a jury may disregard his testimony because he is an interested witness." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000); *see In re Dana Corp*., 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

**REPLY:** Plaintiff offers no specific evidence to refute Kariuki's sworn testimony and, therefore, her Response is improper. (Local Civ. R. 56.1(d).)

143.    Kariuki reviewed the IG Sales Team's secondary versus primary sales credits trading performance, including the report reflecting credit numbers through August 2020 to identify the two weakest performers on his team. The chart containing these numbers, the same as in Paragraph 117 of this SOF, are below

| Employee | Total Sales Credits | Primary Sales Credits | Secondary Sales Credits |
|---|---|---|---|
| Christopher Tolkin | 3,535,400 | 2,514,400 | 1,021,000 |
| Barry Sherman | 3,412,300 | 2,983,600 | 428,700 |
| Jeffrey Barker | 1,855,000 | 1,570,700 | 284,300 |
| Erin McKenna | 2,298,400 | 2,063,900 | 234,500 |

| | | | |
|---|---|---|---|
| Thomas Steckroth | 1,899,400 | 1,584,800 | 314,600 |

(Boyarsky Aff. ¶ 33, Ex. 30 [Aug 2020 Excel]; Kariuki Dep. Tr., at 275:21-276:20.)

**RESPONSE:** Deny that the testimony cited demonstrates Kariuki reviewing any particular sales credit numbers. He testified only to "doing that process and started making requests of the financial reporting team." Def. Ex. 66, Kariuki Dep. at 276:17-19. There is no record evidence that he looked at this chart or any other particular chart.

Deny the chart accurately reflects McKenna's performance as of this date. *See supra*, response to ¶ 117.

**REPLY:** *See supra*, reply to ¶ 117.

144.    A summary of the quality of each salesperson's secondary trades through August 31, 2020 is provided below:

| Employee | Secondary Sales Credits | Electronic | Voice | Riskless | AXE |
|---|---|---|---|---|---|
| Christopher Tolkin | 1,021,000 | 404,500 | 616,500 | 0 | 561,600 |
| Barry Sherman | 428,700 | 149,300 | 279,400 | 21,400 | 200,600 |
| Jeffrey Barker | 284,300 | 222,300 | 62,000 | 7,500 | 51,100 |
| Erin McKenna | 234,500 | 82,700 | 151,800 | 2,800 | 104,800 |
| Thomas Steckroth | 314,600 | 137,500 | 177,100 | 0 | 174,500 |

(Boyarsky Aff. ¶ 33, Ex. 30.)

**RESPONSE:** Deny the chart accurately reflects McKenna's performance as of this date. *See supra*, response to ¶ 117. Deny the exhibit cited contains any "voice" trades.

**REPLY:** These figures are reflected in Boyarsky Aff., Ex. 30 and 2nd Supp. Boyarsky Aff., Ex. 72 at DEFENDANTS021347.  Plaintiff raised no evidence to dispute their veracity.

"Voice" trades are a combination of AxE, Bid or Offer, Anti-Axed, and Not-Axed trades (i.e., trades other than electronic trades.) (Supp Boyarsky Aff., Ex. 64, Garvey Dep. Tr., at 55:10-25, 316:21-23)

145.    Based on his review of the sales report and the quality of the secondary sales credits, Kariuki determined that Barker and McKenna were the two weakest performers in secondary sales, and more specifically, their electronic trading, voice trades, and AXE trades were the weakest relative to the rest of the IG Sales Team. (Kariuki Dep. Tr., at 252:7-261:15.)

**RESPONSE:** Deny that Kariuki testified specifically to how the performance of McKenna and Barker compared to the rest of the team. Deny Kariuki undertook this review as described. *See supra*, response to ¶¶ 140, 142–143. The sales numbers were a mere pretext to terminate McKenna. *See supra*, response to ¶ 129.

**REPLY:** Kariuki explicitly testified that "Jeff Barker was the weakest performer on the team.  Erin was the second [weakest]."  (Supp Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 259:23-24.)  Plaintiff presented no evidence disputing Kariuki's sworn testimony that he considered secondary trade credits, the opinions of the primary trade team, the opinions of the secondary trade team, and the employees' overall ability to contribute to Santander in determining that McKenna and Barker were the weakest members of his team.  (*See supra*, reply to ¶ 140.)

146.    Kariuki also solicited the feedback of Garvey and the trading team in making his decision to terminate the two weakest performers on his team. (Kariuki Dep. Tr., at 259:9-24.)  As the sales and trading desks are required to work closely together, and thus, Kariuki valued Garvey's opinion and made sure that he obtained Garvey's feedback on the sales team, identify areas of improvement, and discuss business strategies. (*Id.* at 228:2-14.)

**RESPONSE:** Deny Kariuki undertook this review as described. *See supra*, response to ¶ 140.

**REPLY:** Plaintiff presented no evidence disputing Kariuki's sworn testimony that he considered secondary trade credits, the opinions of the syndicate team, the opinions of Garvey and his team, and the employees' overall ability to contribute to Santander in determining that McKenna and Barker were the weakest members of his team. (*See supra*, reply to ¶ 140.)

147.    Garvey testified that he, Kariuki, and Minuesa collectively made the decision to terminate Barker and McKenna. (Garvey Dep. Tr., at 169:5-10.) According to Garvey, there had been ongoing discussions between him, Kariuki, and Minuesa about upgrading the sales team even as early as March 2019, the time when Kariuki took over management of the IG Sales Team. (*Id.* at 169:22-171:15.) At some point in time, they decided that the IG Sales Team was underperforming, and that they needed to upgrade the salespeople to improve the overall performance of the team. (*Id.*)

**RESPONSE:** Admit. The "point in time" was McKenna's first pregnancy. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)

148.    Garvey testified that he agreed with Kariuki's decision to terminate Barker and McKenna as the two weakest performers on the IG Sales Team. (Garvey Dep. Tr., at 169:5-184:18.) He further testified that even if he were asked to select someone to terminate and/or upgrade in 2019, he would still have made the decision to terminate McKenna based on her underperformance. (*Id.* at 171:2-172:9.) Similar to Kariuki, Garvey concluded that Barker and McKenna were the two weakest performers on the IG Sales Team based on their secondary sales

credits, and more specifically, their electronic versus voice trades.  (*Id.* at 176:4-179:3.)  Consistent with Kariuki's testimony, Garvey also testified that, based on McKenna's account list, she had ample opportunity to succeed, and yet, still underperformed and failed to execute trades.  (*Id.* at 176:4-25; Kariuki Dep. Tr., at 260:12-261:9.)

**RESPONSE:** Admit that Garvey agreed with the decision to terminate McKenna. Admit Garvey wished to terminate McKenna in 2019, the year he denied McKenna an accommodation when she was suffering pregnancy complications and also the year she took a maternity leave. Admit Garvey based his analysis in part on McKenna's 2019 numbers. Def. Ex. 64, Garvey Dep. at 177:21-22. Deny Garvey ever testified that McKenna "failed to execute trades."

**REPLY:**  Garvey testified that he considered McKenna's 2020 performance when evaluating her performance.  (Licul Aff., Ex. 5, Garvey Dep. Tr., at 177:18-24.)  Garvey testified that McKenna and Barker "weren't trading enough," which is to say that they failed to execute trades.  (Supp Boyarsky Aff., Ex. 64, Garvey Dep. Tr., at 176:21-22.)  Plaintiff invented a statement that Garvey wished to terminate McKenna in 2019.  Instead, Garvey testified that he did not identify McKenna as a person to terminate, but rather "…*if someone had asked me at that point in time* I would have said she is the one we would need to upgrade." In response to the question "Did anyone ask you at that point in time?," Garvey answered "Not that I can recall, no."  (*Id.* 172:1.) (emphasis added) Plaintiff offers no specific evidence to refute Garvey's sworn testimony and, therefore, her Response is improper. (Local Civ. R. 56.1(d).)

Garvey did not have authority to grant or deny McKenna an accommodation.  (See reply ¶ 73.)  He involved Human Resources to assist in 2019, because he knew SIS policy did not permit a sales employee to execute trades remotely.  (*See supra*, reply to ¶¶ 72, 73, 74.)  In this regard,

the authorization of a remote work arrangement would have involved multiple levels of approval. (*See supra*, reply to ¶ 67; Cignarella Aff. ¶ 10.)

149.    Garvey also felt that in comparison to the rest of the IG Sales Team, both Barker and McKenna demonstrated a lack of effort in engaging the traders, which to Garvey, signaled that they were not engaging their clients and likely contributed to their low secondary trade volumes. (Garvey Dep. Tr., at 179:17-184:18.) Specifically, Garvey testified that for the majority of McKenna's tenure at Santander, she appeared disengaged, and failed to provide feedback to the trading desk to let them know what her clients were thinking and what they should be working on with respect to trades. (*Id.*) Garvey testified that he "could barely tell that [McKenna] was working" and that she "didn't seem like she was there." (*Id.* at 180:9-11.)

**RESPONSE:** Admit Garvey's negative views of McKenna.

150.    Garvey spoke to the traders on his team in a regular basis, and during these conversations, he would ask them which salespeople they spoke to. (Garvey Dep. Tr., at 181:13-183:13.) Given that his team of traders rarely, if ever, mentioned McKenna, Garvey concluded that she was not engaging the trading desks, which explained her underperformance and lack of voice trades. (*Id.*)

**RESPONSE:** Object to the testimony as inadmissible hearsay. The statements of other traders that they had not spoken to McKenna are out-of-court statements offered for the truth of the matter asserted, and inadmissible under Fed. R. Evid. 801(c).

**REPLY:** Counsel for Plaintiff questioned Garvey about how Garvey assessed McKenna's engagement with the trading team to which Garvey responded, and because McKenna does not like the answers she claims the responses are hearsay.  Her counsel solicited Garvey's responses thereby precluding McKenna from claiming they are inadmissible.  (Garvey Dep. Tr. 181:9-182:21

(Q: So you would ask him either daily or biweekly whether he engaged with Ms. McKenna; is that right? A: I would ask them on a daily basis who had talked to which salespeople. Yes.  Q: And what was his response? A: Again this was an ongoing conversation, but they would say no, we have of not. Q: so that is not just Brandon. All of the traders you asked said to you on a daily basis – sorry? A: All the traders.  (*Id.* 181:6-21.))

151.    In addition to soliciting feedback from Garvey and the trading team, Kariuki also solicited feedback from the Syndicate and Debt Capital Markets ("DCM") team. (Kariuki Dep. Tr., at 267:10- 274:20.) While DCM did not provide much feedback, the Syndicate team provided a lot positive feedback on Steckroth. (*Id.*) Given that Santander hired Steckroth specifically because of his background in asset-backed securities ("ABS"), the Syndicate team felt that he was doing a really good job of connecting Santander with clients that it previously did not have access to, especially clients and accounts that were focused on specific productions like ABS. (*Id.*)

**RESPONSE:** Object to the testimony as inadmissible hearsay. The statements of other Santander employees about Steckroth and his performance are out-of-court statements offered for the truth of the matter asserted, and inadmissible under Fed. R. Evid. 801(c).

**REPLY:** Counsel for Plaintiff question Kariuki about what he did to assess McKenna and Steckroth to determine McKenna was a lower performer, and because McKenna does not like the answers she claims the responses are hearsay.  Her counsel solicited Kariuki's responses thereby precluding McKenna from claiming they are inadmissible.  (Kariuki Dep. Tr. 270:6 (Q: what other feedback did you get about Mr. Steckroth? A: Traders were very supportive of his efforts. They said that, you know, he is – he has made some good headway with J.P. Morgan investment management, and that account with him joining became the most active account for us in secondary trading.))

Even if the cited deposition testimony contains hearsay, which Defendants deny, the statements are admissible to show that Kariuki conducted a thorough analysis and made an informed decision by looking at statistical data of sales activity but also sought the input of Garvey, the syndicate team and traders who interacted with McKenna and the rest of the IG Sales Team.

152.    Kariuki also received positive feedback from the traders about Steckroth's efforts to make secondary trades and connect with his clients. (Kariuki Dep. Tr., at 270:6-271:19.) According to the traders, as a result of Steckroth's efforts with a particular client, that client became one of the most active accounts in secondary trading with Santander. (*Id.*) Even during the pandemic, Steckroth made plans to have lunch with the client and invited Kariuki to join given that they were both in the city. (*Id.*) During that time, Kariuki observed that Steckroth appeared to have a good rapport with that particular client. (*Id.*)

**RESPONSE:** Object to the testimony as inadmissible hearsay. The statements of other Santander employees about Steckroth and his performance are out-of-court statements offered for the truth of the matter asserted, and inadmissible under Fed. R. Evid. 801(c). Admit that Kariuki took a positive view of Steckroth's client interactions and, apparently, a dim view of McKenna not coming to the city for client lunches during a pandemic, while she was contemplating pregnancy, before any vaccines were available.

**REPLY:** *See supra*, reply to ¶ 151.

153.    It took Kariuki less than two weeks from the time he obtained the secondary sales report from the reporting team to identify McKenna and Barker as the two weakest performers to be terminated. (Kariuki Dep. Tr., at 282:20-283:9.)

**RESPONSE:** Deny that Kariuki first decided to terminate McKenna at this time. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.)

**K.  Kariuki Selected McKenna and Barker for Termination Before He Knew of Her Second Pregnancy.**

154.    After identifying Barker and McKenna as the two lowest performers on the team, Kariuki discussed his decision with Minuesa. (Kariuki Dep. Tr., at 273:15-274:20; Minuesa Dep. Tr., at 75:22-78:11.) During this discussion, Kariuki explained the process he used to identify Barker and McKenna as the two lowest performers on his team. Specifically, he told Minuesa that he based his decision on the following criteria: (a) the quality of the sales credits, how much of it was primary versus secondary; (b) within the types of secondary trades, how much of its was conducted over an electronic platform versus voice trades; (c) the opinion of the people on the Syndicate team; and (d) the secondary traders' opinion. (*Id.* at 273:15-274:20.)

**RESPONSE:** Deny that Kariuki first decided to terminate McKenna at this time. *See supra*, response to ¶ 125. Deny that Kariuki used the process described. *See supra*, response to ¶ 140. Accordingly, deny Kariuki had this conversation with Minuesa as described.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.)  Plaintiff presented no evidence disputing Kariuki's sworn testimony that he considered secondary trade credits, the opinions of the primary trade team, the opinions of the secondary trade team, the opinion of Garvey, and the employees' overall ability to contribute to Santander in determining that McKenna and Barker were the weakest members of his team.  (*See supra*, reply to ¶ 140.)

155.    Based on Kariuki's explanation and rationale, Minuesa relied upon his assessment and approved Kariuki's decision to terminate Barker and McKenna as the two lowest performers on the IG Sales Team. (Kariuki Dep. Tr., at 274:6-20; Minuesa Dep. Tr., at 77:17-78:7.)

**RESPONSE:** Admit that Minuesa relied upon Kariuki's assessment.

156.    After Kariuki and Minuesa finalized the decision to terminate Barker and McKenna, on August 25, 2020, Kariuki sent an email to Yahn from HR to discuss the restructuring and begin the termination process. (Kariuki Dep. Tr., at 275:4-10; Boyarsky Aff. ¶ 48, Ex. 45; Yahn Dep. Tr., at 49:18-23.)

**RESPONSE:** Deny that the decision to terminate McKenna was only finalized in August. *See supra*, response to ¶ 125. Otherwise, admit.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.)

157.    On September 1, 2020, Yahn, Kariuki, and Minuesa had a conference call (the "September 1 Call") to discuss the restructuring. (Boyarsky Aff. ¶ 49, Ex. 46.) During this conversation, Kariuki informed Yahn that he had selected Barker and McKenna as the two lowest performers to be terminated as part of the restructuring. (*Id.*; Kariuki Dep. Tr. at 275:21-277:9; Yahn Dep. Tr. at 15:15-23.) Kariuki also informed Yahn that Steckroth had a large transaction[57] he expected to complete although it had a long settle date, and therefore, was not yet reflected on Steckroth's sales credits at the time. (Kariuki Dep. Tr., at 380:19-381:19; Yahn Dep. Tr., at 145:3-146:8.) Steckroth only received the sales credits from the transaction on November 25, 2020. (Kariuki Aff. ¶ 22.; Boyarsky Aff. ¶ 50, Ex. 47, 11/25 Excel; Boyarsky Aff. ¶ 51, Ex. 48.) Notably, Steckroth consummated and settled the trade resulting in the second largest trade for the Investment Grade Sales team for the 2020 year. (Kariuki Aff., at ¶ 22.)

**RESPONSE:** Deny that the single-day snapshot offered at Def. Ex. 47 shows a change in Steckroth's sale numbers. Deny that Def. Ex. 47 is what Defendants have claimed. It is clearly a

---

[7] The transaction involved financing for a mine in Chile, which was a complicated transaction affected by geopolitical influence and therefore took more time to execute.  (Kariuki Aff. ¶ 19.)

spreadsheet demonstrating sales from August 31, 2020, not November 25, 2020. Def. Ex. 47. Admit otherwise to the conversations between Yahn and Kariuki. Admit, too, that Kariuki thought Steckroth's deal hugely important, even though it was the kind of primary deal Santander has otherwise disparaged and has especially disparaged in the context of McKenna's performance. *See supra*, response to ¶ 36.

**REPLY:** The undisputed record evidence shows that Steckroth's private placement involved work comparable to a secondary trade, even though it was classified as a primary trade for sales credit purposes. (*See supra*, reply to ¶ 36.)

158.    On September 2, 2020, Yahn sent Kariuki an email confirming that they discussed the restructuring the day before and stated: "Here is the template for the org chart, ***as we discussed yesterday***." (Boyarsky Aff. ¶ 52, Ex. 49 (emphasis added.))  Yahn also told Kariuki that she would "follow up in the coming days on a draft write up of the restructure." (*Id.*)

**RESPONSE:** Admit the email described was sent.

159.    In or around the fall of 2020, Santander began discussing a potential return to the office encouraged employees to return to the office to the extent they could. (Kariuki Dep. Tr., at 207:11-20.) Kariuki felt that it was not his place to decide who should return to the office because it was a personal decision, and therefore, invited Yahn to join one of his morning sales calls with his team. (*Id.* at 210:17-211:9, 214:15-215:7.)

**RESPONSE:** Admit.

160.    On September 2, 2020, Yahn joined Kariuki's morning sales call with the Fixed Income sales team to discuss return-to-work policies and answer any questions the team had about returning to the office. (Kariuki Dep. Tr., at 207:11-211:9; Yahn Dep. Tr., at 79:4-12; Boyarsky Aff. ¶ 53, Ex. 50 [NATIVE FORMAT].) During the call, Kariuki specifically instructed his team

to reach out to Yahn directly to let her know whether or not they intended on returning to the office, and then Yahn would let Kariuki know. (Kariuki Dep. Tr., at 210:17-211:9, 214:15-216:13.)

**RESPONSE:** Admit.

161.    Shortly after the morning sales call with Yahn ended, on September 2, 2020, McKenna emailed (the "September 2 Email") Yahn in which she stated that she would not be returning to the office because she just found out that she was pregnant. (Boyarsky Aff. ¶ 54, Ex. 51 at DEFENDANTS000800.)  In the September 2 Email, McKenna also informed Yahn that her first doctor's appointment was scheduled for September 17, 2020, and asked Yahn if they could revisit her return to the office after that. (*Id.*)

**RESPONSE:** Admit the emails were sent as described.

162.    Yahn responded to McKenna's September 2 Email on the same day and told McKenna that it "ma[de] sense to revisit" McKenna's return to the office after her doctor's appointment and congratulated her on the good news. (Boyarsky Aff. ¶ 54, Ex. 51 at DEFENDANTS000800.) Yahn also told McKenna that: "I assume you haven't yet told the team of your good news, so I can just mention to Omar that you and I discussed a return to be confirmed after 9/17 without mentioning any details.  Does that work?"  (*Id.*)

**RESPONSE:** Admit the emails were sent as described.

163.    McKenna confirmed that she had not told anyone, including Kariuki, about her pregnancy and Yahn agreed not to disclose the information. (Boyarsky Aff. ¶ 56., Ex. 53, at DEFENDANTS000799-800.) McKenna responded: "Thank you so much.  ***I haven't told anyone since it is still so early***.  That sounds perfect; I really appreciate it." (*Id.*) (emphasis added.)

**RESPONSE:** Admit McKenna sent an email with these contents.

164.    On September 16, 2020, Yahn sent a text message to Shannon Cruz, an HRBP on Yahn's team who also supports the CIB team, detailing the sequence of events leading up to McKenna's announcement of her pregnancy to her. (Boyarsky Aff. ¶ 55, Ex. 52 at DEFENDANTS000196; Yahn Dep. Tr., at 78:21-79:12.)  In the text message, Yahn stated to Cruz that approximately "2 weeks ago," Kariuki informed her that he "wanted to [l]et go Jeff Barker and Erin McKenna." (Boyarsky Aff. ¶ 55, Ex. 52 at DEFENDANTS000196; Yahn Dep. Tr., at 79:2-12.) Yahn also stated to Cruz that the day after Kariuki informed Yahn that he was going to terminate Barker and McKenna, McKenna reached out to Yahn to tell her about her pregnancy and "confirmed that she didn't tell anyone yet given how early it was." (Boyarsky Aff. ¶ 55, Ex. 52 at DEFENDANTS000196; Yahn Dep. Tr., at 79:2-12.)

**RESPONSE:** Admit the contents of these texts.

165.    On September 17, 2020, McKenna emailed Yahn to provide an update about her pregnancy and asked if they could revisit any return-to-work discussion after her first trimester, per her doctor's instructions because she was "high risk." (Boyarsky Aff. ¶ 56, Ex. 53 at DEFENDANTS000799.) McKenna also offered to send a doctor's note.  (*Id.*)

**RESPONSE:** Admit the contents of these messages.

166.    At the time of McKenna's request, many people were still working from home and Santander was not requiring its employees to return to the office. (Kariuki Dep. Tr., 210:17-212:7.) Consequently, Yahn did not consider McKenna's request to continue working from home at the time as a request for an accommodation, and thus, told McKenna that she did not need to see her doctor's note at the time. (Boyarsky Aff. ¶ 56, Ex. 53 at DEFENDANTS000799.)

**RESPONSE:** Deny the record contains any documentary evidence or testimony about Yahn's state of mind. Admit the contents of the messages.

**REPLY:** At that time, McKenna was already working from home as part of Santander's transition to remote work during the covid-19 pandemic, and Santander had not required employees to return to the office. (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., 210:17-212:7.) As such, Yahn had no reason to view McKenna's statement about delaying her return to the office as a request for an accommodation. (Boyarsky Aff., Ex. 53 at DEFENDANTS000799.) Plaintiff introduced no evidence contradicting this interpretation.

167.    On September 17, 2020, Kariuki emailed Yahn and asked her if anyone from his team has reached out to her about returning to office in preparation for their return including planning seating arrangement in compliance with compliance with COVID-19 regulations and safety precautions in place at the time. (Boyarsky Aff. ¶ 57, Ex., 54 at DEFENDANTS000701; Kariuki Aff. ¶ 24.)

**RESPONSE:** Admit the contents of the email.

168.    On the same day, Yahn responded to Kariuki's email and provided him with the names of the employees who would not be returning to the office. (Boyarsky Aff. ¶ 57, Ex., 54 at DEFENDANTS000701.) Although Yahn included McKenna's name on the list of employees who would not be returning to the office, she did not mention McKenna's pregnancy to Kariuki. (*Id.*) Indeed, other than the names of the employees, Yahn did not provide Kariuki with details on why those employees were not returning to the office. (*Id.*)

**RESPONSE:** Admit.

169.    Two male sales employees – Sherman and Tolkin – informed Yahn that they would not be returning to the office, to which Kariuki accepted their request without any explanation since it was not mandatory to return to the office. (Kariuki Aff. ¶ 25.)

**RESPONSE:** Admit.

170.    On September 28, 2020, Kariuki forwarded an email with a sales report containing the secondary sales credits for the IG Sales Team to Yahn, stating: "Please find attached the spreadsheet which is used to track secondary trading volumes by salesperson.  The data is supportive of the action(s) we discussed." (Boyarsky Aff. ¶ 58, Ex. 55.)

**RESPONSE:** Admit Kariuki sent such an email. Deny that that the record cited contains the spreadsheet in question. The spreadsheet in the document contains information only about Jeff Barker and Barry Sherman. Def. Ex. 55, DEFENDANTS000189.

**REPLY:** The spreadsheet attached to this document can be found at 2nd Supp. Boyarsky Aff., Ex. 78, DEFENDANTS021528 and clearly shows primary and secondary trade information for McKenna and Barker.

171.    On October 12, 2020, Kariuki sent an email to Yahn again confirming that they would be terminating the two lowest performers on the IG Sales Team as discussed, and "replacing one of those people with Kristin Foley." (Boyarsky Aff. ¶ 58, Ex. 55.)

**RESPONSE:** Admit the email was sent. Deny it mentions "terminating the two lowest performers as discussed." Instead, it reads, "we have decided to . . . exit the two people in IG discussed." Def. Ex. 55, DEFENDANTS000187.

**REPLY:** Based on prior conversations between Kariuki and Yahn, it is clear to Yahn the "two people in IG discussed" were the "two lowest performers."   (Def. Ex. 55, DEFENDANTS000187; *see supra*, reply to ¶¶ 157-158.)

172.    More than a month after he informed Yahn of his decision to terminate Barker and McKenna, on October 19, 2020, McKenna sent Kariuki a Bloomberg message and disclosed her second pregnancy to him for the first time. (Boyarsky Aff. ¶ 59, Ex. 56 ; Yahn Dep. Tr., at 83:15-

87:16.)  McKenna is aware of no facts that would suggest that Kariuki or Yahn knew she was pregnant before the decision to terminate was made. (McKenna Dep. Tr., 234:16-239:12.)

**RESPONSE:** Admit the message was sent. Deny the testimony of McKenna supports that proposition that "McKenna is aware of no facts that would suggest that Kariuki or Yahn knew she was pregnant." No such question was asked in this range of the testimony.

**REPLY:** When Mckenna was asked what facts supported her pregnancy discrimination, she did not allege that Yahn or Kariuki were aware of her 2020 pregnancy before the decision to terminate her was made.  (Supp. Boyarsky Aff., Ex. 67, McKenna Dep. Tr., 234:16-239:12.)

173.    Kariuki was shocked by notice of McKenna's pregnancy. (Minuesa Dep. Tr. 85:7-87:5.) Almost immediately after receiving McKenna's Bloomberg message, Kariuki copied and pasted that Bloomberg chat and sent it to Yahn, asking her if McKenna's recent revelation "changes anything." (Boyarsky Aff. ¶¶ 60, 65, Ex. 57; Ex. 62; Kariuki Dep. Tr., at 288:3-289:25.) Kariuki also informed Minuesa that McKenna just notified him of her pregnancy, and he shared the information with human resources. (Kariuki Dep. Tr. 293:21-294:19.)

**RESPONSE:** Object to the testimony of Minuesa about Kariuki's assertion that he was shocked as inadmissible hearsay. It is offered for the truth of the matter asserted, that Kariuki was shocked, and therefore hearsay under Fed. R. Evid. 801(c). "[A] jury may disregard his testimony because he is an interested witness." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see In re Dana Corp.*, 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

Deny that the record contains any evidence of Kariuki's exchanges with Minuesa.

**REPLY:** Plaintiff offers no specific evidence to refute Minuesa or Kariuki's sworn testimony and, therefore, her Response is improper. (Local Civ. R. 56.1(d).) Plaintiff deposed both

Kariuki and Minuesa regarding their exchange when they learned McKenna was pregnant. (Boyarsky Aff., Ex. 66, Kariuki Dep. Tr. 294:2-19; Boyarsky Aff., Def. Ex. 68, Minuesa De. Tr. 85:7-87:5.)  Their testimony is not hearsay.

174.  Yahn informed Kariuki that because he made the decision to terminate Barker and McKenna before he knew about her pregnancy, they could proceed with the termination as planned. (Kariuki Dep. Tr., at 289:4-25.)

**RESPONSE:** Admit.

175.  It was Yahn's role as the HRBP to review the business decision provided in connection with any personnel changes and provide advice to the extent that there were problems or concerns with a particular business decision. (Yahn Dep. Tr., at 71:3-9.)

**RESPONSE:** Admit.

176.  With respect to Kariuki's decision to terminate McKenna and Barker, Yahn concluded that there were no legitimate reasons to stop McKenna's termination. (Yahn Dep. Tr., at 71:3-9.)

**RESPONSE:** Admit.

177.  Yahn was confident that McKenna's pregnancy had nothing to do with the termination because Kariuki did not know about McKenna's pregnancy at the time he decided to terminate McKenna and Barker. (Yahn Dep. Tr., at 83:15-87:10.) She testified that, while the sequence of events were very close in time, McKenna disclosed her pregnancy to her the day after Kariuki informed her of his decision to terminate Barker and McKenna. (*Id.* at 82:18-83:3, 83:15-84:15.) Further, at the time she informed Yahn of her pregnancy, McKenna confirmed that she had not told anyone about her pregnancy including Kariuki. (*Id.* at 84:4-9.) In light of McKenna's confirmation that she had not disclosed her pregnancy to anyone on the Fixed Income sales team

*the day after* Kariuki notified Yahn of his decision to terminate McKenna and Barker, Yahn testified that she did not "know how [Kariuki] would have known" of McKenna's pregnancy at the time he decided to terminate her. (*Id.* at 86:5-20.)

**RESPONSE:** Deny "Yahn was confident that McKenna's pregnancy had nothing to do with the termination." *See infra*, response to ¶ 178.

**REPLY:** Plaintiff offers no evidence to refute Yahn's testimony.  (*See infra*, reply to ¶ 178.)

178.   Yahn further reviewed the decision to terminate McKenna and Barker and its rationale with two appropriate internal advisors.  (Yahn Dep. Tr., at 88:20-90:7, 78:18-20.) Upon such review, they concluded the decision to terminate was made without any knowledge of Plaintiff's pregnancy and based on objective and legitimate criteria. (*Id.*)

**RESPONSE:** Admit the first sentence. Deny Yahn concluded the termination was "based on objective and legitimate criteria." She expressed skepticism of the business rationale provided, and Kariuki resisted providing her with more information. Ex. 6, DEFENDANTS021784-021785. Kariuki ultimately forced her to move forward without the information requested. Kariuki refused to participate in a subsequent investigation into the rationale for terminating McKenna, after an internal Santander analyst told him and Yahn that he did not believe that McKenna's secondary sales numbers justified her termination. Ex. 24, DEFENDANTS000183-000185.

**REPLY:** Plaintiff misinterpreted the evidence.  Nothing in the documents cited by Plaintiff indicate that Yahn expressed skepticism of the business rationale provided or that Kariuki resisted providing her with more information.  All emails in Pl. Ex. 6, DEFENDANTS021784-021785 take place over a five-day period, from October 28, 2020, through November 2, 2020 hardly evidencing delay on Kariuki's part.  Throughout Pl. Ex. 6, DEFENDANTS021784-021785 Yahn comments

on the form of the restructure document but provides no opinion—certainly no skepticism—about its qualitative content.  Plaintiff's description of skepticism is not supported by the evidence.  See Pl. Ex. 6, DEFENDANTS021784-021785.  Nothing in Pl. Ex. 24, DEFENDANTS000183-000185 supports the contention either that an internal Santander analyst told Yahn that McKenna's secondary sales numbers didn't justify her termination or that Kariuki refused to participate in an internal investigation into McKenna's termination.  Gari Feliu in fact notes that McKenna's 2020 secondary sales decreased year-over-year from her 2019 secondary sales credits.  (*Id.*)

L.  **Human Resources' Supporting Documentation for the Restructuring of the Fixed Income IG Sales Team.**

179.    As the HRBP supporting the team, it was Yahn's responsibility to draft the business rationale and selection assessment form for the restructuring and talent upgrade.  (Yahn Dep. Tr., at 12:11-16, 15:15-16:10, 20:8-21:14; Boyarsky Aff. ¶ 41, Ex. 38; Boyarsky Aff. ¶ 61, Ex. 58.) Thus, after Kariuki told Yahn that Barker and McKenna were going to be terminated as a result of the restructuring during the September 1 Call, Yahn requested that Kariuki send her the sales reports and other documentation that he used to identify McKenna and Barker as the two lowest performers on the team. (Yahn Dep. Tr., at 15:15-20:2; Boyarsky Aff. ¶ 49, Ex. 46 DEFENDANTS 28512 [NATIVE FORMAT].) To ensure that she had all the necessary information to draft the documentation supporting the restructure and Barker's and McKenna's termination, Yahn also requested that Kariuki send her the current organizational chart. (Yahn Dep. Tr., at 50:24-52:22, 59:11-19.)

**RESPONSE:** Deny Def. Ex. 58 has anything to do with assertions above. This is an email about hiring Kristin Foley. Deny Def. Ex. 46 has anything to do with the assertions above. It is only apparently a calendar entry for the September 1 Call.  Admit it was Yahn's responsibility.

Deny the decision to terminate McKenna was first made on September 1, 2020. *See supra*, response to ¶ 125. Admit Yahn requested more documentation.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.) The September 1 calendar entry confirms the date Kariuki and Yahn spoke about terminating McKenna and Barker and corroborates their testimony in this regard.  Yahn's email to Kariuki dated September 2, 2020 refers to their conversation the day prior and states "Here is a template for the org chart, as *we discussed yesterday*. I will follow up in the coming days on a draft write up of the *restructure.*" (emphasis added) (Boyarsky Aff. Ex. 49) This evidence corroborates their discussion on September 1 as they each testified that they confirmed on this date the decision to terminate McKenna's and Barker's termination.

180.    In an email dated September 9, 2020, Kariuki sent the then-current organizational chart for his team to Yahn.  (Boyarsky Aff. ¶ 52, Ex. 49.)

**RESPONSE:** Admit Kariuki sent this documentation.

181.    In an email dated September 28, 2020, Kariuki requested for the secondary trading sales report for the IG Sales Team from the reporting team. (Boyarsky Aff. ¶ 57, Ex. 54.)  In the email to the reporting team, Kariuki further stated: "I am also looking to understand what is done in comp (Market Axess) vs voice." (*Id.*) The reporting team responded to Kariuki's email on the same day, and attached a report that showed the salesperson's total sales credits to date, as well as a detailed breakdown of each individual salesperson's sales credits for: (i) primary versus secondary sales; (ii) electronic versus voice trades; and (iii) the type of trade executed (*i.e.*, whether it was AXE, riskless, or bid and offer). (*Id.*) On September 28, 2020, Kariuki forwarded the email with the attachment to Yahn and stated: "Please find attached the spreadsheet which is used to

track secondary trading volumes by salesperson. The data is supportive of the action(s) we discussed." (*Id.*)

**RESPONSE:** Deny Def. Ex. 54 contains any of the correspondence cited. This is an email chain about working from home. As to Def. Ex. 55, admit all of the communications. Deny that the exhibit cited contains the spreadsheet in question. It contains only information about Jeff Barker and Barry Sherman.

**REPLY:** The information about Barker and Barry Sherman is simply a screenshot from the spreadsheet pasted into the email. Defendants inadvertently attached the wrong email as Ex. 54 to the Boyarsky Aff. The correct email is attached to the Boyarsky 2nd Supp. Aff as Ex. 74. (2nd Supp. Boyarsky Aff. ¶ 11, Ex. 78, DEFENDANTS021525). The full tracking spreadsheet, including information for McKenna, can be found at 2nd Supp. Boyarsky Aff, Ex. 78, at DEFENDANTS021528.

182.    After Yahn received the current organizational chart from Kariuki, as well as the sales report containing the secondary sales numbers for the IG Sales Team, Yahn worked with Kariuki to begin drafting the business rationale and selection assessment form. (Yahn Dep. Tr., at 66:8-17.)

**RESPONSE:** Admit.

183.    The business rationale is a document that Human Resources drafts whenever a restructuring or talent upgrade occurs. (Yahn Dep. Tr., at 20:8-25.) It provides a detailed summary of the reasons for the specific business decision, as well as the data and information that was considered in support of the action taken. (*Id.*; Boyarsky Aff. ¶ 41, Ex. 38 [Business Rationale].)

**RESPONSE:** Admit Defendants' explanation of the business rationale document. Deny it "provides a detailed summary of the reasons for the specific decision" as it only documents Santander's justifications for the termination.

184.    The selection assessment form is a form that Human Resources is required to complete whenever the business does a talent upgrade that indicates the personnel on the team, as well as provides information related to the upgrade. (Yahn Dep. Tr., at 13:5-17; Boyarsky Aff. ¶ 61, Ex. 58 [Selection Assessment Form].) It contains several columns and identifies all the individuals on the IG Sales Team and includes other personnel information such as their titles/positions and work location. (*Id.*; Yahn Dep. Tr., at 13:5-12.)

**RESPONSE:** Admit the form of this document, as described.

185.    Also included in the selection assessment form are Kariuki's rankings of the salespeople on the IG Sales Team based on their skills ("A"), performance ("B"), and level of contribution ("C"). (Boyarsky Aff. ¶ 60, Ex. 57; Yahn Dep. Tr., at 13:5-12.)  Each criterion was ranked on a 4-point scale. (Boyarsky Aff. ¶ 60, Ex. 57; Yahn Dep. Tr., at 110:21-112:7.)

**RESPONSE:** Admit the form of the document, as described.

186.    With respect to skills, Kariuki considered whether the individual salesperson had the skillset to meet client demand and the needs of the business going forward. (Boyarsky Aff. ¶ 60, Ex. 57; Yahn Dep. Tr., at 44:10-20, 51:4-52:2, 108:8-109:7.)  Specifically, Kariuki considered: (i) the salesperson's sales skills and their ability to drive secondary sales; and (ii) whether the salesperson was specialized in certain products or areas that Santander was hoping to expand into. (Boyarsky Aff. ¶ 60, Ex. 57; Yahn Dep. Tr., at 51:4-52:2, 108:8-109:7.)

**RESPONSE:** Admit the document purports to document these considerations. Deny these were Kariuki's true considerations. The record is replete with evidence that Kariuki's true reason

was discriminatory, based on a pattern of conduct towards McKenna stretching back to her first pregnancy. *See supra*, responses to ¶¶ 20–22, 26–27, 36, 65, 80, 91, 93–96, 100, 103, 107–108, 117, 120, 123, 125, 129, 152.

**REPLY:** A catch-all reference to numerous unrelated portions of the record does not raise a genuine issue of fact. (*See supra*, reply to ¶¶ 20–22, 26–27, 36, 65, 80, 91, 93–96, 100, 103, 107–108, 117, 120, 123, 125, 129, 152.)

187.    As for the performance ranking of the salespeople, although the focus was on recent sales performance (*i.e.*, 2020) and specifically secondary sales credits, Kariuki also took into account year over year performance. (Kariuki Dep. Tr., at 262:24-264:7.) In addition to the individual salesperson's sales credits based on their sales credits, Kariuki also considered pipelines and projects that they have worked on. (Yahn Dep. Tr., at 61:10-62:2, 109:23-110:2.)

**RESPONSE:** Deny the deposition range cited for Kariuki (262:24-264:7) contains any testimony about "year over year performance." Deny that Kariuki did anything more than look at McKenna's overall secondary sales number. *See supra*, response to ¶ 140. This is not to mention the evidence that Kariuki's true reason was discriminatory. *See supra*, response to ¶ 186. His focus was not on recent sales performance. He also looked at the period covering McKenna's pregnancy. Ex. 3, Minuesa Dep. at 79:7-14; Def. Ex. 64, Garvey Dep. at 177:18-24 (agreeing that they assessed McKenna's performance for the prior several years). That period would have shown other salespeople getting credit for sales on McKenna's accounts while she was on leave. Def. Ex. 66, Kariuki at 157:18-24 (explaining that, when a salesperson is out of the office for an extended period, the person who backs up the account will receive sales credit for trades executed on those accounts.) Santander generally faulted McKenna for being unable to make sales while on maternity leave. *See supra* response to ¶ 115.

**REPLY:** Plaintiff cited no evidence to contradict Kariuki's sworn testimony regarding his methodology for identifying the weakest members of his team, which is corroborated by Santander's business rationale document. (*See supra*, reply to ¶ 140.) McKenna repeatedly ignores Kariuki's testimony, as an example, regarding his explanation to Minuesa about the process he used to identify Barker and McKenna as the lowest performers to terminate. (*See* Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr. 274:6-14: "Q: What did you say when you explained to him your process? A: I told him that I looked at the quality of sales credits considering how much of it was primary versus secondary, how much was done via electronic platform versus live trades or voice trades. I also solicited the opinion of [the] syndicate [team] and the opinion of our secondary traders.") Plaintiff further ignores Kariuki's testimony that he considered his team's performance from 2019 to 2020 (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep Tr., at 267:23-268:4 ("So because Tom was hired specifically for asset backed securities, [the traders] felt like he was doing a really good job of connecting Santander with clients that we did not have access or have a rapport with prior to his joining [in 2019]."))

188.    With regard to the salesperson's level of contribution, Kariuki considered the salesperson's creativity, drive, and ability to meet their sales objectives regardless of any institutional obstacles they may face. (Yahn Dep. Tr., at 44:23-45:17, 109:14-22.)

**RESPONSE:** Object to Yahn's testimony about Kariuki's methodology as hearsay. Deny this range of Yahn's deposition contains any testimony regarding "creativity, drive, and ability." Deny that Kariuki did anything more than look at McKenna's overall secondary sales number. *See supra*, response to ¶ 140. This is not to mention the evidence that Kariuki's true reason was discriminatory. *See supra*, response to ¶ 186.

**REPLY:** Plaintiff presented no evidence disputing Kariuki's sworn testimony that he considered secondary trade credits, the opinions of the primary trade team, the opinions of the secondary trade team, and the employees' overall ability to contribute to Santander in determining that McKenna and Barker were the weakest members of his team.  (*See supra*, reply to ¶¶ 140, 187.)

189.    The rankings assigned to each of the three criteria showed that Barker was the weakest performer on the team, and McKenna was the second weakest performer. (Boyarsky Aff. ¶ 60, Ex. 57.)

**RESPONSE:** Deny these rankings showed anything about the real relative performance. They were simply used to justify a decision Kariuki had already made. *See supra*, response to ¶¶ 125, 129.

**REPLY:** Plaintiff's bare assertion does not create a genuine issue relating to the nature of the rankings.  Plaintiff identified no evidence that the rankings were "used to justify a decision Kariuki had already made."  (*See supra*, reply to ¶¶ 125, 129.)

190.    At approximately the same time, based on Foley's background and experience, Kariuki, Garvey, Minuesa, and Murali collectively decided that Foley would be a good fit for the business moving forward, and thus, decided to extend an offer of employment to Foley.  (Garvey Dep. Tr., at 163:9-167:8; Boyarsky Aff. ¶ 61, Ex. 58 at DEFENDANTS021428.)

**RESPONSE:** Deny this was coincidence and that Foley was only chosen for the first time at this point in time. Foley had already been chosen to replace McKenna. Santander had interviewed Foley during McKenna's first maternity leave. *See supra*, response to ¶ 125. Foley replaced McKenna, as shown by the fact that she took over McKenna's accounts. Ex. 42, DEFENDANTS021982 (showing that Foley received four of five of McKenna's largest accounts);

Ex. 43, DEFENDANTS027967 (Sherman stating that all of McKenna's large accounts except one had been given to Foley); Def. Ex. 55, DEFENDANTS000187.

**REPLY:** Plaintiff cites no evidence that Foley was chosen to replace McKenna.  Foley was initially interviewed due to the need to fill the position vacated by Healion.  (*See supra*, reply to ¶ 125.)  The distribution of accounts to Foley helped maintain an equitable distribution of the top 25 IG secondary accounts amongst the salespersons who primarily handled IG sales.  (*See* Licul Aff., Ex. 42, DEFENDANTS021982.)  The reallocation saw Foley end up with four of the top 25 accounts, as compared to Sherman's four, Steckroth's five, and Tolkin's ten.  (*Id*.)

191.    Yahn testified that the business rationale and selection assessment forms were Human Resources forms that she had to complete as part of any reduction in force. (Yahn Dep. Tr., at 19:17-20:2.) By the time she drafted the business rationale and selection assessment form, however, the decision to terminate Barker and McKenna already was finalized. (*Id.*)

**RESPONSE:** Admit. The decision had been made by February 25, 2020. *See supra*, response to ¶ 125.

**REPLY:** Plaintiff cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020.  (*See supra*, reply to ¶ 125.)

192.    On October 28, 2020, Yahn sent Kariuki drafts of the business rationale and the selection assessment form for his approval and input. (Boyarsky Aff. ¶ 62, Ex. 59.)

**RESPONSE:** Admit.

193.    Following a conversation with Kariuki, on October 28, 2020, Yahn sent Kariuki revised versions of the business rationale and the selection assessment form. (Boyarsky Aff. ¶ 62, Ex. 59.)

**RESPONSE:** Admit.

194.    After Kariuki approved the business rationale and selection assessment form, on November 2, 2020, Yahn sent the approved documents to Brian Molinari from Employee Relations (a team within human resources what conducts further objective reviews of documents) for his review and approval. (Boyarsky Aff. ¶ 63, Ex. 60; Yahn Dep. Tr., at 20:15-22:14, 88:17-13.) A few weeks before she sent him the approved business rationale and selection assessment form, Yahn had previously discussed with Molinari the timeline between when Kariuki decided to terminate Barker and McKenna and when he found out about her second pregnancy.  (Yahn Dep. Tr., at 88:17-89:13.) Thus, Molinari was aware that Kariuki did not know of McKenna's pregnancy at the time he decided to terminate her.  (*Id.*)

**RESPONSE:** Admit.

195.    On November 6, 2020, Kariuki, with assistance from Yahn and Molinari notified Barker and McKenna of their termination.  (Yahn Dep. Tr., at 106:20-107:14.)  After McKenna and Barker's termination, their accounts were reassigned to other salespeople including, Steckroth, Sherman, and Foley. (Steckroth Dep. Tr., 104:11-105:19; Kariuki Dep. Tr. 374:6-375:18.) Foley also took over some accounts previously handled by others. (Kariuki Dep. Tr. 374:6-375:18.)

**RESPONSE:** Deny the citation to Yahn's deposition discusses notifying Barker. Admit the date of the termination. Deny McKenna's accounts were distributed across the board. They were given primarily to Foley. Ex. 42, DEFENDANTS021982 (showing that Foley received four of five of McKenna's largest accounts); Ex. 43, DEFENDANTS027967 (Sherman stating that all of McKenna's large accounts except one had been given to Foley).

**REPLY:** Plaintiff's citations do not dispute the sworn testimony of Steckroth and Kariuki that McKenna's accounts were distributed to multiple salespersons on the IG team or that Foley took over accounts not handled by McKenna.  Plaintiff's documents speak to the distribution of

McKenna's largest accounts by secondary sales volume, not to her account base as a whole.  (Pl. Ex. 42, DEFENDANTS021982; Pl. Ex. 43, DEFENDANTS027967.)

**M. McKenna's Allegations Concerning Christopher Farina.**

196.    In the Amended Complaint, McKenna alleges that "the day before Santander fired McKenna it welcomed a new hire into Kariuki's group—a man who did not even have the necessary licenses to perform the job." (Boyarsky Aff. ¶ 21, Ex. 18 at ¶ 68; McKenna Dep. Tr., at 149:10-15.)  McKenna testified that the individual she was referring to in Paragraph 68 of the Amended Complaint was Christopher Farina. (McKenna Dep. Tr., at 149:10-15.)

**RESPONSE:** Admit.

197.    Farina, however, was hired for the Emerging Markets sales team—a different sales team from McKenna who was on the IG Sales Team. (Kariuki Dep. Tr., at 55:7-13.)

**RESPONSE:** Admit that Farina was hired to the Emerging Markets team and that Santander designated this as a different team. Deny that these were substantively different teams, as they overlapped in their activities and were both headed by Kariuki. *See supra*, response to ¶ 52.

**REPLY:** Plaintiff has introduced no evidence to contradict Kariuki's testimony that the Emerging Markets and Investment Grade sales teams were different teams.  Kariuki's management of both teams is not evidence that they were the same team.  Garvey managed both the sales team and the trade team at one time, but that did not convert salespersons into traders or vice versa.

198.    Kariuki hired Farina because he was qualified for the job. (Kariuki Dep. Tr., at 55:22-56:15.) In addition to his extensive experience in sales and emerging markets, Farina had good relationships and knew how to do business and build relationships. (*Id.*)

**RESPONSE:** Deny that Farina was qualified for the job. It took him six weeks after his hiring to obtain the needed licenses. Def. Ex. 66, Kariuki Dep. at 61:13-17. Deny that Kariuki even

believed Farina was qualified, as he himself noted that Farina was "inexperienced at sales," and noted that he was "unsure about [Farina's] work ethic." Ex. 41, DEFENDANTS021218.

**REPLY:** Plaintiff takes Kariuki's notes about Farina out of context to create a dispute of where there is none.  The document Plaintiff cites, Pl. Ex. 41, DEFENDANTS021218, contains brief notes on 16 candidates for roles at Santander, with spaces for three "pros" and three "cons" for each candidate.  (*Id*.)  Based on this document, Plaintiff extrapolates that Kariuki concluded Farina was unqualified based on the two "cons" that Kariuki included on Farina's row.  According to Plaintiff's misrepresentation, the presence of any "con" on this chart meant that a candidate was unqualified.  (*Id*.)  Moreover, finding that a candidate has a few "cons" is hardly evidence that a manager considers that candidate unqualified.  Rather, it simply means that the manager is fulfilling his obligation to fully evaluate each candidate for a job. Moreover, Kariuki testified that he knew Farina because he was a client previously.  (Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. Tr. 52:16-20.)  Kariuki testified that Farina previously worked on the IG [Investment Grade] Desk at Alliance Bernstein for more than 12 years and that Kariuki called the head of trading at Alliance Bernstein to ask about Farina and was told "there is nobody that they would rather have cover them at Santander than Chris Farina because he understands their operation, and they all know him they said forever."  (Licul Aff., Ex. 10, Kariuki Dep. Tr. 367: 5-19.) Kariuki also answered the question about what made Farina qualified by stating "He has extensive experience in emergency markets. He knows sales and has good relationship. He knows how to build relationships, and he approaches business with a certain level of curiosity that will ensure that – that will ensure he will be successful as a salesperson." (Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr. 56: 7-15.)

199.    Before Farina joined Santander, he worked at 91 Asset Manager, a European asset manager which required him to have a European regulatory license. (Kariuki Dep. Tr., at 56:18-

57:4.) As a result, at the time that Kariuki hired Farina, while he had a European license, he did not have a U.S. regulatory license and was required to study for them. (*Id.* at 56:21-62:9.)

    **RESPONSE:** Admit.

    200.    Although Kariuki hired Farina before he obtained his U.S. regulatory license, he did not execute any trades until he was properly licensed. (Kariuki Dep. Tr., at 58:24-59:9.)

    **RESPONSE:** Admit.

    201.    Only after McKenna's termination, on February 4, 2021, McKenna filed her discrimination charge ("Charge") with the Equal Employment Opportunity Commission (the "EEOC") and New York State Division of Human Rights. (Boyarsky Aff. ¶ 64, Ex. 61.) She subsequently filed this action. (Boyarsky Aff. ¶ 21, Ex. 18.)

    **RESPONSE:** Admit.

    202.    During McKenna's deposition, when asked about the evidence or facts showing that McKenna's termination was because of her pregnancy, McKenna fumbled her responses and refused to answer the question. (McKenna Dep. Tr. at 139:22-147:17, 234:16-239:12.) Counsel asked McKenna this question a number of different ways in an effort to obtain the facts which formed McKenna's belief that her pregnancy was the reason for her termination—the basis of her discrimination claim—but she refused to answer. (*Id*. at 139:22-147:17.) Later in the deposition McKenna was asked if there were other facts that supported her discrimination claim and, again, she offered no substantive response and fumbled her answers. (*Id*. at 234:16-239:12.) After a recess requested by her lawyer, McKenna testified to "three simple things" that support her claims for pregnancy discrimination: (1) she did not receive a proper accommodation during her 2019 pregnancy; (2) her bonus pay for the years 2018 and 2019 was cut; and (3) she was replaced. (*Id.*

at 239:5-12.) As set forth below, none of this conduct, even accepted as true (which Defendants do not), gives rise to an inference of discrimination. (*Id*. at 238:16-12.)

**RESPONSE:** Deny McKenna fumbled responses or refused to answer questions. Counsel for Defendants repeatedly sought an answer to the legal question of what evidence McKenna had for her claim. Def. Ex. 67, McKenna Dep. at 141:14-19. Counsel for Defendants failed to respond to repeated suggestions that he frame his question in a way that would not elicit privileged communications or legal conclusions and instead repeatedly browbeat McKenna about her "evidence." *Id*. at 141:7-8 ("I'm asking her, what evidence does she have."); *id*. at 142:3 ("is there any evidence . . . please tell me.").

Deny that McKenna's testimony encompasses the sole evidence of pregnancy discrimination in the record.

## DEFENDANTS' RESPONSE TO
## ADDITIONAL MATERIAL AND DISPUTED ISSUES OF FACT

In addition to the disputed facts set forth above, Plaintiff Erin McKenna further sets forth the additional material facts to which it is contended that there exists a genuine issue of fact to be tried.

203.    Erin McKenna is a finance professional who specializes in matching securities buyers and sellers with high-grade investment products to match their investment strategies. McKenna Decl. at ¶ 1. Since graduating from Boston University School of Management with Honors in 2002, she has progressed from an Assistant Sales Trader to a Senior Vice President of Sales, working at Royal Bank of Canada, ING and National Bank of Canada, amongst other institutions. Ex. 44, PL 000115. As of 2018, McKenna had been working successfully at the National Bank of Canada as a Vice President of Sales for the previous six years. *Id.*

**RESPONSE**: Admit McKenna's educational and employment history.  Deny that the record establishes that McKenna worked "successfully" at National Bank of Canada and object to the testimony as irrelevant as McKenna's performance at her prior employer is not "of consequence in determining the action."  (Fed. R. Evid. 401(b).) Regarding her performance at National Bank of Canada, to the extent relevant, her performance reviews reflect McKenna's performance peaking in 2013 and declined through the end of her tenure with her prior employer. (*See infra*, response to ¶ 205.)

204.    In May 2018, Defendant William Garvey, a bond trader at Santander, recruited McKenna to work on his sales team. Def. Ex. 64, Garvey Dep. at 86:18-87:2; McKenna Decl. at ¶ 2. At the time, McKenna had no children and was not pregnant. McKenna Decl. at ¶ 2.

**RESPONSE**: Admit the first sentence.  Admit McKenna's parental status but deny knowledge about her pregnancy status.  Deny Plaintiff's parental and pregnancy status at the tie of hire are material to the claims or defenses in this litigation.

205.    When Garvey first approached her, McKenna had been successfully working at National Bank for six years. This is evidenced by her positive performance reviews from her time there. Ex. 45, DEFENDANTS028503-DEFENDANTS028510

**RESPONSE**: Admit name of McKenna's former employer.  Deny that the record demonstrates that McKenna was "successful[]" at her prior job.  In fact, the document Plaintiff cites shows McKenna's performance peaking in 2013 and declining through the end of her tenure with her prior employer.  (Pl. Ex. 45, DEFENDANTS028503-DEFENDANTS028510.)  Object to the testimony as irrelevant as McKenna's performance at her prior employer is not "of consequence in determining the action."  (Fed. R. Evid. 401(b).)

206.    To draw her to his team, Garvey promised her that she would receive a $200,000 per year bonus. Ex. 9, McKenna Dep. at 13:21-24.

**RESPONSE:** Plaintiff's self-serving testimony does not create a genuine issue of fact regarding the explicit terms of the offer letter that she accepted, which did not include a guaranteed bonus. (*See supra*, at ¶ 57.)

207.    McKenna had sixteen years' experience in her field. Ex. 44, PL000115.

**RESPONSE:** Admit.

208.    One of her main goals was to develop an account list in Midwest and Chicago, a goal she pursued vigorously. McKenna Decl. at ¶ 3.

**RESPONSE:** Deny Plaintiff's Declaration is evidence of McKenna's ambition or mental state.

209.    In October, Garvey congratulated her for "doing most of the heavy lifting on trips to . . . the Midwest." Ex. 23, DEFENDANTS004408.

**RESPONSE:** Admit that this document so states.

210.    At the end of 2018, McKenna became pregnant, and, during one of these trips to the Midwest in 2018, Garvey learned that she was pregnant. Ex. 5, Dep. of Garvey at 106:2-20.

**RESPONSE:** Admit.

211.    In 2019, McKenna began suffering serious complications with her pregnancy that threatened to cause a miscarriage. McKenna Decl. at ¶ 4. She had had numerous miscarriages in the past. McKenna Decl. at ¶ 11.

**RESPONSE:** Deny that any admissible extrinsic evidence supports the contentions in McKenna's declaration.

212.    In January, she was hospitalized with vaginal bleeding. Ex. 46, PL000856-000857.

**RESPONSE:** Admit.

213.    In early February, she was hospitalized for two more nights and diagnosed with threatened pre-term labor and a shortened cervix. Ex. 47, PL000935; Ex. 48, PL 000977.

**RESPONSE:** Admit only that Plaintiff's exhibits are medical records from February 2019 and that those medical records reflect her health diagnosis and medical history.

214.    After her hospitalization, her doctor told her she would need to go on bedrest and could not commute to work. Ex. 49, PL 000980.

**RESPONSE:** Admit that the notes indicate McKenna should "rest[] at home." The record does not establish that McKenna's doctor ordered her not to commute.

215.    McKenna informed Garvey that her doctor had told her to work from home, Def. Ex. 64, Garvey Dep. at 107:12-18.

**RESPONSE:** Admit that Garvey so testified.

216.    Garvey at first permitted her to do so, granting her accommodation request. McKenna Decl. at ¶ 10. McKenna began working from home in January 2019. Def. Ex. 67, McKenna Dep. 23:21.

**RESPONSE:** Admit that McKenna so testified, but deny Garvey granted an accommodation to regularly work from home. (*See supra*, ¶¶ 67, 69, 73 and replies thereto.)

217.    His only request was that she include "another salesperson on the desk . . . in a chat if [she] was doing a trade." Ex. 9, McKenna Dep. at 24:4-5.

**RESPONSE:** Admit that McKenna so testified. *See supra*, response to ¶ 216 for the denial regarding Garvey's communication and authority.

218.    She followed these instructions by looping in her co-worker, Barry Sherman, and she remotely accessed her secure Bloomberg "in order to make trades." Def. Ex. 67, McKenna

Dep. at 27:15-16. Doing so, her trades were "captured on Bloomberg" as they usually would be when she worked from the office. Ex. 9, McKenna Dep. at 22:20–22; McKenna Decl. at ¶ 12.

**RESPONSE:** Admit that McKenna so testified.

219.    Santander's policies had long permitted executing trades from home under a variety of circumstances, for instance allowing traders to execute off-premises trades on "holidays in NY (when Latam markets are open)." Def. Ex. 1, DEFENDANTS028029-028030 (Santander policies for working from home under a variety of circumstances, including "holidays in NY (when Latam markets are open).") They also provided for the issuance of an "authorized personal device (iPhone/iPad/Android) – mobile telephone" that an employee could use to securely confirm trades while working off-site. *Id*.

**RESPONSE:** Deny.  The existence of a narrow set of exigent circumstances in which trades may be executed outside the office does not create a genuine dispute as to Santander's policy that "[o]ff-premises trades are generally not permitted."  (Boyarsky Aff., Ex. 2, DEFENDANTS02800l; *see supra*, ¶¶ 21, 25, 26 and replies thereto.)

220.    Working from home, she continued to perform well. In mid-January, Garvey congratulated her again for closing a notable deal. Ex. 50, DEFENDANTS005035.

**RESPONSE:** Admit that DEFENDANTS005035 reflects praise for work by Chris Dearborn and McKenna on a single trade.  Deny that this document establishes anything about McKenna's overall performance.

221.    By February 8, she had the second highest secondary sales on her team. Ex. 26, DEFENDANT005163-005164.

**RESPONSE:** Deny.  Licul Aff., Ex. 26, DEFENDANT005163-005164 clearly demonstrates that as of February 8, 2019, McKenna's year to date secondary sales credits were the

fifth highest out of seven active members of her team.  McKenna's year to date secondary sales volume as of February 8, 2019, was the sixth highest out of the seven active members of her team. (*Id*.)  Plaintiff's misstatement of their own exhibit does not create a genuine issue of fact.

222.    Though she was, in fact, working full time, Garvey nevertheless believed that she was working only "part time." Def. Ex. 64, Garvey Dep. at 109:16.

**RESPONSE:** Admit that Garvey's testimony so states.  Deny that any admissible extrinsic evidence establishes that McKenna was working full time while only being in the office a few days a week.

223.    He believed "that was unacceptable." (*Id*. at 114:2-10.)

**RESPONSE:** Admit that Garvey's testimony so states.

224.    At around this same time, Garvey first became concerned with McKenna's performance. Ex. 5, Garvey Dep. at 170:5-9.

**RESPONSE:** Deny that Garvey so testified.  Garvey was directly asked whether he began to have concerns with McKenna's performance when she asked to work from home and stated that "[i]t was prior to that time."  Supp. Boyarsky Aff., Ex. 64, Garvey Dep. Tr., at 172:10-15.

225.    Accordingly, he began proposing to Kariuki and others within Santander that McKenna be terminated. Def. Ex. 64, Garvey Dep. at 170:19-25. Before this time, Garvey had never tried to terminate McKenna. McKenna Decl. at ¶ 5.

**RESPONSE:** Deny that Garvey so testified or that the record supports this contention. Garvey specifically testified that no conversation took place regarding McKenna's performance or continued role at Santander at the time she asked to work from home in 2019.  (Supp. Boyarsky Aff., Ex. 64, Garvey Dep. Tr., 171:19-20) ("No specific conversation along those lines took place.")  Plaintiff misrepresented Garvey's testimony that he discussed with Kariuki and Minuesa

the need to upgrade the sales team as continuous discussion since the time that Kariuki took over as head of IG sales.  (Licul Aff., Ex. 5, Garvey Dep. Tr. 171:1-172:1.)  In fact Garvey made clear that he did not identify McKenna as a person to terminate, but rather "…if someone had asked me at that point in time I would have said she is the one we would need to upgrade." In response to the question "Did anyone ask you at that point in time?," Garvey answered "Not that I can recall, no."  (*Id*. 172:1.)

226.    At Garvey's behest, Santander gave McKenna a bonus 15% below target, $30,000 less than the amount Garvey had promised her, even though she had received a 3.43 on her 2018 performance review, higher than any other team member. Def. Ex. 19, DEFENDANTS025574.

**RESPONSE:** Under Santander's bonus policy, an employee could receive a bonus lower than their target due to the performance of the organization as a whole or of their particular line of business.  (*See supra*, ¶¶ 48-51 and replies thereto.)  Plaintiff worked for Santander in 2018 for eight months or two thirds (2/3) of the year for which her total bonus was 15% less than her target and consistent with her offer letter (Boyarsky Aff., Ex. 15) and bonus plan, including which provides for pro-rated bonuses for employees starting before September 29, 2018 (Boyarsky Aff., Ex. 12, p. 5 [DEFENDANTS000645].) (*See supra*, ¶¶ 48-51, 61 and replies thereto.)  The email from Retamar states "This amount will be prorated in 2018 depending on your final start date." (Boyarsky Aff., Ex. 17.)  Plaintiff also received a $75,000 signing bonus in 2018. (Boyarsky Aff., Ex. 15).

227.    Meanwhile, Santander awarded a full bonus to a male member of McKenna's team, Barry Sherman, even though Sherman had scored only a 3.28. *Id.*

**RESPONSE:** Admit the amount of Sherman's bonus and his performance review score. Deny that the record establishes that Santander managers were required to only use performance

review scores in comparing employees for the purposes of bonus allocations. Other males received lower bonuses compared to the plan during Plaintiff's employment. (*See* Boyarsky Aff., Ex. 19.) Sherman worked the full year and McKenna worked for two thirds of the year when she also received a $75,000 signing bonus.

228.   On March 8, 2019, Garvey rescinded McKenna's accommodation, without consulting human resources or anyone else. (Def. Ex. 64, Garvey Dep. at 115:8-20; McKenna Decl. at ¶ 13.)

**RESPONSE:** Deny the characterization of Garvey's actions.

229.   Only after granting and then rescinding the accommodation on his own did Garvey report McKenna's situation to his supervisor (Juan Minuesa) and human resources. Def. Ex. 64, Garvey Dep. at 109:16-20; 110:9-14; Ex. 17, DEFENDANTS000698 (Garvey's email).

**RESPONSE:** Admit only that Garvey informed Minuesa and human resources about McKenna's pregnancy. Deny that Garvey granted and rescinded an accommodation. (*See supra*, ¶¶ 67, 69, 73 and replies thereto.)

230.   Santander's human resources department then began a protracted processing of McKenna's accommodation request. Ex. 17, DEFENDANTS000695-000699.

**RESPONSE:** Admit that Santander's human resources department began processing McKenna's request after Garvey elevated the request. Deny the characterization of the process as "protracted."

231.   As part of a potential accommodation, Santander considered paying for a car service for McKenna twice a week, but never finalized that plan. Ex. 18, DEFENDANTS001453.

**RESPONSE:** Admit that Santander did not finalize a plan to pay for a car service for McKenna. Deny any implication that Santander denied McKenna's request for a car service. On

Wednesday, April 3, 2019, one week after her email of Wednesday, March 27, 2019 that Plaintiff's cite above (Pl. Ex. 18, DEFENDANTS001453), McKenna emailed Beatriz Retamar from her office to inform Retamar that she is "all good now to commute."  (Boyarsky Aff., Ex. 26, DEFENDANTS000699-000700.)  McKenna stated that she "should be back to a regular schedule and [her] husband will probably drive in as much as he can so less commuting for me."  (*Id.*)

232.    In the meantime, McKenna could not do any work, because Santander would not allow her to work from home, citing its internal policy against home working. Def. Ex. 26, DEFENDANTS0700.

**RESPONSE:** Admit that Boyarsky Aff., Ex. 26, DEFENDANTS0700 states Santander's pre-pandemic policy towards remote work due to operational compliance reasons.

233.    Santander required McKenna to use vacation time to stay home without doing work. McKenna Decl. at ¶ 14.

**RESPONSE:** Deny that admissible extrinsic evidence supports the contention in McKenna's declaration.

234.    But Santander's treatment of McKenna made no sense—its policies at the time explicitly permitted working from home under a variety of circumstances when it benefited Santander's business, including "holidays in NY (when Latam markets are open)." Def. Ex. 1, DEFENDANTS028029-028030. Moreover, Kariuki was able to monitor all of the relevant Bloomberg IM and email traffic. Ex. 10, Kariuki Dep. at 35:10-23; 38:15-19; 198:6-9.

**RESPONSE:** Deny.  The existence of a narrow set of exigent circumstances in which trades may be executed outside the office does not create a genuine dispute as to Santander's policy that "[o]ff-premises trades are generally not permitted."  (Boyarsky Aff., Ex. 2, DEFENDANTS02800l; *see supra*, ¶¶ 21, 25, 26 and replies thereto.))

235.     Santander's pregnancy leave-time allowance is far lower than peer institutions—fourteen weeks as opposed to a typical sixteen to twenty-two. Ex. 27, Kao Dep. at 23:2-9.

**RESPONSE:** Object to the testimony as irrelevant as Santander's pregnancy leave policy as compared to other banks is not "of consequence in determining the action." (Fed. R. Evid. 401(b).) Santander provided paid leave for maternity, which is more than required by the FMLA's unpaid leave obligation, thus demonstrating more favorable treatment than applicable law requires.

236.     It also fails to furnish its legally mandated lactation rooms with basic sanitary products or working sinks. *Id.* at 19:22-20:9.

**RESPONSE:** Deny that Kao's testimony so states.  Kao merely testified that she suggested changes to Santander's lactation rooms, which Santander implemented.  (Licul Aff., Ex. 27, Kao Dep. Tr., at 19:5-20:9.)

237.     Unsurprisingly, Santander employees have complained to HR about these issues in recent times. *Id.* at 18:12-19:18.

**RESPONSE:** Deny that Kao's testimony so states.  Kao specifically testified that she had never raised a complaint to Santander's Human Resources department.  (Licul Aff., Ex. 27, Kao Dep. at 18:12-16) ("Q.  Have you ever raised a complaint to any HR employee of Santander? A: Complaints?  No.").  She testified that she raised a question about the financial maternity benefit.

238.     By March 20, 2019, almost two weeks after learning about it, Santander was still nowhere near finalizing McKenna's accommodation request, even though it involved an ongoing, severe disability. Ex. 17, DEFENDANTS000695 (internal HR emails, indicating that Santander did not decide to obtain information from McKenna's doctor until March 20).

**RESPONSE:** Deny any implication that Santander willfully delayed obtaining information from McKenna's doctor.

239.    Because of Garvey's unexplained and alarming about-face, Santander's long delays, and her inability to work in the meantime because of Santander policies, McKenna became fearful that her job was at risk. McKenna Decl. at ¶ 16.

**RESPONSE:** Deny that any admissible extrinsic evidence supports the contention in McKenna's declaration.

240.    On March 21, 2019, with no end in sight to this situation, McKenna begged her doctor to allow her to return to work. Ex. 51, DEFENDANTS028337.

**RESPONSE:** Deny that Licul Aff., Ex. 51, DEFENDANTS028337 demonstrates that McKenna "begged" her doctor to allow her to return to work.  The document states that McKenna "asks again to return to work."  (*Id.*)

241.    Her doctor expressed reluctance and told McKenna that returning to work could create "potential issues." *Id*.

**RESPONSE:** Deny the characterization of Licul Aff., Ex. 51, DEFENDANTS028337. The document establishes that McKenna was advised that "there really is no evidence to show that a return [to work] would increase her chance of early birth."  (*Id.*)

242.    Nevertheless, at McKenna's urging, she allowed McKenna to return to work "4 days a week as long as she is provided with transportation." Ex. 52, PL000119.

**RESPONSE:** Admit that the document so states.

243.    McKenna submitted this note to Santander HR. McKenna Decl. at ¶ 15.

**RESPONSE:** Deny that any admissible extrinsic evidence supports the contention in McKenna's declaration.  Licul Aff., Ex. 52, PL000119 is admissible evidence of her doctor's statement, but not McKenna's Declaration.

244.    McKenna also submitted medical documentation, attesting to her "shortened cervix, preterm contractions" and informing Santander that McKenna was limited across a broad array of major life functions, including Sitting, standing, walking, bending over, climbing, reaching overhead, kneeling, pushing and pulling, crouching/stooping, lifting or carrying, repetitive use of both hands, simple/light grasping of both hands, firm/strong grasping of both hands, fine motor movements of both hands. Ex. 53, DEFENDANTS028463-028465.

**RESPONSE:** Admit that the document so states.  Defendants refer to the document, which states that McKenna was "cleared to return to work 4 days a week."  (Licul Aff., Ex. 53, DEFENDANTS028463-028465.)

245.    Four days later, McKenna was hospitalized due to her pregnancy complications. Ex. 54, PL 000986-000996

**RESPONSE:** Admit that Licul Aff., Ex. 54, PL 000986-000996 includes medical records from March 25, 2019.

246.    She was hospitalized again on March 27. Ex. 18, DEFENDANTS001453.

**RESPONSE:** Admit that Licul Aff., Ex. 18, DEFENDANTS001453 includes an email from Erin McKenna stating that she was at the hospital for tests the night of March 27, 2019.

247.    A few hours after being discharged from the hospital that day, McKenna emailed Kariuki, telling him she still had not heard from Santander HR about "a car service two days a week." *Id.*

**RESPONSE:** Admit that the document so states.

248.    Finally, on April 2, 2019, Santander told McKenna that "remote working is not an option . . . because we can't control the 'environment', meaning who can have access to that nonpublic information." Def. Ex. 26, DEFENDANTS000700.

**RESPONSE:** Admit that the document so states.

249.    However, Santander was referring only to its own policies; no industry regulation bars employees in McKenna's position from working from home. Ex. 10, Kariuki Dep. at 201:21-22 ("Other than the bank's policy, no, no regulatory rules.")

**RESPONSE:** Deny that FINRA regulations as implement by Santander allowed institutional sales personnel to work from home.  (*See supra*, ¶¶ 17-19 and replies thereto.)

250.    Indeed, it was common to execute trades and conduct other business through proxies within the company, for instance when a trade needed to be conducted in a different time zone. Ex. 5, Garvey Dep. at 111:12-15 (explaining that he has asked traders in London to execute trades on his behalf.)

**RESPONSE:** Deny that Garvey's testimony that occasionally looping in a colleague to conduct an after-hours trade establish that such a practice would have been viable for a salesperson operating throughout the entire day every business day, which is to say working from home.  (*See supra*, reply to ¶¶ 17-19 and replies thereto.)

251.    Confusingly, Santander asked McKenna to look into working from a Santander bank near her home. Def. Ex. 26, DEFENDANTS000699. McKenna quickly ascertained that there was no location near her; the information was publicly available. McKenna Decl. at ¶ 19.

**RESPONSE:** Admit that Santander asked McKenna if there was a Santander bank branch close to her home.  Admit that there was no Santander bank branch close to her home that was set up technologically and in compliance with applicable FINRA regulations and SIS policy that would provide an alternative work location.  Deny that Santander's request was confusing, given that a local Santander branch would have provided the secure environment in which McKenna could have executed trades in compliance with FINRA regulations.

252.     Sensing that Santander would never take her disability seriously, and continuing to fear she would lose her job if she pressed her accommodation request, McKenna said that she was in good enough health to begin working from the office full-time again. *Id*.; McKenna Decl. at ¶ 18.

**RESPONSE:** Deny that admissible extrinsic evidence supports McKenna's state of mind or motivations as described in her declaration.

253.     Santander promptly closed its accommodation request. Def. Ex. 26, DEFENDANTS000699.

**RESPONSE:** Admit that Santander closed its accommodations request on April 3, 2019 after McKenna informed Santander that she no longer needed a car service.  (Boyarsky Aff., Ex. 26, DEFENDANTS000699.)  Deny the record demonstrates that Santander had an obligation to keep open McKenna's accommodation request after she had withdrawn it.

254.     However, on April 24, 2019, McKenna's obstetrician told her she could commute to the office only two to three times per week for two weeks "and then not at all" "due to medical complications of her pregnancy." Ex. 55, PL000118.

**RESPONSE:** Admit that this document so states.

255.     Still fearing a backlash and believing that a further accommodation request would founder the same way her prior request had, McKenna did not reveal this note to Garvey and Kariuki until April 29, 2019. Ex. 56, DEFENDANTS008376.

**RESPONSE:** Admit that in Licul Aff., Ex. 56, DEFENDANTS008376 McKenna informs Garvey that she left a note from her doctor in a drawer at work.  Deny that this document or any other piece of admissible evidence speaks to McKenna's state of mind or whether she delayed informing Garvey about the note.

256.    Nobody from Santander HR ever reached out to her about this note. McKenna Decl. at ¶ 18.

**RESPONSE:** Deny that admissible extrinsic evidence supports the contention in McKenna's declaration.

257.    Kariuki now managed both the IG and EM teams. Ex. 10, Kariuki Dep.at 31:10-23.

**RESPONSE:** Admit.

258.    As one of his first actions in his new role that spring, he moved salesperson Jeff Barker from the EM to the IG sales team. Ex. 10, Kariuki Dep. at 187:5-23.

**RESPONSE:** Admit the timing of Barker's transfer from the EM to the IG sales team.

259.    While Kariuki had previously considered terminating Barker, he decided not to because he thought Barker was working hard and making an effort. Ex. 10, Kariuki Dep. at 186:18-22 ("I felt like he was – yes, he was – he was working hard.")

**RESPONSE:** Admit that Kariuki considered Barker's effort in deciding not to terminate him.  Deny that Kariuki testified that the only reason he decided not to terminate Barker was his effort.  Kariuki testified that he also considered the availability of a replacement at that time.  (Licul Aff., Ex. Kariuki Dep. at 186:20-22) ("I also at the same time didn't see a clearcut better replacement or better option.").

260.    Minuesa, too, thought it important to give Barker a second chance. Ex. 3, Minuesa Dep. at 67:25-68:3 ("Q: Was the move of Mr. Barker from EM to IG to help him perform better? A: I think so. Yes.")

**RESPONSE:** Admit that Minuesa testified that one of the reasons for moving Barker from EM to IG was "to help him perform better."  (Licul Aff., Ex. 3, Minuesa Dep. at 68:2.)  Deny that Minuesa testified that this was the only reason for Barker's transfer.  Minuesa also testified that

Santander wanted "to get the benefit of some synergies between clients that traded both emerging markets and IG, crossover clients."  (*Id.* at 67:21-24.)

261.    In general, Santander always gave men second chances—indeed, even promoted them to incentivize them to work more efficiently—rather than firing them. Ex. 40, DEFENDANTS026311 (In an email expressing severe criticisms of employees Chris Dearborn and Barry Sherman, stating "Barry will at least work when promoted.") Garvey also spoke with Dearborn between three and four times over the course of several months about his underperformance before finally terminating him. Def. Ex. 64, Garvey Dep. at 64:9-14.

**RESPONSE:** Deny any disparate treatment between men and women on Santander's sales teams.  Soon thereafter, Dearborn was terminated for performance reasons – not as part of a restructuring. (*See supra*, ¶ 86 and reply thereto.)

262.    Though Kariuki was now in control of the IG sales team, Garvey remained closely involved in personnel decisions affecting the team, including the assignment of accounts, Ex. 10, Kariuki Dep. at 148:8-10 ("[A]ny allocation or reallocation of accounts that happened would have involved Bill Garvey") and assessments of employee performance, *Id.* at 228:3-4 ("Bill is my partner in this.")

**RESPONSE:** Admit that Kariuki made the statements cited in the above paragraph.

263.    With McKenna negotiating her disability leave and preparing for the birth of her son and maternity leave, Garvey and Kariuki first discussed potentially terminating her. Boyarsky Aff., Ex. 5, Garvey Dep. at 170:23-25.

**RESPONSE:** Deny that Garvey and Kariuki discussed terminating McKenna at this time. (*See supra*, response to ¶ 225.)

264.    Garvey advised Kariuki that he believed that McKenna did not have real relationships with her accounts, and that, of the salespeople on the IG team, only Barry Sherman had real relationships worth preserving. Ex. 10, Kariuki Dep. at 123:17-22.

**RESPONSE:** Admit.

265.    Meanwhile, when McKenna raised the issue of her work-from-home accommodation with Kariuki, he told her simply that she "would be fired" if she "worked from home." Def. Ex. 67, McKenna Dep. at 49:7.

**RESPONSE:** Deny.   McKenna's self-serving testimony is nowhere supported in the record.

266.    As she was preparing to go on leave, McKenna spoke to Barker, and learned that he would be moving to IG and taking over certain accounts from her. Ex. 9, McKenna Dep. at 119:2-5.

**RESPONSE:** Admit that Barker took over some accounts from McKenna at this time. Deny any implication that reallocating accounts was irregular.

267.    This was irregular, as accounts would usually only be reassigned (for instance when someone left Santander) through open, transparent team meetings, so that each salesperson could have input. Ex. 10, Kariuki Dep. at 131:23-143:7.

**RESPONSE:** Deny that reallocating accounts was irregular or that such a transparent process did not occur to the extent that any accounts were reallocated at this time.  (See supra, ¶ 95 and reply thereto.)

268.    Alarmed at the threat to her career, McKenna told Garvey that she was losing accounts to Barker because of her maternity leave. Ex. 22, PL 001813.

**RESPONSE**: Deny that Licul Aff., Ex. 22, PL 001813 shows that McKenna found Barker transferring to IG a threat to her career.  The text message states that she found his transfer "a little concerning."  (*Id*.)

269.    "This is bullshit," Garvey replied to her. *Id.*

**RESPONSE**: Object to the text message as hearsay inadmissible under Fed. R. Evid. 801(c).  It is an out-of-court statement used to prove the truth of the matter asserted.  Garvey testified regarding this text message that he later confirmed it was not a concern because he learned that McKenna's accounts were not improperly taken away from her, that her concerns were unfounded because Kariuki would not improperly assign her accounts and that if she had concerns, she should inform Kariuki and Minuesa before she started her maternity leave. (2nd Supp. Boyarsky Aff., Ex. 77, Garvey Dep. Tr., at 16:25-18:5.)

270.    After further explanation from McKenna, Garvey told her:

> This shit pisses me off so badly . . . But I'll calm down and figure out the right way to say it. They cannot fuck with your account list for having a baby. Even thinking about it should be grounds for a lawsuit.

> Ex. 22, PL 001815; Ex. 5, Garvey Dep. at 15:8-10 ("[T]hat would be discriminatory.")

**RESPONSE**: Object to the text message as hearsay inadmissible under Fed. R. Evid. 801(c).  It is an out-of-court statement used to prove the truth of the matter asserted.  Garvey later addressed McKenna's concerns and determined they were unfounded.  (*See supra*, response to ¶ 269.)

271.    Following up, Garvey sent an Instant Bloomberg ("IB") message to McKenna with a suggested draft of an email to Minuesa and Kariuki that would explain her concerns about losing accounts while on maternity leave. Ex. 21, DEFENDANTS008213.

**RESPONSE:** Object to the IB message as hearsay inadmissible under Fed. R. Evid. 801(c). It is an out-of-court statement used to prove the truth of the matter asserted.  To the extent that Licul Aff., Ex. 21, DEFENDANTS008213 is admissible, Defendants only admit it's an accurate copy of the IB message but not the truth of the content. *See also supra*, response to ¶ 269.

272.    Garvey suggested that she specifically flag her concern that she would be losing the Northwest Mutual Life and PPM accounts. *Id.*

**RESPONSE:** Object to the IB message as hearsay inadmissible under Fed. R. Evid. 801(c). It is an out-of-court statement used to prove the truth of the matter asserted. To the extent that Licul Aff., Ex. 21, DEFENDANTS008213 is admissible, Defendants only admit it's an accurate copy of the IB message but not the truth of the content.  *See also supra* response to ¶ 269.

273.    McKenna sent her email to Minuesa and Kariuki just over an hour letter [*sic*], expressing her concern about losing accounts because of her pregnancy; mentioning particular concerns about both the Northwest Mutual and PPM accounts; and stating her fear that Santander was sidelining her. Ex. 20, DEFENDANTS008045.

**RESPONSE:**   Admit   that   McKenna   sent   the   message   in   Pl.   Ex.   20, DEFENDANTS008045.

274.    Kariuki replied that McKenna had "nothing to be concerned about." Ex. 57, DEFENDANTS008079.

**RESPONSE:** Admit that Kariuki so stated.

275.    McKenna gave birth on May 6, 2019. Ex. 58, PL 001010.

**RESPONSE:** Admit.

276.    Thereafter, she began her maternity leave. Ex. 5, Garvey Dep. at 123:8-13.

**RESPONSE:** Admit

277.    On June 3, Kariuki became concerned that "[w]ith Erin McKenna currently on maternity leave, we only have three salespeople. This leaves the team too thin if someone is out of office." Ex. 30, DEFENDANTS001510.

**RESPONSE:** Admit that Kariuki so stated.  Deny that McKenna's maternity leave was the only reason Kariuki was concerned about staffing.  Brian Healion voluntary left Santander in June 2019.  (Supp. Kariuki Aff. ¶ 18.)  Chris Dearborn was terminated at the end of April 2019.  *Id*. at ¶ 16.

278.    Acting on his concerns about McKenna's maternity leave, Kariuki quickly interviewed and offered a job to Tom Steckroth that summer. Ex. 2, Steckroth Dep. at 62:17-63:20; 76:25-77:7.

**RESPONSE:** Deny that Santander hired Steckroth due to Kariuki's concerns about McKenna's maternity leave.  Minuesa testified that Steckroth was hired for his expertise in asset backed securities.  (Minuesa Dep. Tr., at 99:14-101:3.)  Steckroth was interviewed with multiple other candidates in July, and ultimate was made an offer in an offer letter dated September 11, 2019 stating an employment start date of September 30, 2019.  (2nd Supp. Boyarsky Aff., Ex. 79, DEFENDANTS009041; 2nd Supp. Boyarsky Aff., Ex. 80, DEFENDANTS026212-26213.) The evidence shows the absence of haste to fill Healion's job; in fact, Steckroth began employment with Santander almost a month after McKenna returned from her maternity leave on August 12, 2019. (*See supra*, ¶ 97.)

279.    Santander also reached out to Kristin Foley—the person who ultimately replaced McKenna—in summer 2019 about a potential job offer. Ex. 35, Foley Dep. at 11:20-12:6.

**RESPONSE:** Admit only that Chris Tolkin first communicated with Foley regarding employment in the summer of 2019, but at that time not that a job was open.  (*See* Licul Aff., Ex.

35, Foley Dep. at 11:20-12:6.)  After Foley visited the Santander office and met with several people

in the IG Group, the next time she spoke with someone at Santander about potentially working at

Santander was in the summer of 2020.  (*Id*. 20:2-9.)  During the approximate year that lapsed

between her office visit and her communications in the summer of 2020 about a job possibility,

she only communicated with Santander for business purposes to do her job for Imperial Capital.

(*Id*. 20:16-21:222.)  Deny any connection between Santander's interest in Foley and McKenna's

maternity leave.

Foley's meeting with Santander occurred in the summer of 2019 when Santander

interviewed Steckroth to fill the vacancies left from Helion's and Dearborn's departures. The

evidence does not demonstrate any correlation to McKenna's pregnancy.

280.    Santander brought her in for an interview. *Id*. at 13:21-14:5;  Ex. 32,

DEFENDANTS009704.

**RESPONSE:** Admit.  Deny any connection between Foley's interview and McKenna's

maternity leave.  *See supra*, response to ¶ 279.

281.    Also during McKenna's maternity leave, Kariuki asked Santander HR to post a

listing for two new team-members. Ex. 31, DEFENDANTS026348.

**RESPONSE:** Admit the contents of the email.  Deny any connection between the job

postings and McKenna's maternity leave.

282.    With McKenna still out, Santander reassigned the EM side of the Northwest Mutual

account—an account McKenna had opened, and one she had specifically flagged in her earlier

email to Kariuki—to Jeff Barker. Ex. 9, McKenna Dep. at 103:8-12; Ex. 10, Kariuki Dep. at

153:15-22.

**RESPONSE:** Deny Plaintiff's account of how Northwest Mutual was reallocated.  Both Barker and McKenna had a relationship with Northwest Mutual and wanted sole responsibility for the account.  (Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 153:7-20.)  Kariuki thus allocated Investment Grade sales for Northwest Mutual to McKenna and Emerging Markets sales to Barker, allowing each salesperson to develop the portion of the business for which they were most suited. (*Id*. at 153:15-22.)  Deny also the timing.  Pl. Ex. 20, DEFENDANTS008045, sent prior to McKenna's maternity leave, shows that the reallocation of accounts began prior to McKenna's maternity leave.

283.    It also reassigned all of her Chicago accounts, except for Northern Trust, to Barker. Ex. 9, McKenna Dep. at 119:23-120:3.

**RESPONSE:** Deny.  Plaintiff's self-serving testimony is not supported by the record.

284.    These accounts included Neuberger Berman, Allstate, PPM (another account she had specifically flagged to Kariuki) and Legal and General, amongst others. Ex. 9, McKenna Dep. at 120:13-20.

**RESPONSE:** Deny.  Plaintiff's self-serving testimony is not supported by the record.

285.    While McKenna received other accounts, including the Vanguard account, she had to build those relationships from scratch, whereas accounts such as Neuberger Berman and Northwest Mutual were already producing reliable business. Ex. 9, McKenna Dep. at 123:3-10. When she lost her Midwest accounts, she also lost the benefit of her travel the year before. McKenna Decl. at ¶ 20.

**RESPONSE:** McKenna did not have to "start from scratch" in building the accounts that were assigned to her as part of this reallocation.  To the contrary, she received the Investment Grade sales for Northwest Mutual, a client with whom she had a relationship; Western Assets, a

client with whom she also had a good relationship; and Vanguard, a strategically important client with a close institutional relationship with Santander. (Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 153:15-22; 154:23-25; 154:15-19; *see also supra*, reply to ¶ 93.) Deny that travel for work was a perquisite to which McKenna was entitled. McKenna received accounts from Sherman, a seasoned and successful sales person who generated primary and secondary sales far higher than hers. (*See supra*, ¶95 and reply thereto.) All employees including -- but not limited to, Steckroth when he was hired, Sherman when he lost accounts to McKenna and McKenna when she received reassigned accounts – started with new accounts that they needed to learn. (*Id.*)

286.    As a result of these changes, McKenna would have fewer total accounts in 2020 than in 2019. Ex. 24, DEFENDANTS000183-000184.

**RESPONSE:** Admit the contents of the document cited.

287.    For instance, by June of 2020, McKenna had already generated as much sales credit on the Vanguard account as for the whole year of 2019. Ex. 59, DEFENDANTS018075-018076.

**RESPONSE:** Admit that McKenna asserted such in this document. Deny that any evidence other than Plaintiff's self-serving assertion exists of Vanguard's year over year sales.

288.    By the time of her termination, the number was over 50% higher than for all of 2019. *Compare* Ex. 59, DEFENDANTS018075 ($40,884 in IG secondary business in June 2020) with Ex. 42, DEFENDANTS021982 (showing secondary IG sales credits of $64,087 immediately after McKenna's termination).

**RESPONSE:** Deny that the documents cited support Plaintiff's conclusion.

289.    When salesperson Brian Healion left Santander that summer, Kariuki simply moved all of his former accounts over to salesperson Chris Tolkin. Ex. 19, DEFENDANTS009040.

**RESPONSE:** Deny.  Pl. Ex. 19, DEFENDANTS009040 is a single sentence email from Tolkin to the Santander Middle Office distribution list asking for Healion's accounts to be moved over to him.  It provides no evidence that Kariuki "simply plowed all of Healion's accounts into Chris Tolkin" and gives no insight into Kariuki's rationale.  In fact, Kariuki did not reassign Healion's accounts to Tolkin.  (Supp. Kariuki Aff. ¶ 18.)  Rather, Tolkin "asked to cover [Healion's accounts] temporarily because he was Healion's backup to help with accounts during Healion's employment, and the team needed to cover the accounts during the interim period after Healion's departure."  (*Id.*)  This was simply a stopgap measure until Healion's accounts were "further redistributed to the remaining sales team, including to McKenna when she returned from her leave."  (*Id.*)

290.    He also signed all sales credits on McKenna's accounts to the men who covered those accounts. Def. Ex. 66, Kariuki Dep. at 157:18-24 (explaining that, when a salesperson is out of the office for an extended period, the person who backs up the account will receive sales credit for trades executed on those accounts.)

**RESPONSE:** Deny any implication that assignment of sales credits to an employee who covers another employee's accounts during a long-term absence is improper or irregular.  (*See supra*, reply to ¶ 101.)

291.    For instance, on October 29, 2019, a little over two months after McKenna returned to the office, Def. Ex. 67, McKenna Dep. at 99:25, Minuesa asked his direct reports to rank their team members based on how they "[saw] the value of [their] team members." Ex. 60, DEFENDANTS001953.

**RESPONSE:** Admit that the document so states.

292.    The next day, Garvey emailed Minuesa regarding the IG team's sale performance. Ex. 12, DEFENDANTS010714.

**RESPONSE:** Admit.

293.    He commented that "Chris Tolkin," one of the IG salespeople, "has massively outperformed Barry [Sherman]," another IG salesperson. *Id.*

**RESPONSE:** Admit that the document so states.

294.    Garvey compared these two individuals because they were the only two "who [had] spent the whole year on the desk." *Id*.

**RESPONSE:** Admit that the document so states.

295.    However, even while acknowledging that her leave made it impossible to compare her to the rest of the team, Garvey added that "Erin and Jeff have really done very little for our business this year." *Id*.

**RESPONSE:** Admit that the document so states.  At the time Garvey sent the email he was not McKenna's supervisor.

296.    One day after Garvey's email, on October 31, 2019, Kariuki sent Minuesa a ranking of the members of his two teams, based on performance. Ex. 13, DEFENDANTS010850.

**RESPONSE:** Admit.

297.    Minuesa had requested this ranking from Kariuki "[s]hortly after" Kariuki "assumed responsibilities as head of the EM sales desk." Ex. 10, Kariuki Dep. at 234:15-17 (identifying the timing of Minuesa's request); 235:21-22 (identifying the teams Minuesa asked him to rank).

**RESPONSE:** Admit that Kariuki so testified.

298.    To determine McKenna's rank, Kariuki examined her sales credit numbers. Ex. 10, Kariuki Dep. at 237:5-6.

**RESPONSE:** Admit that Kariuki so testified.

299.    He also spoke with other stakeholders within Santander about her performance. *Id.* at 237:14-18.

**RESPONSE:** Admit that Kariuki so testified.

300.    Based on the feedback he gathered, Kariuki ranked McKenna the lowest performer on her team, just below Jeff Barker. Ex. 13, DEFENDANTS010850.

**RESPONSE:** Admit.

301.    For the other team he ranked at this time, the LatAm Sales team, Kariuki ranked Melissa Zaccagnino last. *Id.*

**RESPONSE:** Admit.

302.    Zaccagnino was also pregnant at the time of this ranking, and Kariuki was aware of this, as Zaccagnino had recently begun scheduling doctor's appointments related to her pregnancy. Ex. 60, DEFENDANTS026376; Ex. 62, DEFENDANTS010843 (follow up emails between Kariuki and Zaccagnino about her doctor's appointments); Ex. 63, DEFENDANTS021140 (emails from later that month about Zaccagnino leaving to get an ultrasound).

**RESPONSE:** Admit.   Deny any implication that Zaccagnino's pregnancy affected Kariuki's ranking.

303.    In ranking Zaccagnino last on her team, Kariuki did not analyze any sales credit reports, but weighed only two anecdotes about her performance, which, he believed, showed that Zaccagnino was "disruptive." Ex. 10, Kariuki Dep. at 242:18-248:7.

**RESPONSE:** Deny Plaintiff's characterization of Kariuki's opinion of Zaccagnino. Kariuki's assessment was based on an incident where Zaccagnino misled a member of Santander's research team into joining a meeting with a former client of Zaccagnino's who had moved to a company whose account was managed by another Santander salesperson. (Boyarsky Aff., Ex. 73, Kariuki Dep. Tr., at 244:3-24.) Zaccagnino further failed to notify anyone on her team that her former client had moved to a new company. (*Id.*) In Kariuki's estimation, her actions "could have really fractured the team and [were] something that was not okay and kind of flies in the face of everything that our team represents." (*Id.* at 244:20-24.) Kariuki further testified that Zaccagnino negatively affected the bank by allocating resources to people at her accounts based on her personal opinion of them, rather than based on whether they could make profitable deals with Santander. (*Id.* at 247:23-248.)

304. When Kariuki drafted his mid-year 2019 review of McKenna (shortly after he ranked her last to Minuesa) he scrubbed it of any negative remark. Def. Ex. 33, DEFENDANTS000358-000365; Ex. 10, Kariuki Dep. at 103:2-8.

**RESPONSE:** Admit the contents of Kariuki's mid-year 2019 review.

305. He limited his feedback on McKenna's performance to a copy-pasted comment: "Erin recently returned from maternity leave to be given a new list of account [sic] for which she is responsible. I am confident that she will do well." Def. Ex. 33, DEFENDANTS000358; DEFENDANTS000363.

**RESPONSE:** Admit that the document cited contains this comment.

306. Apart from three categories, to which he supplied the above copy-pasted answer, Kariuki left the other thirteen categories blank, even though McKenna had given herself self-assessments in all sixteen categories. Id. at DEFENDANTS000358-000365.

**RESPONSE:** Admit that certain categories on McKenna's assessment were blank. Deny that McKenna filled out all section. She did not provide a comment for the last three assessment areas: SPF Support People, SPF Talk Straight, and SPF Truly Listen. (Boyarsky Aff., Ex. 33, DEFENDANTS000358-000365)

307.    Moreover, though she marked herself as "significantly exceeds" or "exceeds" in multiple categories, Kariuki simply marked her as "Expectations Totally Met" in every single category, including her "Overall Rating." *Id*.

**RESPONSE:** Admit the ratings as reflected in the document cited. Deny any implication that it is improper for a manager's rating to differ from an employee's self-rating.

308.    Santander policy, for one thing, required the reviews to accurately reflect employee performance. Ex. 10, Kariuki Dep. at 104:14-24; 105:17-22; Ex. 28, Yahn Dep. at 29:17-30:8 ("Q: So if an employee had some significant job deficiency, the manager is expected to tell the employee of that deficiency; correct? A: Yes.")

**RESPONSE:** Admit that Yahn so testified.

309.    Kariuki ranked Barker above McKenna in the rankings he provided to Minuesa, even though Kariuki had just recently been considering firing Barker for poor performance, Ex. 10, Kariuki Dep. at 186:8-11, because, in the words of Garvey, Barker wasn't "doing anything." *Id*. at 190:20-22.

**RESPONSE:** Admit only that Kariuki ranked Barker above McKenna.

310.    Kariuki's reviews of Barker during 2019, in contrast to the reviews he gave McKenna (whom he ranked below Barker), were unstintingly negative. Ex. 14, DEFENDANTS025575-025584.

**RESPONSE:** Admit Barker's reviews. Deny any comparison to McKenna.

311.    In Barker's mid-year 2019 review, he told Barker that he was underperforming in executing "axes," a form of secondary trade. Ex. 64, DEFENDANTS025586-025587.

**RESPONSE:** Admit.

312.    He wrote outright that Barker's "production is lackluster." Ex. 14, DEFENDANTS025584.

**RESPONSE:** Admit that the document so states.

313.    Accordingly, at the end of 2019, Kariuki gave Barker an overall rating of "Partially Meets," amidst a generally negative review. *Id*. at DEFENDANTS025575.

**RESPONSE:** Admit that the document so states.

314.    Kariuki gave Barker a bonus 30% lower than the previous year. *Id*. at DEFENDANTS025574.

**RESPONSE:** Admit.

315.    Kariuki also ranked Steckroth much higher than McKenna, at second place. Ex. 13, DEFENDANTS010850.[8]

**RESPONSE:** Admit.

316.    Steckroth had been working for too little time for Kariuki to accurately compare him to McKenna. Ex. 10, Kariuki Dep. at 348:14-18 ("Q: So as of October 2019, you really didn't have much in the way of numbers with respect to Mr. Steckroth, right? A: Correct.")

**RESPONSE:** Admit the existence of this quote in the document cited.  Deny the rest, especially Plaintiff's derivation of the word "accurately" from the cited testimony, and Kariuki did not testify regarding a comparison to McKenna.

---

[8] An "axe" is a form of secondary trade. Ex. 10, Kariuki Dep. at 253:3-9.

317.     At the end of 2019, Kariuki gave McKenna a diminished bonus of $165,000, $5,000 less than the year before. Ex. 9, McKenna Dep. at 168:21-23; Ex. 3, Minuesa Dep. at 33:19-34:4 (Minuesa testifying that Kariuki had sole discretion to allocate bonuses at this time.)

**RESPONSE:** Admit the amount of McKenna's 2019 bonus.

318.     Upon informing her of her bonus, Kariuki told McKenna she was "lucky" to receive that amount "because [she] had missed so much time for pregnancy." Ex. 9, McKenna Dep. at 169:6-7.

**RESPONSE:** Deny Plaintiff's uncorroborated, self-serving testimony and that the record supports McKenna's self-serving testimony.

319.     By February 25, 2020, Kariuki had decided to terminate McKenna and Barker. Ex. 10, Kariuki Dep. at 231:2-6; Ex. 36, DEFENDANTS014894; Ex. 3, Minuesa Dep. at 110:20-24. As Yahn described at this time, this only began "the recruitment process" that would need to be finalized "before we can notify the current employees of the impacts to their roles." Ex. 36, DEFENDANTS 014894.

**RESPONSE:** Plaintiff has cited no evidence establishing that the decision to terminate McKenna and Barker had been made by February 2020. (*See supra*, reply to ¶ 125.)

320.     While on other occasions Santander supervisors assessed their employees across a variety of objective and subjective metrics, when choosing McKenna he decided to make a decision based purely on McKenna's allegedly low secondary sales numbers, as he explained at his deposition. Ex. 10, Kariuki Dep. at 260:16-261:9; *see also id*. at 63:17-20 (describing how, when he fired Ken Hoffman, Kariuki considered "sales credits" as well as "feedback from traders with whom he dealt.")

**RESPONSE**: Deny. Plaintiff cited testimony that does not show any meaningful distinction in the methodology and criteria Kariuki used for McKenna and Ken Hoffman. *See* Licul Aff., Ex. 10, Kariuki Dep. Tr. at 260:16-261:9; *see also* Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 63:17-20.) Kariuki's undisputed testimony is that in deciding to terminate Hoffman he considered Hoffman's performance as measured by sales credit, by discussing Hoffman with traders, and by observing his work on a daily basis. (*Id.* at 63:17-23) Kariuki did not testify in the cited transcript about how other supervisors assessed employees. Further, the is no evidence surrounding the circumstances surrounding Ken Hoffman for which McKenna can make an accurate comparison.

321.    At this moment in time, February 25, 2020, McKenna's secondary sales volume year-to-date was twice that of Barker's and three times as great as Steckroth's for 2020. Ex. 37, DEFENDANTS014915-014916.

**RESPONSE:** Admit that the document so states. Deny the significance of this document for a single date almost five months earlier than the decision made to terminate her, which considered her performance over time focusing mostly on 2020, is irrelevant.

322.    Kariuki's decision, as he justified it to Minuesa, was based not only on 2020 but on sales performance for the prior "two or three years," a period straddling McKenna's 2019 pregnancy complications and maternity leave, Ex. 3, Minuesa Dep. at 79:7-14; Def. Ex. 64, Garvey Dep. at 177:18-24 (agreeing that they assessed McKenna's performance for the prior several years).

**RESPONSE:** Admit the testimony but deny that her pregnancy was included in the consideration.

323.     Garvey outright blamed McKenna for her absences in 2019, saying that McKenna failed to "engage anyone" "[f]or the majority of her time at Santander." Def. Ex. 64, Garvey Dep. at 180:11-16.

**RESPONSE:** Plaintiff's Response mischaracterizes Garvey's testimony.     Garvey specifically focused on McKenna's lack of communications with the trade team, which he measured via daily conversations with the traders.  (Boyarsky Aff., Ex. 66, Garvey Dep. Tr., at 181:13-182:12) ("Q.  And how did you measure her engagement with the trading team? A. Based on her lack of communication with the traders. . . . A.  I would ask them on a daily basis who had talked to which salespeople.")

324.     In February 2020, Melissa Zaccagnino was pregnant and about to go on maternity leave. Ex. 65, DEFENDANTS015102.

**RESPONSE:** Admit that Plaintiff's exhibit is an email from March 10, 2022 regarding coverage of Zaccagnino's accounts while on maternity leave.

325.     At around this time, Kariuki started a conversation with Yahn about Zaccagnino's employment. Ex. 28, Yahn Dep. 126:3-5.

**RESPONSE:** Deny that Yahn testified that Kariuki "began" a conversation with her at this time about Zaccagnino.  Yahn testified that she did not recall the date at which Kariuki first discussed Zaccagnino's employment and that she frequently discussed employees' career paths with managers.  (Licul  Aff., Ex. 28, Yahn Dep. Tr., at 126:13-20, 127:11-15) ("mangers do pick my brains sometimes around, you know, what we can do with our employees and from a career development standpoint").

326.     While he believed she was a "good employee" he thought there were "other areas that she could be a better fit" elsewhere in Santander. *Id.* at 127:3-8; Ex. 29,

DEFENDANTS012112 (Yahn email about Zaccagnino). Kariuki's testimony relates to his inquiry with Yahn about helping her in her career growth.

**RESPONSE:** Admit that the documents cited contain these quotations.

327.   In stark contrast to the compliance difficulties Santander had cited when McKenna first requested to work from home, its employees made a "seamless" transition. Ex. 2, Steckroth Dep. at 89:22.

**RESPONSE:** Admit that Steckroth so testified.  Testimony that front office employees found the transition to work from home seamless does not create a genuine issue as to whether the transition was burdensome on Santander.  (*See supra*, reply to ¶ 20.)   Record evidence demonstrates that the transition to work from home was both time-consuming and costly for Santander, and Plaintiff has introduced no evidence to demonstrate otherwise. (*See supra* ¶¶ 20, 27 and replies thereto.)

328.   The transition used a system to "plug in" and remotely connect to their work computers. Ex. 2, Steckroth Dep. at 90:2-5; Ex. 3, Minuesa Dep. at 94:15-19 ("We just sent people all the hardware home, and they didn't have to do anything. We sent everything there, and there was support from the IT department.")

**RESPONSE:** Deny. Plaintiff's Response quotes only half of Juan Minuesa's testimony regarding the process of converting Santander to a work-from-home workforce in response to an unprecedented global pandemic.  While front office employees may not have had to do much to transition home, at the enterprise level Santander "need[ed] to provide hardware, laptops, monitors, turrets to communicate and give access to the – to the local network to be able to monitor, supervise.  *It is complex*." (Licul Aff., Ex. 3, Minuesa Dep. at 94:9-13 (emphasis added). (*See supra* ¶¶ 20, 27 and replies thereto.)

329.    Once they were set up, employees would then sign an attestation that they were following Santander's work from home regulations. Ex. 4, DEFENDANTS026390-026391.

**RESPONSE:** Admit.

330.    Meanwhile, Santander supervisors expended a little extra effort to ensure that their employees had the proper equipment to work remotely. Ex. 5, Garvey Dep. at 145:10-146:23 ("I told them to be in constant contact with me if there were any issues that were encountered with working from home."). Managers were then able to supervise their individual salespeople electronically. Ex. 3, Minuesa Dep. at 94:20-23.

**RESPONSE:** Deny.  Plaintiff's intentional misrepresentation and/or lack of familiarity with the technological and regulatory compliance measures involved to convert to a remote work environment in an investment bank for front office employees, especially for salespeople and traders, does not support her claim that little effort was involved.  (*See supra*, ¶¶ 27, 20 and replies thereto.)

331.    To this day, Santander has continued a hybrid work-from-home policy. Ex. 5, Garvey Dep. at 150:20-151:6.

**RESPONSE:** Deny that Garvey so testified.  At the time of his deposition in February 2022, Garvey testified that "we are all working from home."  (Boyarsky Aff., Ex. 77, Garvey Dep. Tr., at 150:20-21.)  Over the course of the covid-19 pandemic "[t]here were times when [Santander employees] were all working from the office every day, and there were times when [Santander employees] were working remotely like a hybrid."  (*Id.* at 150:22-151:2.)

332.    While working from home, McKenna performed well and energetically pursued new business. Ex. 66, DEFENDANTS017648-017649.

**RESPONSE:** Deny that the document cited establishes that McKenna in general performed well or "energetically pursued new business." This is an email chain in which Kariuki gives McKenna light praise for opening a single account. (Licul Aff., Ex. 66, DEFENDANTS017648-017649.) It thus does not provide evidence of her overall quality or efforts while working from home during the pandemic.

333. Kariuki set specific sales goals for Steckroth and Barker. Ex. 67, DEFENDANTS026135 ("Tom will finish the year with just over USD 4m in sales credits.")

**RESPONSE:** Admit that Kariuki established expectations in his 2020 mid-year review of Steckroth. (Licul Aff., Ex. 67, DEFENDANTS026135.) Plaintiff's exhibit is Steckroth's 2020 mid-year review and does not speak to Kariuki's goals for Barker. (*Id.*)

334. However, Kariuki does not currently know whether Steckroth has ever generated more than $4 million in sales credits annually during his employment at Santander. Ex. 10, Kariuki Dep. at 78:7-9.

**RESPONSE:** Admit that Kariuki so testified. Kariuki's ability to recall the historical sales credits of his direct reports over the course of multiple years is not material to this action or evidence supporting Plaintiff's claims.

335. Nor could he recall, just a month after Steckroth's performance review in 2021, what Steckroth's sales credits were at that time. Def. Ex. 66, Kariuki Dep. at 80:10-12.

**RESPONSE:** Admit that Kariuki so testified. Kariuki's ability to recall the historical sales credits of his direct reports over the course of multiple years is not material to this action or evidence supporting Plaintiff's claims.

336. Steckroth himself could not recall reaching $4 million in sales credits until 2021. Ex. 2, Steckroth Dep. at 85:5-11.

**RESPONSE:** Admit that Steckroth testified that he reached $4 million in sales credits in 2021.

337.    At this time, Kariuki also gave Barker a specific sales credit goal of $5.5 million through the end of the year and specified that Barker should increase "secondary trading volumes in European Credit, IG Credit and EM Credit." Ex. 8, DEFENDANTS025603.

**RESPONSE:** Admit that Kariuki established sales credit expectations in his 2020 mid-year review of Barker.  (Licul Aff., Ex. 8, DEFENDANTS025603.)

338.    Kariuki also specifically mentioned that 32% of Barker's sales credits were in EM secondary trading. *Id.* (acknowledging that 32% of Barker's sales credits were in EM secondary trading).

**RESPONSE:** Admit that Kariuki's 2020 mid-year review of Barker included his EM secondary trading percentage.  (*Id.*)

339.    By contrast, Kariuki's mid-year 2020 review of McKenna gave her no sales goal. Def. Ex. 34, DEFENDANTS000366.

**RESPONSE:** Admit that Kariuki's 2020 mid-year review of McKenna did not state specific sales credit goals.  (*Id.*)

340.    It also elided any mention of her EM trades, indicating only her "secondary IG trading." Id.

**RESPONSE:** Admit that Kariuki's 2020 mid-year review of McKenna did not specifically mention her EM trades in the "brief summary of what the employee has achieved/accomplished YTD."  (*Id.*)

341.    The omission prompted McKenna to comment on the review "Thank you for the feedback Omar. I have also done some nice secondary trades in the EM space as well." *Id.*

**RESPONSE:** Admit that the document cited contains this comment.

342.    In general, during this period, Santander was not giving McKenna credit for all of her sales in the EM space. E.g., Ex. 33, DEFENDANTS017953-017954 (McKenna complaining to Kariuki that a report from Garvey had not counted voice trades in EM).

**RESPONSE:** The documents Plaintiff cites do not provide "evidence that Santander stopped counting McKenna's secondary EM trades at some point in 2020." Boyarsky Aff., Ex. 34, DEFENDANTS000366, McKenna's 2020 mid-year review, does not establish that Kariuki did not consider EM trades in McKenna's performance review. McKenna merely provided feedback that she had "also done some nice secondary trades in the EM space as well." (*Id*.) Licul Aff., Ex. 33, DEFENDANTS017953 is an email from McKenna to Kariuki noting "*additional* EM voice trades" that she wanted included in a report. Her use of "additional" evidences that other EM voice trades were counted as done previously. (*Id*.)

343.    On June 30, 2020, without any warning and with no explanation ever given, Santander removed a large number of sales credits from McKenna, resulting in her secondary sales credits falling slightly below Steckroth's. *Compare* Ex. 34, DEFENDANTS018269-18270 (Showing McKenna with secondary sales credits of 177.48 and Steckroth with secondary sales credits of 140.07, on June 22, 2020), DEFENDANTS018272-018273 (showing McKenna with secondary sales credits of 192.48 and Steckroth with secondary sales credits of 147.02 on June 23, 2020), and 018295-18296 (showing McKenna with secondary sales credits of 194.40 and Steckroth with secondary sales credits of 153.38 on June 29, 2020), with DEFENDANTS018318-018319 (Showing McKenna with secondary sales credits of 143.34 and Steckroth with secondary sales credits of 153.38 on June 30, 2020), DEFENDANTS018463-018464 (showing McKenna with secondary sales credits of 143.35 and Steckroth with secondary sales credits of 156.29 on

July 6, 2020), and DEFENDANTS018466-018467 (showing McKenna with secondary sales credits of 143.35 and Steckroth with secondary sales credits of 156.29 on July 7, 2020).[9]

**RESPONSE:** The undisputed evidence shows that sales credits were at times revised downwards. (Licul Aff., Ex. 10, Kariuki Dep. at 334:2-7, 334:18-19, 335:9-337:6; Boyarsky Aff., Ex. 77, Garvey Dep. at 104:23-105:2.) Any downward revision to McKenna's secondary credits in June 2020 was thus not done outside of Santander's standard practices. Moreover, the $51,060 difference between McKenna's June 29, 2020 and June 30, 2020 secondary sales, (*see* Pl. Ex. 34 DEFENDANTS018295-018296 and DEFENDANTS018318-18319), is still less than the difference between McKenna's August 30, 2020 secondary sales and the secondary sales of Jeff Barker, the next highest performer. (*See supra*, ¶ 117.)

SIS Middle Office, a separate and independent team, is responsible for supporting traders and salespersons in the day-to-day activities of the trading room, as well provide reports on the activities to senior management within the business area. (Boyarsky Aff.,, Ex. 1, at DEFENDANTS028017.) Middle Office performs critical functions to ensure controls are in place for the accurate capture and reporting of activities (internal and external), while assisting the salespeople in servicing clients (e.g., affirming transactions with Fixed Income clients, responsible for novation/assignment process, etc.) (*Id.*) SIS Middle Office is responsible for generating all sales credit reports with specific and prescribed parameters. (*Id.* at DEFENDANTS028021; Boyarsky Aff., Ex. 2, at DEFENDANTS027992; Kariuki Supp. Aff., ¶ 19.) Per SIS policy, all mistakes or modifications to transactions must be reported to, and processed by, Middle Office. (Boyarsky Aff., Ex. 1, at DEFENDANTS028021; Boyarsky Aff., Ex. 2, at

---

[9] Santander, without explanation, reduced the sales numbers of Tolkin, Sherman and McKenna at this time. As the comparison shows, only Barker's and Steckroth's numbers went unchanged. **RESPONSE:** Deny.

DEFENDANTS027991.)  Only SIS Middle Office has the authority to modify transactions or sales reports.  (Kariuki Supp. Aff., ¶ 19.)  SIS Middle Office was neither involved in nor consulted about the decision to terminate McKenna or Barker.  (Kariuki Supp. Aff., ¶ 20.)

344.    For a tabulation of sales credits to ever decrease, the salesperson would usually have to have made "some sort of mistake." Ex. 10, Kariuki Dep. at 334:2-7.

**RESPONSE:** Admit that Kariuki so testified.

345.    A "mistake" would mean, in this context, an error, such as failing to account for a foreign currency, that would cause Santander to lose money on the transaction. *Id.* at 335:9-337:6 ("At the end of the day, somebody lost money, and somebody is going to be accountable.")

**RESPONSE:** Admit that Kariuki so testified.

346.    This would happen "very infrequently." Ex. 5, Garvey Dep. at 104:23-105:2; Ex. 10, Kariuki Dep. at 334:18-19 ("A couple of times a year.")

**RESPONSE:** Admit that Garvey and Kariuki so testified.

347.    When it happened on these rare occasions, the salesperson or trader impacted would be informed. *Id*. at 336:4-6; 17-18. No one ever informed McKenna that she had made such a mistake. McKenna Decl. at ¶ 22.

**RESPONSE:** As to the first sentence, admit that Kariuki so testified.  As to the second sentence, admit that McKenna's declaration so states.  McKenna reviewed the sales reports and in the past raised questions about them. (2nd Supp. Boyarsky Aff., ¶ __ Ex. 85, DEFENDANTS008222.) Her self-serving declaration that no one made her aware of the reports is not supported by the evidence.

348.    Meanwhile, Santander resumed conversations to hire Kristin Foley. Ex. 35, Foley Dep. at 20:2-9; Ex. 68, DEFENDANTS020856.

**RESPONSE:** Admit that Santander spoke with Foley in July 2020.

349.   Foley was the salesperson they had first interviewed during McKenna's first maternity leave, who was 56-years old and had no children. Ex. 35, Foley Dep. at 44:16-45:7; 56.1 Counterstatement of Plaintiff at ¶ 135 (Garvey interviewed Foley on July 29, 2020).

**RESPONSE:** Admit that Santander interviewed Foley.  Deny the record evidence shows that any Santander employee was aware of Foley's age or parental status when she was interviewed. Steckroth also interviewed with Santander around this time period. (Boyarsky Aff., Ex. 84, DEFENDANTS009800.)

350.   On August 25, 2020, Kariuki reached out to Christina Yahn, a Vice President of Human Resources, to begin coordinating McKenna's ouster. Def. Ex. 45, DEFENDANTS000723.

**RESPONSE:** Admit that Kariuki emailed Yahn on August 25, 2020 to set up a call to discuss "personnel changes to the sales team."  (Boyarsky Aff., Ex. 45, DEFENDANTS000723.) Deny any characterization of McKenna's termination as an "ouster."

351.   They continued discussing her termination through September 2020. Ex. 69, DEFENDANTS021397.

**RESPONSE:** Admit that Kariuki and Yahn continued to discuss personnel changes through the date of this email, September 14, 2020.

352.   On September 28, 2020, Kariuki provided sales credit numbers for his team to justify McKenna's termination. Ex. 40, DEFENDANTS021729; Ex. 70, DEFENDANTS021525 ("the data is supportive of the action(s) we discussed.")

**RESPONSE:** Admit that Kariuki sent the email in Licul Aff., Ex. 70.  Deny any implication that the sales credits were a post-hoc justification for McKenna's termination, but

rather the document corroborated the decision previously made.  Deny that Licul Aff., Ex. 40 relates to Kariuki's September 28, 2020 email.

353.    In his discussions with Yahn, Kariuki focused in on a snapshot of McKenna's 2020 sales as impacted by the June 30, 2020 revision. Ex. 28, Yahn Dep. at 60:4-13.

**RESPONSE:** Admit that Yahn testified that she discussed 2020 sales credits with Kariuki. Deny that Yahn testified as to all factors Kariuki considered in making the decision to terminate McKenna.

354.    Showing that McKenna's status as a mother was central to his thinking about these personnel decisions, Kariuki asked McKenna on September 17, 2020, in the context of discussing Santander's return to work, whether McKenna had childcare, a question McKenna found confusing and insulting. McKenna Decl. at ¶ 21; Ex. 71, PL000803 ("My boss asked me today if I had childcare (bc they are sending us back soon)… I was so taken aback like there is zero chance I would work and watch him -thomas is barely here they leave at 9 and still aren't even home yet [message timestamp:] 4:25:44 PM".)

**RESPONSE:** Deny that Kariuki's question regarding childcare had to do with anything other than Kariuki's interest in McKenna's ability to return to the office given the widespread difficulties of securing childcare during the covid-19 pandemic.  Santander did not require employees to return to the office. (2nd Supp. Boyarsky Aff., Ex. 73, Kariuki Dep. Tr., at 203:25-204:13; Supp. Boyarsky Aff., Ex. 66, Kariuki Dep. Tr., at 210:17-212:7) Several employees with medical issue chose to remain working remotely with no consequence. (Boyarsky Aff., Ex. 54)

355.    On October 19, 2020, McKenna first informed Kariuki she was pregnant. *Supra* at ¶ 172.

**RESPONSE:** Admit.

356.    Nine days later, Yahn submitted to Kariuki a memorandum that would document the "business rationale" for the termination. Ex. 39, DEFENDANTS021728.

**RESPONSE:** Admit.

357.    Her initial draft did not mention secondary sales credits. *Id.* at DEFENDANTS021729.

**RESPONSE:** Admit.

358.    Instead, she highlighted McKenna's name and left Kariuki the following comment: "Can we talk through the business results that you provided at the end of September? I want to understand Tom Steckroth's mandate and current volume and YTD results when compared to Erin's." *Id.*

**RESPONSE:** Admit that such a comment is in the document.

359.    Indeed, as Kariuki later admitted, Steckroth's sale numbers were "comparable" to McKenna's at the time of her termination. Ex. 10, Kariuki Dep. at 382:8-11.

**RESPONSE:** Admit that Kariuki's testimony uses the word "comparable."  Deny, however, that Kariuki's statement demonstrates that Steckroth's sales numbers were in fact comparable to McKenna's at the time of her termination in that Kariuki stated repeatedly that he wasn't able to fully recall the sales numbers.  (2nd Supp. Boyarsky Aff., ¶ __, Ex., Kariuki Dep. Tr., at 383:8-10) ("I would like to see the sales numbers before I guess"). *See supra*, ¶ 129 and reply thereto for Defendants' response concerning the term comparable.

360.    After the two discussed, Kariuki defended the sales-credit rationale for terminating McKenna by telling Yahn that Steckroth had just "closed a big deal," which would change the numbers to better support the sales rationale. Ex. 6, DEFENDANTS021785.

**RESPONSE:** Admit that the document cited contains the phrase "closed a big deal." Deny any implication that Kariuki so stated to Yahn as a "defense" of his business decision. In fact, this deal was Steckroth's private placement, which involved work comparable to a secondary trade. (*See supra*, ¶ 36 and response thereto.)

361.    Yahn could not recall a time any other employer had been credited for deals not yet completed. Def. Ex. 70, Yahn Dep. at 62:3-16. McKenna is also not aware of any such instance, and had never herself been credited for an incomplete or future deal. McKenna Decl. at ¶ 24.

**RESPONSE:** Deny any implication that crediting Steckroth for the private placement deal was inappropriate. Plaintiff's self-serving declaration about her lack of knowledge is not admissible evidence.

362.    Yahn asked for those updated numbers on October 28, 2020. Ex. 6, DEFENDANTS021785.

**RESPONSE:** Admit that Yahn sent the email of October 28, 2020 contained in this exhibit.

363.    Yahn was confused, since McKenna was the third highest overall performer on her team, above Barker and Steckroth. (Ex. 72, DEFENDANTS021809.)

**RESPONSE:** Deny that the document cited provides any evidence of Yahn's mental state. Plaintiff's exhibit is a spreadsheet with no commentary from Yahn.

364.    Yahn followed up twice, on October 30, 2020 and November 1, 2020 (a Sunday) to get these updated numbers. Ex. 6, DEFENDANTS021785.

**RESPONSE:** Admit the timing of Yahn's emails.

365.    Kariuki did not reply until November 2, 2020. *Id*. at DEFENDANTS021784-021785.

**RESPONSE:** Admit the timing of Kariuki's email.

181

366.    Though he had not obtained updated sales numbers by this time and offered no substantiation for the "big deal" Steckroth was purportedly closing, he remained confident that the numbers supported his analysis. Id.

**RESPONSE:** Deny any implication that Kariuki lacked adequate information to consider Steckroth's private placement, of which he had been aware since August 2020.  (Supp. Kariuki Aff. ¶¶ 7-10, 12-15.)

367.    Fifteen minutes later, Yahn had added two sentences to the restructure memorandum, justifying the terminations by describing the "need for stronger secondary sales results" and "driving up secondary sales." Id. at DEFENDANTS021784.

**RESPONSE:** Admit that the sentences were added to the business rationale document. Deny any implication that they were added as a post hoc justification rather than to conform the document to the evaluation process used.

368.    "Good," replied Kariuki, "that makes me feel better." Id.

**RESPONSE:** Admit that the document so states.

369.    The deal was, in fact, a primary deal. Def. Ex. 48, DEFENDANTS02854-028544; *see supra* at ¶¶ 34, 36.

**RESPONSE:** Admit that credits for the deal were logged as primary credits.  Deny that the sale was of the same complexity or value to Santander of a primary trade.  The sale referenced in Licul Aff., Ex. 6, DEFENDANTS021784-021785 was a "special situation trade" involving $417,200,000 of bonds that Steckroth helped place on behalf of Macquarie Investment Management Advisors ("Macquarie"), one of his accounts.  (Supp. Kariuki Aff. ¶¶ 3-7.)  While the sales credits for this sale were reflected in Steckroth's primary sales credits, "the time and effort it takes to source an investor willing to invest and consummate a private placement is more

akin to executing a secondary trade." (*Id*. at ¶¶ 8, 13.)  To effect this sale, Steckroth "spent several

hours on telephone calls with lawyers and custodians to understand and help manage the loan

confirmation process, and to make sure the lawyers for their clients were satisfied with the

documentation involved to secure the loan." (*Id*. at ¶ 12.)  Steckroth also "conducted calls with

analysist of their clients who purchased the securities to provide requested information about the

loan, handled calls with banks' attorneys and asset managers' attorneys regarding the term sheet."

(*Id*. at ¶¶ 9, 12)  Steckroth's work on this trade was fundamentally different than the work that goes

into a primary deal. (*Id*. at ¶¶ 3-14.)  The sale was only recognized as a primary deal because it

involved the sale of the client's "stock shares or bonds to investors." (*Id*. at ¶ 8.)  In all other

respects it was "the same if not more involved than a secondary trade." (*Id*. at ¶ 4.)

370.    When Kariuki hired Farina, Farina did not have either a Series 7 or Series 63

license. Def. Ex. 66, Kariuki Dep. at 57:23-24.

**RESPONSE:** Admit.

371.    He could not effect any trades until he earned the Series 7. Id. at 59:7-9.

**RESPONSE:** Admit.

372.    This took him four to six weeks to accomplish. Id. at 61:13-17.

**RESPONSE:** Admit.

373.    In contrast to their professed concern for bringing in seasoned salespeople, Kariuki

himself believed Farina was "inexperienced at sales," and noted that he was "unsure about

[Farina's] work ethic." Ex. 41, DEFENDANTS021218.

**RESPONSE:** Admit that these words appear in the document cited.  Deny Plaintiff's

characterization and conclusions. *See also supra*, at ¶ 198 and reply thereto for the response to ¶

373.)

374.    After he joined, Santander had Chris Farina cover multiple IG accounts, i.e. accounts usually covered by McKenna's team. Ex. 10, Kariuki Dep. at 366:16-367:19 (Farina covered AllianceBernstein IG account), id. at 373:14-18 (Farina covered IG side of the Agon Insurance account).

**RESPONSE:** Admit.

375.    The day before terminating McKenna, Kariuki invited her to a Zoom welcome party for Chris Farina, where her son made a brief appearance. McKenna Decl. at ¶ 23.

**RESPONSE:** Object to the testimony as irrelevant as neither McKenna nor her son's attendance at the welcome party is "of consequence in determining the action." (Fed. R. Evid. 401(b).)

376.    In spite of their attempts to build a case against her secondary sales volume, when he explained her termination to her, Santander's attorney, Brian Molinari, assured her the termination had nothing to do with her performance. Ex. 38, PL 001887. After she pressed him for reasons, he reassured her that "this is a restructure" and a "reorganization of the products specialist team." *Id*. at 8:47-9:30.

**RESPONSE:** Object to the surreptitious recording as hearsay inadmissible under Fed. R. Evid. 801(c) as an out-of-court statement used to prove the truth of the matter asserted and violate violates Florida anti-wiretapping law.  Fla. Stat. Ch. 934.03. (*See supra*, reply to ¶129 for response concerning Molinari recording.)

377.    After terminating her, Santander replaced McKenna with Foley. Ex. 73, DEFENDANTS000162 ("Wanted to get your view on the timeline for us to hire Kristen Foley who will replace Erin McKenna."); Def. Ex. 38, DEFENDANTS000021 ("Erin McKenna's role has been identified to be upgraded.")

**RESPONSE:** Deny Plaintiff's characterization of these documents.  In response to the portion Plaintiff quotes from Licul Aff., Ex. 73, DEFENDANTS000162, Molinari responds that "it's not a 'replacement' since the role itself is upgraded from what EM performed."  In contrast to Barker, who was simply terminated, McKenna's role was fundamentally changed, i.e., "upgraded." (Boyarsky Aff., Ex. 38, DEFENDANTS000021.)  (*See also supra*, reply to ¶ 129 for response concerning Molinari recording.)

378.    Santander delayed the actual start date for Foley in order to avoid the appearance that she was replacing McKenna. Ex. 73, DEFENDANTS000161 (Yahn asks whether the company "[s]hould we get started through the confidential req process so it is not visible?" An employee from the legal department agrees "the confidential req process makes sense since you've identified the right talent – start date mid or late-December would be more practical for optics.")

**RESPONSE:** Admit that the document cited contains these quotes.  Deny any implication that Foley was a direct replacement of McKenna.

379.    But, whatever Santander did for its optics, after she joined, Foley took over four (of five) of McKenna's largest accounts, including Vanguard and Northern Trust. Ex. 42, DEFENDANTS021982; Ex. 43, DEFENDANTS027967 (Sherman stating that all of McKenna's large accounts except one had been given to Foley); Def. Ex. 55, DEFENDANTS000187.  On November 25, 2020, McKenna, through counsel, complained that she had been the victim of discrimination. McKenna Decl. at ¶ 25.

**RESPONSE:** Deny that the documents cited speak to the distribution of McKenna's account base as a whole.  They show the distribution of McKenna's largest accounts by secondary sales volume.  (Licul Aff., Ex. 42, DEFENDANTS021982; Licul Aff., Ex. 43, DEFENDANTS027967; *see supra*, reply to ¶ 195.)

380.    On December 23, 2020, Yahn reached out to Garikoitz Feliu, asking if he had "the summary of the 2020 budget vs. actual achievement for each member of Omar's team? We are working on something and this data point would be helpful." Ex. 24, DEFENDANTS000185.

**RESPONSE:** Admit.

381.    It also shows that any prior analysis of McKenna's quantitative performance had been of limited accuracy and sophistication.

> We don't establish a Budget for each sales person/trader; the Budget is set at product/team level. Then each manager is responsible to assess his/her team members performance within the team, knows best each of the team members individual contributions . . . We certainly have the overall Inst. Sales team performance, budget & YoY comparison if that's helpful . . . These are all important metrics that are analyzed to evaluate the team's performance. *Id.*

**RESPONSE:** Admit that this comment appears in the document cited.  Deny any implication that Santander did not adequately consider McKenna's performance at any time in her employment.

382.    In response, Yahn asked Kariuki to let her know if he had ever set a budget for McKenna that Feliu could use in his analysis. (Id.)

**RESPONSE:** Admit that Yahn so stated.

383.    She added "I did notice you input some of these expected metrics in the mid-year reviews of some people which is very helpful too." Id.

**RESPONSE:** Admit that Yahn so stated.

384.    McKenna was not one of those people—Kariuki had never once set such a budget for her, unlike other salespeople on his team (for instance, Steckroth and Barker). *Compare* Ex. 74, DEFENDANTS000357 with Def. Ex. 33, DEFENDANTS000358-000367.

**RESPONSE:** Deny that the documents cited establish that sales goals were not communicated to McKenna.

385.    Conscious of the omission, Kariuki did not further participate in the email exchange with Yahn and Feliu. Ex. 24, DEFENDANTS000183-000185.

**RESPONSE:** Deny that the document cited provides evidence of Kariuki's mental state.

386.    Feliu provided the year-over-year comparison Yahn had requested, with the caveat that he believed the information did not provide a full picture of McKenna's performance. *Id*. at DEFENDANTS000184 ("In order to make a good assessment though, there's other factors to be taken into account.")

**RESPONSE:** Admit that Feliu provided the information requested.  Admit that the quoted passage appears in the document.  Otherwise deny.

387.    Clearly having read the demand letter's contention (later added to the complaint in the instant litigation) that McKenna had lost accounts that were key to her performance, Yahn asked "what clients [McKenna] had in 2019 and which she had in 2020 and any new sales associated with those clients." Id.

**RESPONSE:** Admit that such comment appears in the document cited.  Deny any implication the statement was made in relation to the demand letter.

388.    After examining the information available to him, Feliu told Yahn that the information "will lead to think that she covered less clients in 2020." Id.

**RESPONSE:** Admit that this comment appears in the document cited.

389.    Even after booking his "big deal," a month after McKenna's termination, McKenna's year-to-date sales remained far higher than Steckroth's. Ex. 76, DEFENDANTS022228.

**RESPONSE:** Deny that Plaintiff's exhibit demonstrates that McKenna's year-to-date sales were "fair higher" than Steckroth's as of November 30, 2020.  McKenna's total sales were roughly 5% higher than Steckroth's.  (*Id*.)  Further, Steckroth's secondary trades were 39% higher than McKenna's.  (*Id*.)

Dated:  New York, New York          /s/ *Mitchell Boyarsky*
       May 11, 2022                    Mitchell Boyarsky
                                   Nicole Phe
                                   **NELSON MULLINS RILEY &**
                                   **SCARBOROUGH LLP**
                                   280 Park Avenue
                                   15th Floor West
                                   New York, NY 10017
                                   Telephone:  646.428. 2619
                                   Facsimile:  646.428.2610
                                   E-mail: mitch.boyarsky@nelsonmullins.com
                                                   nicole.phe@nelsonmullins.com

                                   *Counsel for Defendants*