Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------------------x

5  ERIN MCKENNA,

6                              Plaintiff,

7           - against -

8  SANTANDER INVESTMENT SECURITIES, INC.,

9  SANTANDER HOLDINGS, INC., and OMAR

10  KARIUKI, in his individual and

11  professional capacities,

12                              Defendants.

13  ------------------------------------------x

14                              January 28, 2022

                                9:30  a.m.

15

16           DEPOSITION of OMAR KARIUKI,

17  taken by the Plaintiff, pursuant to

18  Notice, held remotely via Zoom

19  videoconference, before Debbie

20  Zaromatidis, a Shorthand Reporter and

21  Notary Public of the State of New York.

22

23

24

25

Page 2

```
1
2   A P P E A R A N C E S :
3        WIGDOR, LLP
4        Attorneys for Plaintiff
5             85 Fifth Avenue
6             New York, New York
7        BY:   VALDI LICUL, ESQ.
8             JOHN CRAIN, ESQ.
9
10       NELSON MULLINS RILEY SCARBOROUGH, LLP
11       Attorneys for Defendants
12            280 Park Avenue
13            New York, New York
14       BY:   MITCHELL BOYARSKY, ESQ.
15             - AND -
16       NELSON MULLINS RILEY SCARBOROUGH, LLP
17            One Financial Center
18            Boston, Massachusetts
19       BY:   NICOLE P. PHE, ESQ.
20
21   ALSO PRESENT:
22       BRIAN DOYLE, Inhouse Counsel
23       Santander Holdings, Inc.
24
25
```

```
                                              Page 3

 1

 2               S T I P U L A T I O N S

 3

 4               IT  IS  HEREBY  STIPULATED  AND

 5      AGREED by  and  between  the  Attorneys  for

 6      the  respective  parties  hereto  that  filing

 7      and  sealing  be  and  the  same  are  hereby

 8      waived.

 9               IT  IS  FURTHER  STIPULATED  AND

10      AGREED  that  all  objections  except  as  to

11      the  form  of  the  question,  shall  be

12      reserved  to  the  time  of  the  trial.

13               IT  IS  FURTHER  STIPULATED  AND

14      AGREED  that  the  within  examination  may  be

15      signed  and  sworn  to  before  any  notary

16      public  with  the  same  force  and  effect  as

17      though  signed  and  sworn  to  before  this

18      Court.

19

20

21

22

23

24

25
```

```
 1              KARIUKI

 2     Q.    Do you recall the year?

 3     A.    No.

 4     Q.    Okay.   What about Ms. Munina?

 5     A.    I hired her as well, and she

 6  started last week.

 7     Q.    What is her position?

 8     A.    Emerging markets sales.

 9     Q.    What about Mr. Farina?

10     A.    Emerging markets sales.

11     Q.    I am sorry.   When did you hire

12  him?

13     A.    I don't recall.

14     Q.    Do you recall the year?

15     A.    No.

16     Q.    How did you come to learn about

17  Mr. Farina?

18     A.    I covered Chris Farina.  He was

19  one of my clients.   I have known him for

20  some time.

21     Q.    How long have you known him?

22     A.    I don't recall.

23  Probably -- actually hold on.   Let me

24  think about that.   I met Mr. Farina in

25  2008.
```

1                    KARIUKI

2       A.    No, I did not.   Other

3   than -- let me take that back.   I knew her

4   from being a salesperson at Santander, but

5   I did not know her prior to her joining

6   Santander.

7       Q.    I see.  You knew her from -- you

8   guys worked for the same bank essentially?

9       A.    We sat 12 feet apart for some

10  time before I became her manager.

11      Q.    Prior to taking over the IG

12  sales team, did you discuss Mr. Sherman

13  with anyone?

14      A.    Not that I could recall.

15      Q.    Did you discuss Mr. Tolkin with

16  anyone?

17      A.    Not that I could recall.

18      Q.    Did you discuss Mr. Barker with

19  anyone?

20      A.    Yes, because he was -- he was on

21  the EM sales team prior to joining the IG

22  sales team.

23      Q.    So you supervised him for a

24  while?

25      A.    I supervised Jeff Barker as an

```
 1              KARIUKI
 2  people working from home.   They
 3  crash -- excuse me.  They crash probably
 4  three times -- somebody's computer crashes
 5  three times a week.
 6      Q.    Has your computer ever crashed?
 7      A.    Yes.
 8      Q.    How many times?
 9      A.    Over what period of time?
10      Q.    Since Covid and after you've
11  been working from home.
12      A.    In total I don't know.   Not
13  functioning properly or crash, I don't
14  know.   Fifteen, twenty times.
15      Q.    Since March of 2020?
16      A.    Is that when Covid first hit?
17  Yes.
18      Q.    Are you asking me or you are not
19  sure when Covid first hit?
20      A.    I am not sure exactly when Covid
21  first hit.
22      Q.    Do you recall that it was in
23  2020?
24      A.    Yes.
25      Q.    By the way, have you returned
```

```
                                              Page 204
 1                    KARIUKI
 2   back to work in the office?
 3        A.     Not full time.
 4        Q.     Okay.   How often do you go back
 5   to the office?
 6        A.     It varies.
 7        Q.     How does it vary?
 8        A.     So around the holidays we had a
 9   spike of cases in the office, so everyone
10   returned home, and people have been home
11   basically until now.  A lot of the team is
12   still home.  Some folks have returned, but
13   the majority of the team is still out.
14        Q.     Okay.   Let me ask you this
15   question.
16              When Covid first struck,
17   everyone was required to work from home,
18   correct?
19                 MR. BOYARSKY:   Objection.
20        You can answer.
21        A.     It was encouraged.
22        Q.     It was encouraged.  Okay.  And
23   who encouraged it?
24        A.     Management.
25        Q.     Did the salespeople on your team
```

```
 1                  KARIUKI
 2   conversation you recall having with Mr.
 3   Minuesa about Ms. McKenna's performance?
 4        A.    Correct.
 5        Q.    Did you have that conversation
 6   before or after Mr. Minuesa asked you to
 7   identify the two worst performers?
 8              MR. BOYARSKY:   Objection.
 9         You can answer.   I think that was
10         after.   I am pretty sure it was
11         after.
12        Q.    Did you have a prior
13   conversation where Mr. Minuesa asked you
14   to identify the two weakest performers?
15              MR. BOYARSKY:   Objection.
16         You can answer.
17        A.    Can you please rephrase the
18   question?
19        Q.    Sure.
20              Prior to discussing
21   Ms. McKenna's performance with Mr.
22   Minuesa, did you have a conversation with
23   him where he asked you to identify the two
24   weakest performers?
25        A.    Yes.
```

1                        KARIUKI

2        Q.     What did he say during that

3   conversation?

4        A.     He said that it is important

5   that we keep the team -- we refresh the

6   team, and so we need to identify -- you

7   need to identify the two weakest

8   performers on the team, and we need to

9   work on exiting them and making sure that

10  our team is fit moving forward.

11       Q.     Do you recall what you said in

12  response?

13       A.     I said okay.  I can do that.

14       Q.     Do you recall anything else that

15  you and Mr. Minuesa said to each other

16  during that conversation?

17       A.     I do not.

18       Q.     And was he asking you to

19  identify two members -- the two weakest

20  members in each EM and IG sales?

21            MR. BOYARSKY:    Objection.

22        You can answer.

23       A.     No.  He asked me to identify

24  the two weakest members of the sales team.

25       Q.     Of the sales team.

Page 234

```
 1              KARIUKI
 2         And what do you understand that
 3  to mean by the sales team?
 4     A.    We were -- it was within the
 5  context of -- you know, I don't recall.
 6  I don't even want to guess.   I don't
 7  recall.
 8     Q.    Did he also ask you to identify
 9  the two weakest members -- to rank the
10  members of the Latam team?
11     A.    No.
12     Q.    Do you recall him doing that?
13     A.    Yes.
14     Q.    When was that?
15     A.    That was when I -- shortly after
16  I assumed responsibilities as head of the
17  EM sales desk.
18     Q.    I see.   And what did he say
19  about -- so that was before he asked you
20  to identify the two weakest members of the
21  sales team to le go, correct?
22     A.    Yes.   That was years before.
23     Q.    Years before.   Okay.
24         All right.   So what did he say
25  about identifying the two weakest members
```

Page 235

1                    KARIUKI
2   of the Latam team?
3       A.    At that point he was just taking
4   my temperature to say listen.  You are
5   running the team now.  What do you think
6   of the sales force?
7       Q.    And did you then send him a list
8   of Latam members' rankings?
9       A.    I don't know if I sent him a
10  list at that time.
11      Q.    Did you send him a list at some
12  later time?
13      A.    I did.
14      Q.    And why did you send him a list
15  at the later time?
16      A.    Because he asked me to rank
17  salespeople.
18      Q.    Was that around the same time
19  that he asked you to also rank the IG
20  salespeople?
21      A.    He asked me to rank the Latam
22  and IG salespeople.
23      Q.    Okay.  And is that -- then you
24  sent him a list with those rankings,
25  correct?

```
 1                    KARIUKI
 2       A.    I did.
 3       Q.    Okay.  And do you know why he
 4   was asking you to send him a list asking
 5   you for both rankings, so, in other words,
 6   IG and Latam?
 7       A.    No.   But I am -- if I may add,
 8   this was -- he asks this of all the
 9   business heads.   It wasn't just a sales
10   thing.   It was -- he had asked that of
11   all his direct reports.
12       Q.    But he asked you too, right?
13       A.    He asked me in a group setting
14   with all of his direct reports.  It wasn't
15   explicitly for Omar to rank salespeople.
16       Q.    And then after you sent him
17   those rankings, did you then have --
18             MR. LICUL:   Withdrawn.
19       Q.    Had the conversation where he
20   asked you -- where he told you that he
21   wanted to get rid of the two weakest
22   performers in IG sales, was that after you
23   sent him your rankings?
24       A.    I don't recall the order.
25       Q.    When you gave him your rankings,
```

```
1                    KARIUKI
2   you said you crunched numbers, correct?
3        A.    Yes.
4        Q.    What numbers did you crunch?
5        A.    So I had to look at sales credit
6   numbers.
7        Q.    Any other numbers you crunched?
8        A.    No.  I think that is about it,
9   number crunching.
10       Q.    And what else did you do to rank
11  the different salespeople?
12       A.    I'm sorry.  Say -- can you
13  please repeat your question?
14       Q.    Other than crunching numbers,
15  what else did you consider when you ranked
16  the salespeople?
17       A.    The other stakeholders with whom
18  sales interacts with.
19       Q.    Did you seek their input?
20       A.    Yes, I did.
21       Q.    And who were those stakeholders?
22       A.    Syndicate.
23       Q.    Okay.
24       A.    DCM.
25       Q.    Anyone else?
```

```
 1              CONFIDENTIAL - KARIUKI
 2       Q.      What did she do?
 3       A.      She had a client that left
 4   Goldman Sachs Asset Management to go to
 5   Citadel.   Rather than letting anyone know
 6   that she -- rather than letting anyone
 7   know that her client moved to Citadel, she
 8   misled another member of -- she misled a
 9   member of our team by asking him to join
10   her for a meeting, and it turned out she
11   was going to see someone else's client
12   because someone else covered Citadel.
13              I only found out about it
14   because that person on the research team
15   came back to me and said listen.  I did
16   not feel good about this.  I had no idea
17   this was happening.  She asked me to go
18   with her for a meeting at Citadel meeting
19   someone that she doesn't even cover any
20   more.  I felt that could have been -- that
21   could have really fractured the team and
22   was something that was not okay and kind
23   of flies in the face of everything that
24   our team represents.
25              MR. BOYARSKY:  Before you ask
```

Page 245

1          CONFIDENTIAL - KARIUKI

2       the next question, I ask that we

3       designate this part of the transcript

4       mentioning those two clients as

5       confidential.

6            MR. LICUL:   That's fine.

7            (End of confidential portion.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    KARIUKI
 2      Q.    Who gave you this information
 3  about Ms. Zaccagnino?
 4      A.    One of the research people on
 5  our team.   Guillermo Marino.
 6      Q.    And what did you do after you
 7  learned this information?
 8      A.    I had to think about it for a
 9  second and --
10      Q.    Go ahead.
11      A.    And then I spoke with Melissa
12  about it.
13      Q.    What did you tell her?
14      A.    I didn't say a lot because, you
15  know, sometimes a lot doesn't need to be
16  said.   She apologized.   She said it was
17  one of her biggest clients at Goldman.
18  She was planning on letting the sales
19  team, know, but, you know, she had -- on
20  how to approach it, so this is what she
21  decided to do.
22      Q.    What was your response?
23      A.    I said that is not okay.   That
24  undermines the trust that we all have for
25  one another.   We let people talk to our
```

```
 1                    KARIUKI
 2   clients.  If there is -- you know,
 3   people -- people talk to our clients.   We
 4   let -- we talk to one another's clients.
 5   We go out together as a team sometimes
 6   with clients.   We operate as a very close
 7   knit group.  So doing things like that,
 8   which is selfish and undermining the team,
 9   could really create a fracture within a
10   team that is hard to put back together.
11      Q.    Who were the fellow salespeople
12   that she was undermining?
13      A.    Philip Sobey.
14      Q.    And did you do anything other
15   than talk to Ms. Zaccagnino about this?
16      A.    No.
17      Q.    Okay. And is there any other
18   reason other than that this incident that
19   you rated Ms. Zaccagnino as the worst
20   performer on the Latam team?
21      A.    Yes.
22      Q.    And what was that reason?
23      A.    So Melissa covered large
24   accounts, but she tended to give the banks
25   resources to accounts and to the -- to the
```

1                    KARIUKI

2    people at these accounts that she liked as

3    a opposed to people who could pay us

4    for -- for what we were providing.

5        Q.    Is there any other reason you

6    ranked her last?

7        A.    No.

8        Q.    Did Ms. Zaccagnino take a

9    maternity leave when she was under your

10   supervision?

11       A.    She did.

12       Q.    When was that?

13       A.    I don't recall.

14       Q.    Did any other supervisees of

15   yours ask for maternity leave?

16       A.    I had someone take paternity

17   leave.

18       Q.    Who was that?

19       A.    Ralph Trofa.

20       Q.    When did he do that?

21       A.    I don't recall.

22       Q.    Was that while you were managing

23   him in EM?

24       A.    Yes.

25       Q.    When you were head of EM only?

```
 1                    KARIUKI
 2   team, correct?
 3        A.    I sent him rankings of each
 4   person on the IG sales team and the Latam
 5   sales team.
 6        Q.    Was it around this time?
 7        A.    I don't recall.
 8        Q.    How did you notify Mr. Minuesa
 9   that it was Mr. Barker and Ms. McKenna who
10   are the two weakest performers in your
11   view?
12        A.    I told him in person.
13        Q.    Okay.   You didn't put that in
14   an e-mail, correct?
15        A.    I don't think so.   No.
16        Q.    All right.   Let's fast forward.
17   You described a conversation that you had
18   with Ms. Yan where you asked whether this
19   was still going forward?
20        A.    Correct.
21        Q.    What happens next with respect
22   to the termination of Ms. McKenna?
23        A.    Nothing up until I want to say
24   like November.
25        Q.    And do you recall that that is
```

```
 1                    KARIUKI
 2   when you terminated her employment?
 3       A.    Yes.
 4       Q.    And what prompted you in
 5   November to terminate her employment?
 6             MR. BOYARSKY:   Objection.  You
 7        can answer.
 8       A.    The timing was not my decision.
 9   The only reason I remember is it was two
10   days after my birthday that I had to do
11   this.
12       Q.    So my question is you hear
13   silence --
14             MR. LICUL:  Withdrawn.
15       Q.    First you asked Ms. Yan whether
16   this is still going forward, and she says
17   that yes, but we have processes, correct?
18       A.    Right.
19       Q.    And then there is silence for a
20   period of time?
21       A.    Right.
22       Q.    Okay.   And then what is the
23   next thing you hear about terminating
24   Ms. McKenna?
25       A.    The next thing I hear from?
```

```
 1                    KARIUKI
 2      Q.    From anyone?
 3      A.    The next thing that I heard
 4  after I submitted those numbers was I got
 5  a Bloomberg chat from Ms. McKenna.
 6      Q.    Okay.   And what did that
 7  Bloomberg chat say?
 8      A.    Hi, Omar.  I just wanted to let
 9  you know that I am pregnant, and that is
10  why I haven't been coming in to the
11  office.
12      Q.    And did you respond to that
13  Bloomberg chat?
14      A.    Yes.
15      Q.    What did you say?
16      A.    Congrats, Erin.   You must be
17  really excited.
18      Q.    Did you have a conversation with
19  Ms. McKenna?
20      A.    Outside of that exchange, no.
21      Q.    Did she also say to you in that
22  Bloomberg chat that that is the reason she
23  wouldn't be coming back to the office?
24      A.    She did.
25      Q.    And other than responding to
```

```
 1              KARIUKI
 2  Ms. McKenna, what else did you do in
 3  response to that Bloomberg chat?
 4      A.   Less than 45 seconds after
 5  receiving that Bloomberg chat from -- from
 6  Ms. McKenna, I copied and pasted that
 7  Bloomberg chat and sent it to Christina
 8  Yan and HR asking her if this changes
 9  anything.
10      Q.   And what did you mean by that?
11      A.   Well, someone that I had
12  identified potentially to be laid
13  off -- to be laid off just informed me
14  that she was pregnant.
15      Q.   Okay.  And what did Ms. Yan say?
16  How did Ms. Yan respond?
17      A.   She responded by saying
18  because -- because we have documentation
19  that this was already in process before
20  she told you that she was pregnant, we can
21  move forward with the exercise.
22      Q.   Is that what she said to you?
23      A.   Yes.
24      Q.   What else did she say?
25      A.   That is all that I recall.
```

```
 1              KARIUKI
 2      Q.    But at that time that you got
 3  the IM from Ms. McKenna, you weren't sure
 4  whether you were going forward, correct?
 5              MR. BOYARSKY:   Objection.
 6      You can answer.
 7      A.    Well, at that -- at that point I
 8  had already asked her was this still
 9  happening, and she had told me yes, it was
10  still happening.
11      Q.    Okay.
12      A.    And then Erin sent me this
13  exchange, sent me this chat letting me
14  know that she was pregnant, and then when
15  I sent that to Christina I asked if that
16  changed anything, and she said we were
17  continuing because we had a practice that
18  we were already in the process of doing
19  this before she told you that she was
20  pregnant.
21      Q.    So she was concerned about a
22  lawsuit?
23      A.    I -- I don't -- I don't know
24  what she was concerned about.  I never
25  asked her.
```

```
 1                    KARIUKI
 2       Q.    And when Ms. Yan tells you that
 3  you have proof, what did you understand
 4  that meant?
 5       A.    Meaning that we had already
 6  discussed this and there was already
 7  documentation I assume that we were
 8  already -- that because this was already
 9  happening that it didn't matter that she
10  said that she was pregnant, you know, a
11  couple of months after we had already
12  decided that she was going to be laid off.
13       Q.    Now, prior to Ms. McKenna's
14  Bloomberg IM to you, Ms. Yan told you that
15  there were processes that you still had to
16  go through, correct, about terminating
17  Ms. McKenna's employment, right?
18            MR. BOYARSKY:    Objection.
19        You can answer.
20       A.    I may be mistaken, sir, but I
21  don't recall saying that Christina Yan
22  said that there were still processes.   I
23  recall you asking me if I decided that she
24  should be fired, she and Jeff should be
25  fired.  Why didn't it happen, and I said
```

1                    KARIUKI

2        A.     I don't believe it is true

3    actually.

4        Q.     And what is your basis for not

5    believing it is true?

6        A.     Sure.  Because we also did

7    a -- we did a transaction that the sales

8    credits had not hit yet, but it was a

9    liquid security that we had, and it

10   was -- it had a long settle date.   It was

11   like a three-week or a month settle date.

12   So I don't know how -- what that trade

13   factored in, how they ended the year.

14   But as I was telling you before in the

15   beginning of our conversation,

16   that -- that decision in terms of efficacy

17   of sales is not just based upon a gross

18   number.   There is primary and secondary

19   sales credits.

20       Q.     But you -- go ahead.   Sorry.

21   Finish.

22       A.     With secondary sales credits

23   value is really added for a sales team,

24   and that is the way it's been explained as

25   long as I have been at the bank.   It is

```
 1              KARIUKI
 2   the way in which we look at the business.
 3   It is DCM that takes credit for primary.
 4   It is syndicate that takes credit for
 5   primary.  There are bankers that take
 6   credit for primary, the other people who
 7   could take credit for secondary sales and
 8   trading.  Tom Steckroth's numbers, if we
 9   are talking about him specifically, I
10   believe were comparable to that of Erin
11   McKenna, maybe higher.
12        Q.    So you think they were
13   comparable maybe hire, but you decided to
14   fire Ms. McKenna and not Mr. Steckroth?
15        A.    I decided to fire Ms. McKenna
16   and Jeff Barker because I had to identify
17   the two lowest producers on my team.
18   There was no -- there is data that
19   supports that.  I -- yes.  There was
20   data that supported that, and, you know,
21   I -- the only thing I had -- the only
22   thing that I did was just use numbers and
23   incorporates feedback and make a decision
24   based on that.
25        Q.    Listen to my question.
```