UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
ERIN MCKENNA,                          :
                                       :
                          Plaintiff,   :        21cv941 (DLC)
            -v-                        :
                                       :        OPINION AND ORDER
SANTANDER INVESTMENT SECURITIES,       :
INC., et al.,                          :
                                       :
                          Defendants.  :
                                       :
-------------------------------------- X

APPEARANCES:

For the plaintiff:
Wigdor LLP
Valdi Licul
John S. Crain
85 Fifth Ave.
Ste Fifth Floor
New York, NY 10003

For the defendants:
Nelson Mullins Riley & Scarborough LLP
Mitchell Boyarsky
Nicole Phe
280 Park Ave 15 Floor West
New York, NY 10017

DENISE COTE, District Judge:

     Defendants Santander Investment Securities, Inc., Santander

Holdings USA, Inc. ("SHUSA") (together, "Santander") and Omar

Kariuki ("Kariuki") (collectively "Defendants") have moved for

summary judgment on all claims asserted against them by

plaintiff Erin McKenna ("McKenna" or "Plaintiff").  McKenna

alleges that the Defendants failed to provide her with a

reasonable accommodation for her high-risk pregnancy, subjected her to pregnancy discrimination, and retaliated against her in violation of federal, state, and city antidiscrimination statutes.  For the reasons set forth below, the motion is granted in part.

## Background

The following facts are undisputed or taken in the light most favorable to the Plaintiff, unless otherwise noted. McKenna began working at Santander Investment Securities, Inc. in May 2018 as a salesperson on the Fixed Income sales desk. McKenna was part of the Investment Grade ("IG") Sales team and a "primary and essential function" of McKenna's role was to execute trades.

As a member of the Fixed Income Sales team, McKenna was expected to work from Santander's offices in Manhattan.  Under the Santander Investment Securities ("SIS") Fixed Income Sales & Trading Front Office Manual, off-premises trading is defined as "the execution of trades through telephone lines (e.g., trading over cellular or personal telephone lines or via on or off-site e-mail) whereby the execution is not recorded on the SIS voice systems or the execution of trades is off site of SIS."  Off-premises trading is "generally not permitted."  The enumerated events in which it may occur include

> (1) Times of financial emergency; (2) Acts of God; (3)
> Contingency or unexpected development in the global
> financial markets; (4) On holidays in NY (when Latam
> markets are open) or; (4) after hours which could
> adversely affect [Santander]'s position whereby a
> trader (or Salesperson, at their client's request)
> needs to execute a trade off-premise he/she must be
> authorized to do so prior to closing the transaction
> by the Head of Fixed Income (approval must be obtained
> in writing).

The Front Office Manual describes the "appropriate procedures" to follow to execute off-premises trades.

In late 2018, McKenna disclosed her pregnancy to William ("Bill") Garvey, the Head of Investment Grade Trading and her manager at the time. During the early months of 2019, McKenna contends that Garvey allowed her to come into the Santander office whenever she could and to otherwise work remotely. Defendants contend that Garvey did not give McKenna permission to work remotely.

In early 2019, McKenna received a bonus of $170,000 for the year 2018. According to the terms of McKenna's offer letter, she was eligible "to receive a discretionary bonus with a reference of $200,000, payable in accordance with SIS policy with respect to the payment of bonuses" for 2018. Accordingly, for 2018, McKenna received $30,000 less than the amount listed in the offer letter.

On March 7, 2019, Garvey sent McKenna a text message requesting "[a]ny word on whether or not you can come back to work?" McKenna responded that she was still advised not to

return to the office because of concerns that "stairs and train"
could cause labor.  On March 8, Garvey emailed Human Resources,

> Erin has been instructed by her doctor that she cannot
> take the train in to work due to complications from
> her pregnancy.  It's likely this will remain the case
> until she has the baby (due date first week of June).
> I have instructed her that she is unable to execute
> any transactions while she is out of the office.

On March 12, Catherine Baer from Human Resources emailed
McKenna to request that she get in touch with the benefits team
and send Human Resources a copy of her doctor's instructions.
The next day, Baer emailed McKenna to thank her for talking
earlier and referenced a meeting set to occur later in the day.
On Tuesday, March 19, Baer wrote that she had not heard back
from McKenna.  Baer noted in the email that McKenna's position
"is not one that has the ability to work remote" and asked
McKenna whether there were "any other accommodations" her doctor
was requesting.  McKenna responded on the same day that she was
going to see the doctor on Thursday and would get a note at that
time.  Baer responded that "everyone is trying to figure out a
solution that will work" and asked whether "Uber or another ride
share service" is an option.

On March 21, McKenna requested that Santander provide a car
service two days a week.  She noted that her husband could drive
her into work twice a week if Santander could provide a car
service the other two days.  Baer responded that, until the

completed forms are received, Human Resources wouldn't be able to review her request.

McKenna procured a physician's certification for a pregnancy related accommodation that same day.  McKenna's doctor stated that McKenna "needs to be provided with transportation and has been cleared to return to work 4 days a week."  The form describes several medical conditions related to McKenna's pregnancy that "restrict her ability to perform at full capacity."  The doctor notes that McKenna "should not be lifting anything at all, climbing or pushing/pulling."  A second note from the same doctor, also dated March 21, states that McKenna "has been cleared to go back to work 4 days a week as long as she is provided with transportation."

On April 2, Beatriz Retamar from Human Resources emailed McKenna to say she "had some news, but still figuring out before telling you."  Retamar requested McKenna's help with "one thing" and asked whether McKenna could "figure out if you have any branch near your home comfortable for you to go."  Retamar noted that "remote working is not an option even with the fingerprint, and CITRIX . . . because we can't control the 'environment', meaning who can have access to that non public information."  On April 3, McKenna responded to Retamar's email and said "I think I am all good now to commute.  I just have to take it easy but I am out of the critical time for the baby."  McKenna noted that

there did not seem to be any branches near her house but that she "should be back to a regular schedule." Retamar forwarded the email to others in Human Resources. On April 3, Molinari responded to the email thread, "Case is closed".

Omar Kariuki assumed responsibility for both the Emerging Markets and Fixed Income Sales teams around March 2019 and became McKenna's supervisor. On April 5, McKenna emailed Minuesa, the Head of Markets in the U.S. and Kariuki's manager, and Karuiki regarding coverage for her Midwestern accounts while she was on maternity leave. In the April 5 email, McKenna wrote,

> I sat down with Jeff Barker yesterday to discuss his helping to back me up on my Midwest accounts while I am out on maternity leave. Omar asked me to do this last week before he left and I was more than happy to do so to make sure my accounts are efficiently covered in my absence. However, it left me concerned that my client list was going to be substantially changed as a result of my time off after having a baby. . . .[W]hen Jeff mentioned that he would be covering IG accounts in addition to EM going forward and that he specifically covers Northwestern Mutual I was concerned. For instance, this is one [of] my biggest accounts that I opened. . . . I have done both EM and IG trades with Northwestern Mutual since I have been here. From our conversations, I was under the impression that Jeff would be helping back me up while I was out, but now it seems like he's going to be taking over some of my accounts even when I come back.

(Emphasis supplied). Kariuki responded that the message Barker relayed was wrong and McKenna's account list would remain intact while she was out on leave.

On April 29, McKenna told the Defendants that she had obtained a doctor's note.  The note, which is dated April 24, advises McKenna "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all.  This is due to medical complications of her pregnancy."  There is no evidence that McKenna provided this note to the Defendants.  McKenna gave birth on May 6, and began her maternity leave.

McKenna returned from maternity leave on August 12, 2019. A week earlier, on August 4, Minuesa emailed Kariuki about undertaking a restructuring of the sales team.  In his email, he said that "[l]ooking at the activity in secondary markets and the 2H of the year, our priorities should be focused in . . . re-structuring of team (low-production sales persons)."

In February 2020, McKenna received a bonus for the year 2019 of $165,000.  This was $5,000 less than her 2018 bonus.

In February 2020, Santander returned to the discussion of restructuring the Investment Grade Sales team.  In a February 24 email, Christina Yahn, Vice President of Human Resources, refers to a meeting with Juan Minuesa and Kariuki about "a proposed restructure to the Institutional Sales team."  Yahn states that "[g]iven the client/revenue focus of the team, we need to begin the recruitment process and secure final candidates before we can notify the current employees of the impacts to their roles." The Plaintiff contends that she was identified at that time as a

"current employee" who would lose employment in this
restructuring.  Beginning in March 2020, Santander transitioned
to remote work in response to the COVID-19 Pandemic.

On August 25, 2020, Kariuki and Minuesa emailed Yahn to set
aside time to discuss "personnel changes to the sales team."
The parties agree that in those discussions Santander identified
McKenna as a person who would lose her job in the restructuring.
Documents reflect that the three individuals met on September 1
at 10:30 a.m., and that the next day Yahn sent Kariuki a
template for a new organization chart.

On September 2, Santander held a meeting, attended by
McKenna, regarding "the new protocol" for returning to work in
the office during the pandemic.  McKenna emailed Yahn after the
meeting to explain that she had "just found out" she was again
pregnant.  McKenna requested that they wait to discuss her
return to the Santander office until after her September 17
doctor's appointment.  Yahn responded that it "ma[de] sense to
revisit" her return to the office after the September 17
appointment.  Yahn wrote "I assume you haven't yet told the team
of your good news, so I can just mention to Omar that you and I
discussed a return to be confirmed after 9/17 without mentioning
any details."

On September 16, Yahn sent a text message to Shannon Cruz,
another employee on Yahn's Human Resources team, detailing the

sequence of events leading up to McKenna's pregnancy

announcement.  Yahn stated that

> Omar told me like 2 weeks ago he wanted to [l]et go
> Jeff Barker and Erin McKenna . . . .  I cannot tell
> Omar she's pregnant bc it's her thing to do, but need
> to factor in the implications of it with letting her
> go.

On September 17, McKenna wrote to Yahn that she "was going back

to the doctor in 2 weeks to be monitored" because she is "high

risk."  McKenna noted that her doctor had asked if they "could

revisit a return to work after my first trimester (end of

October) since this is a critical time."  McKenna said she would

receive a note from her doctor shortly.  Yahn responded that she

did "not need to see the note at this time."

On October 12, Kariuki sent an email to Yahn noting that he

and Minuesa had "decided to . . . exit the two people in IG

discussed."  On October 19, McKenna sent Kariuki a Bloomberg

message and disclosed her pregnancy.  Having just learned that

McKenna was pregnant, Kariuki sent Yahn an email with the

subject "Does this change anything?" and included McKenna's

message regarding her pregnancy in the body of the text.

Santander proceeded with its decision to terminate

McKenna's employment.  A "Severance Decision Form" dated October

28, prepared by Yahn and Kariuki, lists McKenna and Barker as

the "impacted" team members.  An October 28 draft of the

restructuring documents includes a request by Yahn regarding

McKenna.  She asks Omar to "talk through the business results
that you provided at the end of September?  I want to understand
Tom Steckroth's mandate and current volume and YTD results when
compared to Erin's."

On November 4, Yahn sent Molinari a description of the
revised business rationale for the organizational changes being
made to the Investment Sales team.  The document notes that

> [w]e have identified that we have a need to enhance
> the focus of the IC3s to of course be Sales centric,
> including a need for stronger secondary sales results
> . . . .  Therefore, based on assessment of the
> remaining IC3 incumbents, one of the IC3 level
> positions will be impacted to undergo an upgrade to
> help build the existing credit business including
> driving up secondary sales while also excelling in
> working in a matrixed and manual operations dependent
> environment. . . .  <u>Erin McKenna's role has been
> identified to be upgraded with an incumbent with the
> above skills and competencies</u>.

(Emphasis supplied.)  The document lists McKenna as one of the
"impacted team member(s)."  On November 6, 2020, McKenna was
fired.

On February 3, 2021, McKenna filed this lawsuit.  The
complaint asserts claims against all Defendants for interference
and retaliation in violation of the Family and Medical Leave
Act, 29 U.S.C. § 2601 et seq. ("FMLA"), discrimination and
retaliation under the New York State Human Rights Law, Executive
Law § 290 et seq. (the "NYSHRL"), and discrimination and
retaliation under the Administrative Code of the City of New

York §8-107 et seq. (the "NYCHRL").  It also asserts claims

under NYSHRL and NYCHRL against Kariuki for aiding and abetting.

On February 4, 2021, McKenna filed a Charge of

Discrimination with the Equal Employment Opportunity Commission

("EEOC") and the New York State Division of Human Rights

alleging violations of Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") as amended by the

Pregnancy Discrimination Act of 1978 ("PDA") and the Americans

with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA").  On

April 26, McKenna received a Notice of Right to Sue from the

EEOC.

On May 24, McKenna filed an amended complaint adding claims

against Santander for discrimination and retaliation under the

ADA and Title VII.  Following that amendment, McKenna

principally claims (1) a failure to accommodate her pregnancy

beginning on March 8, 2019 by rescinding permission for her to

work from home and refusing to provide or reimburse car

transportation to work; (2) discrimination against her for her

2019 pregnancy and pregnancy leave by reducing two bonuses,

refusing to return certain accounts to her portfolio when she

returned to work in 2019, and terminating her employment in

2020; (3) discrimination against her for her 2020 pregnancy by

terminating her employment; and (4) permanently reassigning many

of her accounts, lowering her bonuses, and terminating her

employment in retaliation for two statements she made in early 2019.

On March 28, 2022, the Defendants moved for summary judgment on all claims.  The motion became fully submitted on May 11.[1]

## **Discussion**

Summary judgment may only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party."  Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law."  Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Kee v. City of New York, 12 F.4th 150, 158

---

[1] On June 21, Plaintiff filed a motion to strike certain documents from the summary judgment record.  The motion to strike is moot given the rulings in this Opinion.

(2d Cir. 2021) (citation omitted).  In the context of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  See also Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016).

I.   The Statutes of Limitations

Among her claims, McKenna alleges that the Defendants violated her rights under the ADA and Title VII.  A claim under Title VII or the ADA must be dismissed as untimely if a plaintiff has not filed a complaint with the EEOC within 180 days of the alleged discriminatory or retaliatory act or filed a complaint with an appropriate state or local agency within 300 days of the occurrence of the alleged illegal act.[2]  The Second Circuit has held that Title VII and ADA charges filed with the EEOC in New York are deemed to be simultaneously filed with the appropriate New York state agency pursuant to the EEOC's regulations and are therefore entitled to the 300 day

---

[2] Under Title VII and the ADA, a plaintiff may only benefit from the 300 day limitations period for such claims -- as opposed to the 180 day limitations period -- if she has first sought relief from an appropriate state or local administrative agency. See 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a).

limitations period.  Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 327-28 (2d Cir. 1999).

The Plaintiff also brings a federal claim under the FMLA. The statute of limitations for interference and retaliation claims under the FMLA is two years.  See 29 U.S.C. § 2617(c)(1). A three-year statute of limitations period applies, however, if a plaintiff proves a "willful" violation of the FMLA.  See id. § 2617(c)(2).

Finally, the Plaintiff brings various state and city law claims. "[C]laims under the NYSHRL and the NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts."  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).

Generally, each discrete discriminatory or retaliatory act that violates federal law "gives rise to a freestanding [federal] claim with its own filing deadline."  Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir. 2012).  Therefore, where a plaintiff's claims are premised on "discrete discriminatory or retaliatory acts such as termination, failure to promote, denial of transfer, or refusal to hire," those claims may be barred by the statute of limitations "if they occurred prior to the 300-day period even though they may be related to acts that occurred within the permissible 300-day period."  Davis-Garett v. Urb. Outfitters,

14

Inc., 921 F.3d 30, 42 (2d Cir. 2019) (quoting National R.R.
Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002)).

A. Application

McKenna filed her EEOC complaint on February 4, 2021.
Therefore, any claims under the ADA and Title VII arising from
acts occurring before April 10, 2020 -- 300 days before she
filed her complaint with the EEOC -- are time barred.  Since
McKenna's ADA claim relates to her 2019 pregnancy, it is time-
barred.  Any Title VII claims arising from the 2019 reassignment
of McKenna's accounts or her 2018 and 2019 bonuses are also
time-barred.  Her Title VII claim arising from the termination
of her employment is timely.  All of McKenna's claims under the
FMLA, NYSHRL, and NYCHRL are timely.

II.  Disability Discrimination

McKenna asserts that the Defendants, in violation of the
ADA, NYSHRL, and NYCHRL, failed to provide her in the period
following March 7, 2019 with a reasonable accommodation in
connection with her 2019 pregnancy.  The Defendants move for
summary judgment on these claims because McKenna does not
qualify as disabled, has failed to show that a reasonable
accommodation existed that would have allowed her to perform the
essential functions of her job at home, and has failed to show
that the Defendants refused a request for an accommodation.
This motion is granted on the ground that McKenna has failed to

show that Santander refused to reasonably accommodate her
pregnancy.

A. Legal Standard

The ADA prohibits "discriminat[ion] against a qualified
individual" in the "terms, conditions, and privileges of
employment."  42 U.S.C. § 12112(a).  This provision "requires
employers to take certain affirmative steps to assist employees
with disabilities," which include reasonably accommodating "the
known physical or mental limitations of an otherwise qualified
individual unless the employer can demonstrate that the
accommodation would impose an undue hardship on the operation of
its business."  Bey v. City of New York, 999 F.3d 157, 165 (2d
Cir. 2021) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, a disability is defined "to include, inter
alia, a physical or mental impairment that substantially limits
one or more major life activities."  Hamilton v. Westchester
Cnty., 3 F.4th 86, 92 (2d Cir. 2021) (citation omitted).
Pursuant to the ADA Amendments Act ("ADAAA"), passed by Congress
in 2008, "the term 'substantially limits' shall be construed
broadly in favor of expansive coverage, to the maximum extent
permitted by the terms of the ADA."  28 C.F.R. §
35.108(d)(1)(i)(2016).  "[T]he term 'substantially limits' is to
be interpreted and applied to require a lower degree of
functional limitation than the standard required prior to the

ADAAA." Hamilton, 3 F.4th at 92.  "[F]or purposes of an actual disability claim, a 'disability' shorter than six months in duration now can be actionable under the ADA." Id.

Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . ." N.Y. Exec. Law § 292(21). The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. The term "physical, medical mental, or psychological impairment means . . . [a]n impairment of any system of the body; including, . . . the reproductive system." N.Y.C. Admin. Code § 8-102.

To establish a prima facie case for failure to provide a reasonable accommodation, the plaintiff must establish: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the employer refused to make such accommodations. See Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020).

17

"Where the employee's disability is known to the employer, the ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Stevens v. Rite Aid Corp., 851 F.3d 224, 231 (2d Cir. 2017) (citation omitted). "[T]he ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 98 (2d Cir. 2015).

Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims. See Fox v. Costco Wholesale Corp., 918 F.3d 65, 76 (2d Cir. 2019). The NYCHRL provides "greater protection against disability-based discrimination." Jacobsen v. New York City Health & Hosps. Corp., 22 N.Y.3d 824, 833–34 (N.Y. 2014). Under both the NYSHRL and NYCHRL, however, "the employer's response to the employee's request and any ensuing dialogue about the impact of the proposed accommodation on the employer's business inform the determination of whether a reasonable accommodation exists." Id. at 835.

B. Application

Due to the medical complications arising from her 2019 pregnancy, McKenna has presented evidence that she was disabled for the purposes of the NYHRL and NYCHRL.[3]

> Although pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities under the ADA, as amended. . . . [I]t is likely that a number of pregnancy-related impairments that impose work-related restrictions will be substantially limiting, even though they are only temporary.

EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues (EEOC, June 25, 2015).

The Defendants assert that McKenna is required to establish a long-term or permanent impact on her health to show that she had a disability.  But a "short-term injury can qualify as an actionable disability under the ADA."  Hamilton, 3 F.4th at 93. See also 28 C.F.R. § 35.108(d)(ix)(2016).

McKenna, however, has failed to show that the Defendants refused to afford her a reasonable accommodation for her disability beginning on March 8, 2019.  According to McKenna, Garvey allowed her to work from home in the period between January and March 7, 2019.[4]  On March 7, Garvey texted McKenna to

---

[3] McKenna's ADA claim is time barred.

[4] The Defendants, supported by Garvey's deposition testimony, dispute McKenna's assertion that Garvey ever permitted McKenna to work from home in early 2019.

inquire whether she could return to work.  After McKenna advised Garvey that her doctor told her she could not commute by train, Human Resources became involved and asked for a copy of the doctor's instructions.  The doctor's note that McKenna provided to Santander on March 21 did not indicate that McKenna was unable to leave her home to work.  It indicated instead that McKenna could work four days a week at an office so long as she was provided with transportation.

The Plaintiff has not presented evidence to raise a question of fact that at any point in the weeks that followed March 21 that the Defendants refused the requested accommodation.  The Human Resources personnel asked McKenna whether there was a Santander branch near her home.  The next day, on April 3, McKenna responded and said "I think I am all good now to commute" and she could be back to her "regular schedule."  With that response, McKenna effectively withdrew her request for an accommodation.

McKenna appears to make two arguments to support her disability claim.  First, she appears to argue that she should have been allowed to work from home until she gave birth.  She contends she was permitted by her supervisor to do so between January and March of 2019.  The Defendants dispute that McKenna was ever permitted to work from home and point to Santander's strict prohibition against out-of-office trading in its Manual.

In any event, McKenna's disability claim is premised on the period following March 7, 2019, and McKenna's evidence is that her doctor permitted her to work in an office during this period so long as she used appropriate transportation.  As explained, the Plaintiff has not proffered evidence that the Defendants failed to reasonably accommodate her disability in this period.

Second, McKenna appears to rely on an April 24, 2019 doctor's note that advised her "to cut back on commuting to 2-3 times weekly for 2 weeks and then not at all."  The Plaintiff advised the Defendants on April 29 that she had a doctor's note, but there is no evidence that the Plaintiff ever presented the note to the Defendants.  Instead, she describes it as evidence of her state of mind.  If McKenna wanted an accommodation of her disability on April 29, having told Santander on April 3 that her need for an accommodation had ended, she had to provide the doctor's note to Santander.  McKenna has failed to offer evidence that the Defendants refused a request for an accommodation at any time between April 29 and May 6, the date on which McKenna gave birth to her child.

III. Pregnancy Discrimination

McKenna asserts that the Defendants discriminated against her due to her pregnancies, in violation of Title VII, NYSHRL, and NYCHRL.  The adverse actions she identifies as following her 2019 pregnancy are the refusal to return all of her accounts to

her when she returned to work in 2019 from her pregnancy leave, reducing her bonuses for the years 2018 and 2019, and firing her in 2020.  She asserts that the adverse action taken against her in connection with her 2020 pregnancy was the termination of her employment.

The Defendants contend that McKenna has failed to establish a prima facie case for pregnancy discrimination related to either her 2019 or 2020 pregnancy and that she has not refuted the legitimate business reasons they have given for their business decisions.  The Defendants' motion is granted in part. The Title VII claim related to the 2019 pregnancy is time barred.  The motion is also granted as to all claims arising from the 2020 pregnancy.  The motion is denied with respect to the 2019 pregnancy for claims brought under NYSHRL and NYCHRL.

A. Legal Standard

Title VII makes it unlawful for an employer to "fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII was amended by the Pregnancy Discrimination Act ("PDA") to enact Congress's determination that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."  Newport

22

News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684
(1983).

Claims brought under Title VII are "analyzed using the
familiar burden-shifting scheme adopted by the Supreme Court in
McDonnell Douglas Corp. v. Geren, 411 U.S. 792 (1973)." Walsh
v. N.Y.C. Housing Auth., 828 F.3d 70, 75 (2d Cir. 2016)
(citation omitted).  To establish a prima facie case of
discrimination, a plaintiff need only allege: "(1) that she is a
member of a protected class, (2) that she was qualified for the
position . . . , (3) that she suffered an adverse employment
action, and (4) can sustain a minimal burden of showing facts
suggesting an inference of discriminatory motivation."
Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir.
2015).  Under Title VII, an employer is liable where the
employee's pregnancy or related condition at least "partly . . .
motivated" an employment decision.  Holcomb v. Iona Coll., 521
F.3d 130, 142 (2d Cir. 2008).  "It suffices . . . to show that
the motive to discriminate was one of the employer's motives,
even if the employer had other, lawful motives that were
causative of the employer's decision." Lenzi v. Systemax, Inc.,
944 F.3d 97, 107 (2d Cir. 2019) (quoting Univ. of Tex. Sw. Med.
Ctr. v. Nassar, 570 U.S. 338, 343 (2013)).

A "denial or reduction of a bonus" can constitute an
adverse employment action.  Davis v. New York City Dep't of

Educ., 804 F.3d 231, 236 (2d Cir. 2015).  "The fact that the
employer has discretion whether to grant bonuses or raises does
not support the conclusion that an employer may freely allocate
them on the basis of" discrimination.  Id. at 235-36.

"If the plaintiff establishes a prima facie case, a
presumption of discriminatory intent arises and the burden
shifts to the employer to articulate a legitimate, non-
discriminatory reason for its policy or action." Lenzi, 944
F.3d at 107 (citation omitted).  "If the employer puts forth a
legitimate, non-discriminatory justification, the presumption
drops out of the analysis and the plaintiff must establish, by a
preponderance of the evidence, that the employer's justification
is a pretext for discrimination." Id. at 107-08 (citation
omitted).

Discrimination claims brought under the NYSHRL are
"analytically identical" to Title VII claims.  Id. at 107 n.7
(2d Cir. 2019).  Claims brought under the NYCHRL are analyzed
using the same framework as Title VII and NYSHRL claims,
Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir.
2009), but "must be reviewed independently from and more
liberally than their federal and state counterparts." Loeffler
v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009)
(citation omitted).  The NYCHLR does not require that a
plaintiff prove an adverse employment action.  Mihalik v. Credit

24

Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir.
2013).  Rather, "the plaintiff need only show differential
treatment -- that she is treated 'less well' -- because of a
discriminatory intent."  Id. at 110 (citation omitted).

  B. Application

    McKenna has presented sufficient evidence to raise a
question of fact as to whether the Defendants discriminated
against her as a result of her 2019 pregnancy by reducing her
bonuses below the amount she would otherwise have been given, by
failing to return some of her accounts to her when she returned
from maternity leave, and by planning for and then implementing
the termination of her employment in 2020.  While the Defendants
have provided legitimate reasons for each of those decisions,
the disputed issues of fact must be resolved at trial.

    McKenna's claims related to her 2020 pregnancy, however,
must be dismissed.  McKenna cannot show that her 2020 pregnancy
motivated, even partly, the decision to fire her.  Santander
began to work on a restructuring plan for McKenna's position
many months before McKenna became pregnant and many months
before she advised anyone at Santander that she was pregnant.
McKenna contends that Santander had identified her as someone to
fire in February 2020.  The parties agree that by August 2020,
Santander had identified McKenna as someone who would lose her
job in the restructuring.  McKenna did not advise the Santander

Human Resources department of her pregnancy until September and her supervisor until October 19.  Because McKenna has identified no evidence to support a claim that her 2020 pregnancy played any role on Santander's decision to terminate her employment, her claims based on her 2020 pregnancy must be dismissed.

McKenna argues that, although Santander employees took steps "to coordinate McKenna's ouster" in August, Kariuki did not "actually" terminate her employment until November 6, 2020, eighteen days after she told him about her pregnancy.  To prove discrimination, McKenna must show that the Defendants' decision to terminate her employment was motivated by discriminatory intent.  In this case, the date on which she was actually informed on their decision is not relevant.  Therefore, the Defendants are entitled to summary judgment on the Title VII, NYSHRL and NYCHRL discrimination claims arising from the 2020 pregnancy.

IV.  Retaliation

McKenna asserts that the Defendants retaliated against her in violation of the ADA, Title VII, NYSHRL, and NYCHRL for protesting unequal treatment.  The Defendants contend that these claims fail.  They assert that the federal claims are time-barred and that McKenna cannot demonstrate the causal connection between any protected activity and any alleged adverse action.

The NYSHRL and NYCHRL claims survive in part; the federal claims
are dismissed as time-barred.

  A. Legal Standard

    To make out a prima facie retaliation case under Title VII,
the ADA, or NYSHRL the plaintiff "must show that (1) [s]he was
engaged in protected activity, (2) the employer was aware of
that activity, (3) the employee suffered a materially adverse
action, and (4) there was a causal connection between the
protected activity and that adverse action."  Agosto v. New York
City Dep't of Educ., 982 F.3d 86, 104 (2d Cir. 2020) (citation
omitted); see Fox v. Costco Wholesale Corp., 918 F.3d 65, 72-73
(2d Cir. 2019) (ADA retaliation claim); Summa v. Hofstra Univ.,
708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL).  Once the plaintiff
has established a prima facie case, "the burden shifts to the
employer to articulate some legitimate, non-retaliatory reason
for the employment action."  Zann Kwan v. Andalex Group LLC, 737
F.3d 834, 845 (2d Cir. 2013).  If the defendant does so, the
plaintiff must then show that this "non-retaliatory reason is a
mere pretext for retaliation."  Id.

    An employee's complaint "may qualify as protected activity"
under Title VII "so long as the employee has a good faith,
reasonable belief that the underlying challenged actions of the
employer violated the law."  Kelly v. Howard I. Shapiro &
Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013)

(citation omitted).  Protected activity need not consist of a formal complaint of discrimination; an "internal complaint to company management" can constitute a protected activity under Title VII.  Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992).  The plaintiff's complaint, however, cannot have been so generalized that the employer "could not reasonably have understood that she was complaining of conduct prohibited by Title VII."  Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (citation omitted).

For a retaliation claim to survive summary judgment, the plaintiff must show "a causal connection between the protected activity" and the "adverse action" complained of.  Agosto, 982 F.3d at 104 (citation omitted).  Causation must be proved "according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Zann Kwan, 737 F.3d at 845 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

The adverse-action standard for retaliation "covers a broader range of conduct than does the adverse-action standard for claims of discrimination."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015).  It is "any action that could well dissuade a reasonable worker from making or

supporting a charge of discrimination." Id. (quoting Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).  With

respect to adverse actions in the retaliation context, the

Supreme Court has cautioned that:

> Context maters.  The real social impact of workplace
> behavior often depends on a constellation of
> surrounding circumstances, expectations, and
> relationships which are not fully captured by a simple
> recitation of the words used or the physical acts
> performed.  A schedule change in an employee's work
> schedule may make little difference to many workers,
> but may matter enormously to a young mother with
> school-age children.  A supervisor's refusal to invite
> an employee to lunch is normally trivial, a
> nonactionable petty slight.  But to retaliate by
> excluding an employee from a weekly training lunch
> that contributes significantly to the employee's
> professional advancement might well deter a reasonable
> employee from complaining about discrimination.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69

(2006) (citation omitted).

The NYCHRL prohibits "retaliat[ion] or discriminat[ion] in

any manner against any person because such person has ...

opposed any practice forbidden under this chapter."  N.Y.C.

Admin. Code § 8-107(7).  "To prevail on a retaliation claim

under the NYCHRL, the plaintiff must show that she took an

action opposing her employer's discrimination, and that, as a

result, the employer engaged in conduct that was reasonably

likely to deter a person from engaging in such action."  Leroy

v. Delta Air Lines, Inc., 36 F.4th 469, 474 (2d Cir. 2022)

(citation omitted).  "[C]ourts must analyze NYCHRL claims

separately and independently from any federal ... claims,"
because the NYCHRL is to be construed "broadly in favor of
discrimination plaintiffs, to the extent that such a
construction is reasonably possible."  Mihalik, 715 F.3d at 109
(citation omitted).

   B. Application

   McKenna has presented evidence that she was retaliated
against for purposes of the NYSHRL and NYCHRL in connection with
her April 5, 2019 statement to Santander.[5]  She may pursue these
claims with respect to the Defendants' decision on what clients
should be returned to her portfolio upon her return from
maternity leave.

   In opposing the motion for summary judgment, McKenna
identifies two occasions on which she contends she engaged in
protected activity.  McKenna first claims that she engaged in
protected activity in early 2019 when she asked to work from
home during her pregnancy.  Next, McKenna asserts that she
engaged in a protected activity on April 5, 2019, when she sent
an email to Minuesa and Karuiki, expressing concern that she may
permanently lose her accounts "as a result of my time off after
having a baby."

---

[5] McKenna's Title VII and ADA claims are time barred.

While the April 5 email qualifies as a protected activity, McKenna fails to show that she engaged in any other protected activity in early 2019.  At no point in the FAC or in the evidence submitted in opposition to this motion for summary judgment does McKenna explain what she said in early 2019 that might qualify as protected activity.  She does not report what she said in making a request to work from home and, in fact, does not cite any specific conversation in which she complained of discrimination or unfair treatment, even in the most general terms.  While informal protests of discrimination can constitute protected activity, McKenna fails to show that she made even an informal protest.

McKenna's retaliation claims under the NYSHRL and NYCHRL appear to rest on an assertion that she suffered four materially adverse actions as a result of the April 5 email.  They are (1) the permanent reallocation of some of her accounts during her 2019 pregnancy leave; (2) the payment in early 2020 of a diminished bonus for the year 2019; (3) identification of the plaintiff for termination of employment beginning on February 25, 2020; and (4) the termination of employment in October 2020.[6]

---

[6]  McKenna also cites as an adverse action the receipt of a less than expected bonus for the year 2018.  Since that bonus was decided upon and distributed before April 5, 2019, the retaliation claims based on that bonus must be dismissed.

Each of these four actions is a materially adverse employment action for purposes of a retaliation claim.  They are also adverse actions with respect to the surviving discrimination claims.  Of the four actions, however, only the permanent reallocation of her accounts is sufficiently tethered to her April 5 protected activity to support a retaliation claim.  While the Defendants have provided legitimate business reasons for the account allocations in 2019, the Plaintiff has presented evidence to raise a question of fact to support her retaliation claims and those disputed issue of fact must be resolved at trial.

The Plaintiff does not make any developed argument in support of her claim that the 2020 decisions regarding her bonus and the termination of her employment were motivated, at least in part, by the April 5, 2019 email.  The Plaintiff's evidence links these actions, if at all, to her 2019 pregnancy and maternity leave, not to the email.  While all of these events are to some extent interwoven, the length of time between the single expression of McKenna's fear about the reallocation of her accounts in her April 5, 2019 email and the 2020 events is too great to permit a jury to link the events through anything but speculation.

V.    Interference and Retaliation Under the Family Medical
      Leave Act

McKenna asserts that the Defendants interfered with her

rights under the FMLA and retaliated against her for exercising

those rights.   The Defendants contend that both of McKenna's

claims under the FMLA fail because she continued to work for

over a year after her FMLA leave and has not presented evidence

to refute the legitimate business reasons it has given for the

termination of her employment.

A. Legal Standard

"To succeed on a claim of FMLA interference, a plaintiff

must establish that the defendant denied or otherwise interfered

with a benefit to which she was entitled under the FMLA."

Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir.

2016) (citation omitted).

> [T]o prevail on a claim of interference with her FMLA
> rights, a plaintiff must establish: 1) that she is an
> eligible employee under the FMLA; 2) that the
> defendant is an employer as defined by the FMLA; 3)
> that she was entitled to take leave under the FMLA; 4)
> that she gave notice to the defendant of her intention
> to take leave; and 5) that she was denied benefits to
> which she was entitled under the FMLA.

Id.  Denial of FMLA benefits is interpreted flexibly.

"Interfering with the exercise of an employee's rights would

include, for example, not only refusing to authorize FMLA leave,

but discouraging an employee from using such leave."  29 C.F.R.

§ 825.220(b).  Interference also includes "discharging or in any

33

other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA]," Id. § 825.220(a)(2), and "induc[ing] employees to waive[ ] their prospective rights under FMLA." Id. § 825.220(d).

"To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Graziadio, 817 F.3d at 429 (citation omitted). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." Id.

> In a general sense, an employee brings an
> 'interference' claim when her employer has prevented
> or otherwise impeded the employee's ability to
> exercise rights under the FMLA. 'Retaliation' claims,
> on the other hand, involve an employee actually
> exercising her rights or opposing perceived unlawful
> conduct under the FMLA and then being subjected to
> some adverse employment action by the employer. The
> two types of claims serve as ex ante and ex post
> protections for employees who seek to avail themselves
> of rights granted by the FMLA.

Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d Cir. 2017).

B. Application

McKenna's FMLA interference claim must be dismissed.  She has identified no action by the Defendants that interfered with her taking any FMLA-protected leave or obtaining other FMLA benefits.  McKenna argues that the Defendants interfered with her FMLA rights when they reallocated her accounts.  But, as the Defendants observe, that contention is actually a retaliation claim.

McKenna has presented evidence to raise a question of fact as to her FMLA retaliation claim.  She has presented sufficient evidence from which a jury could find that the Defendants retaliated against her for her absences from the workplace in 2019 by permanently reallocating some of her accounts, reducing her 2019 bonus and terminating her employment.  While the Defendants have explained each of these actions, the disputed issues of fact must be resolved at trial.

VI.  Aiding and Abetting

McKenna argues that Kariuki can be liable under NYSHRL and NYCHRL for discrimination as both a primary and a secondary actor.  "[A]n individual cannot aid and abet his or her own violation of the Human Rights Law."  Hardwick v. Auriemma, 983 N.Y.S.2d 509, 513 (1st Dep't. N.Y. 2014).  As plaintiff sued Kariuki personally, and those claims remain in the lawsuit, he cannot have aided and abetted his own alleged acts of

discrimination and retaliation.  The Defendants' motion for summary judgment on McKenna's aiding and abetting claims is granted.

### Conclusion

The Defendants' March 28 motion for summary judgment is granted in part.  The Defendants are granted summary judgment on the following claims: (1) Discrimination in violation of Title VII and the PDA against Santander; (2) Retaliation in violation of Title VII against Santander; (3) Discrimination in violation of ADA against Santander; (4) Retaliation in violation of ADA against Santander; (5) Aiding and abetting claim in violation of NYSHRL against Kariuki; (6) Aiding and abetting under NYCHRL against Kariuki; (7) Disability discrimination in violation of NYSHRL against all Defendants; (8) Disability discrimination in violation of NYCHRL against all Defendants; (9) Interference under the FMLA against all Defendants.

The following claims will proceed to trial: (1) Discrimination in violation of NYSHRL as to the 2019 pregnancy against all Defendants; (2) Retaliation in violation of NYSHRL against all Defendants; (3) Discrimination in violation of NYCHRL as to the 2019 pregnancy against all Defendants; (4) Retaliation in violation of the NYCHRL against all Defendants;

(5) Retaliation under the FMLA against all Defendants.

Dated:      New York, New York
            July 28, 2022

                                     _____
                                            DENISE COTE
                                  United States District Judge